## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In Re: | § | |
| | § | |
| **OMEGA NAVIGATION ENTERPRISES,** | § | **Case No. [11-      ]** |
| **INC., et al.,**[1] | § | |
| | § | **Joint Administration Requested** |
| Debtors. | § | **Chapter 11** |

**DEBTORS' EMERGENCY MOTION FOR AN ORDER (I) AUTHORIZING THE DEBTORS TO PAY OR HONOR PREPETITION OBLIGATIONS TO FOREIGN VENDORS, SERVICE PROVIDERS AND GOVERNMENTS AND CERTAIN CRITICAL VENDORS, AND (II) AUTHORIZING FINANCIAL INSTITUTIONS TO HONOR ALL RELATED CHECKS AND ELECTRONIC PAYMENT REQUESTS**

> **IF YOU WANT A HEARING, YOU MUST REQUEST ONE IN WRITING AND YOU MUST RESPOND SPECIFICALLY TO EACH PARAGRAPH OF THIS PLEADING.  YOU MUST FILE YOUR RESPONSE WITH THE CLERK OF THE BANKRUPTCY COURT WITHIN TWENTY ONE (21) DAYS FROM THE DATE YOU WERE SERVED AND GIVE A COPY TO THE PERSON WHO SENT YOU THE NOTICE; OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF.**

> **IF A PARTY REQUESTS EMERGENCY CONSIDERATION, THE COURT MAY ACT EXPEDITIOUSLY ON THE MATTER.  IF THE COURT ALLOWS A SHORTER RESPONSE TIME THAN TWENTY ONE (21) DAYS, YOU MUST RESPOND WITHIN THAT TIME.  IF THE COURT SETS AN EMERGENCY HEARING BEFORE THE RESPONSE TIME WILL EXPIRE, ONLY ATTENDANCE AT THE HEARING IS NECESSARY TO PRESERVE YOUR RIGHTS.  IF AN EMERGENCY HEARING IS NOT SET, YOU MUST RESPOND BEFORE THE RESPONSE TIME EXPIRES.**

> **THE DEBTORS HAVE REQUESTED THAT THIS MOTION BE CONSIDERED AT THE DEBTORS' FIRST DAY HEARINGS.**

---

[1] The Debtors in these chapter 11 cases are Omega Navigation Enterprises, Inc.; Galveston Navigation Inc.; Beaumont Navigation Inc.; Carrolton Navigation Inc.; Decatur Navigation Inc.; Elgin Navigation Inc.; Fulton Navigation Inc.; Orange Navigation Inc.; Baytown Navigation Inc.; and Omega Navigation (USA) LLC.

Omega Navigation Enterprises, Inc. ("<u>Omega</u>")[2] et al., the above-captioned debtors and debtors-in-possession (together, the "<u>Debtors</u>"), by and through their undersigned proposed attorneys, hereby file this Emergency Motion For an Order (i) Authorizing the Debtors to Pay or Honor Prepetition Obligations to Foreign Vendors, Service Providers and Governments, and Certain Critical Vendors, and (ii) Authorizing Financial Institutions to Honor all Related Checks and Electronic Payment Requests (the "<u>Motion</u>") and in support thereof, respectfully represent as follows:

## I.  JURISDICTION AND VENUE

1.      This Court has jurisdiction over these matters pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue of these chapter 11 cases in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested in this Motion are §§ 105(a), 363(b)(1), 1107 and 1108 of Title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), and Rule 6003 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>").

## II. BACKGROUND

**Business Description**

2.      On July 8, 2011 (the "<u>Petition Date</u>"), the Debtors filed voluntary petitions for relief under chapter 11, Title 11 of the United States Code (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "<u>Court</u>").  Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors are operating their businesses and managing their property as debtors-in-possession.  The Debtors have requested

---

[2] Capitalized terms used but not otherwise defined in this Motion have the meanings ascribed to such terms in the Affidavit of Gregory McGrath (the "<u>First Day Affidavit</u>"), Chief Financial Officer of Omega Navigation Enterprises, Inc., filed on the Petition Date and incorporated herein by reference.

joint administration of these chapter 11 cases by motion filed concurrently herewith.  No trustees or examiners have been appointed in these cases.

3.        Omega is an international provider of marine transportation services focusing on seaborne transportation of refined petroleum products.  Omega was founded in 2005 and its corporate headquarters is in Athens, Greece.  Omega is the parent company of the Debtors, is incorporated in the Marshall Islands, and completed its initial public offering in April 2006. Omega's Class A Common Shares are traded on the NASDAQ National Market under the symbol "ONAV" and are also listed on the Singapore Exchange Securities Trading Limited under the symbol "ONAV 50."

4.        Together, the Debtors wholly own a fleet of eight high specification product tankers.  Each wholly-owned vessel is owned by a separate Debtor entity (each a "Vessel Owner"), all of which are wholly-owned by Omega.  The vessels have a combined cargo capacity of 512,358 deadweight tons (dwt).  All vessels in the Omega fleet are double hull in order to meet the International Maritime Organization regulations banning all single hull tankers by 2010 or 2015, depending on the port or flag state.  Omega's product tankers are designed to transport several different refined petroleum products simultaneously in segregated, coated cargo tanks.  These cargoes typically include gasoline, jet fuel, kerosene, naphtha, gas oil and heating oil.

5.        Omega generates revenues by employing its fleet of vessels on time charters as well as in the spot market.  For all of the wholly-owned vessels, Omega provides the commercial management in-house through the wholly-owned non-debtor subsidiary Omega Management, Inc.  This management includes obtaining employment for the vessels, negotiating charters, and managing relationships.

6.      Technical management of the vessels (e.g. managing day-to-day vessel operations, performing general vessel maintenance, ensuring regulatory and classification society compliance, oil majors vetting procedures, supervising the maintenance and general efficiency of vessels, arranging hire of qualified officers and crew, arranging and supervising drydocking and repairs, purchasing supplies, spare parts and new equipment for vessels, appointing supervisors and technical consultants and providing other technical support) is provided by the non-debtor Omega Management, Inc. for six of the vessels, and the remainder of the vessels are technically managed by a third party.   Omega is responsible for the strategic management of the fleet, including locating, obtaining financing for, purchasing and selling vessels and formulating and implementing overall business strategies.

**Description of Secured Debt**

7.      Omega is a borrower pursuant to that certain senior secured Facilities Agreement for a US$242,720,000.00 Term Loan dated April 7, 2006 (as amended, modified and supplemented), whereby HSH Nordbank AG is, among other things, appointed agent, security agent and trustee, and HSH Nordbank AG, Credit Suisse, The Governor and Company of the Bank of Scotland, and Dresdner Bank AG are lenders (the "Senior Facility").   Approximately $242.72 million is currently outstanding under the Senior Facility.   The Senior Facility is secured by, among other things, Vessel Owners' guarantees, first priority mortgages, first priority assignment of insurances in respect to the vessels, and first priority assignment of each of the vessels' earnings.

8.      Importantly, prior to initiating these bankruptcy proceedings, Omega filed two lawsuit in the Courts of the Hellenic Republic (the "Greece Litigation") against the lenders under the Senior Facility (the "Senior Lenders"), and Omega reserves its right to seek further damages or enforce the present lawsuits by the filing of additional suits.

9.     In the first suit, Omega asserts, among other things, that the Senior Lenders are in material breach of an agreement whereby they promised to extend the time for repayment of principal under the Senior Facility for three years from the original due date (i.e. extend to April 12, 2014).  The Senior Lenders have not honored their agreement and have refused to extend the repayment under the Senior Facility.  Omega also asserts, among other things, that the Senior Lenders have engaged in abusive exploitation of the relationship of financial dependence between the Debtors and the Senior Lenders and such conduct is opposite to the good faith and contractual ethics required by European standards of competition, and therefore such actions are invalid.  The claims of Omega for abusive exploitation of their dominant position are based on Article 82 of the European Convention and the related European Commission Regulation 1/2003, which are applicable in Greece, as well as pursuant to Greek Law 703/77.

10.     In the second lawsuit, Omega asserts, among other things, that Omega has been and continues to be seriously damaged by, among other things, the Senior Lenders' breach and abusive actions.  Such damages amount to approximately $570,000,000.00 (plus interest) at the time of filing the second suit, and, via the second suit, Omega seeks indemnification for such damages.

11.     Based on the Greece Litigation and the allegations therein, Omega disputes the obligations under the Senior Facility and the claims of the Senior Lenders, as well as the interests granted under the security documents related to the Senior Facility.

12.     Omega is also a borrower pursuant to that certain Junior Secured Loan Agreement for a loan of up to US$42,500,000.00 (as amended, modified and supplemented), whereby by The Bank of Tokyo-Mitsubishi UFJ, Ltd, New York Branch ("BTM") and NIBC Bank N.V. are swap banks, NIBC Bank N.V. is appointed agent, and BTM and NIBC Bank N.V. are lenders (the "Junior Credit Agreement," and together with the Senior Facility, the "Prepetition

Indebtedness"). Approximately $36.2 million is outstanding under the Junior Credit Agreement. The Junior Credit Agreement is secured by, among other things, Vessel Owners' guarantees, second priority mortgages, second priority assignment of insurances in respect to the vessels, and second priority assignment of each of the vessels' earnings.

13.     Together, the lenders under the Senior Facility and the Junior Credit Agreement are referred to herein as the "Prepetition Lenders." All collateral securing the Prepetition Indebtedness is referred to herein as the "Prepetition Collateral."

14.     Omega is also the borrower under a $5,250,000.00 secured demand convertible promissory note between Omega and One Investments, Inc. dated July 16, 2010 (the "Promissory Note"). The Promissory Note is due on demand at any time after its first anniversary. The Promissory Note is secured by a pledge of all shares of Omnicrom Holdings Ltd. and a guarantee by Omnicrom Holdings Ltd. Georgios Kassiotis is the president of One Investments, Inc. Mr. Kassiotis is also an officer of each of the Debtors and a director of each of the Debtors (except for Omega Navigation (USA) LLC, which is member managed).

### III. RELIEF REQUESTED

15.     Certain vendors, including many foreign based entities, (the "Critical Vendors") have claims for providing: (a) essential goods to the Debtors that were received by the Debtors before the Petition Date; and/or (b) essential services that were rendered to, or on behalf of, the Debtors before the Petition Date (collectively, the "Critical Vendor Claims"). By this Motion, the Debtors seek entry of an order pursuant to §§ 105(a), 363(b)(1), 1107(a) and 1108 of the Bankruptcy Code and Rule 6003 of the Federal Rules: (a) authorizing the Debtors, in their discretion, to pay all or part of the Critical Vendor Claims; and (b) authorizing banks and other financial institutions to receive, process, honor and pay and all checks and transfer requests

evidencing amounts paid by the Debtors under the order whether presented prior to or after the Petition Date.

16.     The Debtors estimate that the Critical Vendor payments will not exceed $2 million in the aggregate (the "Critical Vendor Fund").[3]  The Critical Vendor Fund represents less than one (1) percent of the Debtors' aggregate debt obligations as of the Petition Date.  The Debtors contemplate making payments on prepetition Critical Vendor Claims that become payable postpetition in the ordinary course of their businesses as and when they become due.  Additionally, for reasons described in detail below, the Debtors seek permission to make payments on certain prepetition Critical Vendor Claims that have come due prepetition in a manner, amount (subject to the dollar cap described in this paragraph) and time that is subject to the Debtors' discretion.

**Critical Vendor Claims**

17.     As described in the First Day Affidavit, the Debtors rely in the ordinary course of business on the Critical Vendors to supply goods, materials and services without which the Debtors' business either could not operate or would operate at significantly reduced profitability.  The Critical Vendors provide the Debtors with the following categories of goods and services:

(a)     Agents' Expenses and Costs.  Agents provide the crew with assistance in joining/signing off of the vessels.  Moreover, they arrange for necessary ship provisions and repairs, and organize the supply, transport and the handling of goods.  It is essential that the agents are paid so as not to disturb the smooth operations of the vessels worldwide.

(b)     Port Expenses.  Numerous port expenses are accrued by the vessels as they conduct their business throughout the world.  Pilotage, docking masters, towage, mooring, tugs, harbor dues, tonnage dues, etc. are incurred in ports throughout the world.  It is essential that such foreign debts be paid in order to ensure the vessels can continue to conduct business in foreign ports of call.

(c)     Lubes.  Lube oil is crucial to the operation of the engine and most other mechanical functions on board the vessels.  The Debtors obtain lube oil through long-term

---

[3] The Debtors reserve the right to seek to increase the Critical Vendor Fund at a later date if necessary, subject to this Court's approval.

relationships that offer significant volume discounts.  Any disruption to those relationships could have adverse economic consequences.

        (d)   <u>Crew Costs</u>.  Like most international shipping companies, the Debtors retain third party agents that employ and compensate the mostly foreign born highly skilled crew that work on their vessels.  The Debtors cannot risk any impairment to their relationship with these foreign third party manning agents or crews.

        (e)   <u>Cabin, Deck and Engine Stores</u>.  Stores consist of materials necessary to keep the vessels operating.  This may include communication systems, engineer's tools, chemicals, spare parts, safety equipment, cloth and linen products, rigging equipment, etc. Stores are often supplied by foreign vendors in close physical proximity to the vessels.  Stores are of a specialized nature, which makes it imperative that relationships with these vendors are maintained.

        (f)   <u>Bunkers</u>.  Bunker fuel is liquid fuel which powers the Debtors' vessels. Bunker fuel is typically provided by foreign vendors because it is necessary for such vendors to be in close physical proximity to the vessels.  It is essential to the locomotion of the vessels that the Debtors maintain healthy relationships with those vendors who provide them with bunker fuel.

        (g)   <u>Maintenance and Repair</u>.  It is essential that the vessels (e.g. engines, decks, communications equipment, radar, etc.) be maintained and repaired for safe and efficient operation.  Vendors providing these services are typically foreign, as close physical proximity to the vessels is required.

**The Need to Pay Maritime Critical Vendors**

18.     The Debtors believe that the payment of the Critical Vendor Claims is vital to the Debtors' reorganization efforts because, in various instances, the Critical Vendors are the only source or the most preferred source from which the Debtors can procure certain goods and services within a timeframe and at a price that will permit the Debtors to continue to smoothly operate their businesses.  A failure to pay the Critical Vendor Claims would likely result in many of the Critical Vendors refusing to provide goods and services to the Debtors postpetition and may force the Debtors to obtain such goods and services elsewhere at a higher price or in a quantity or quality that is insufficient to satisfy the Debtors' requirements.

19.     A vendor may be the exclusive or preferred supplier of products or services to the Debtors for a number of reasons.  In some cases, it may be the case that the only way that the

Debtors are able to purchase products or services in quantities of the desired amount is through a particular vendor.  For example, the Debtors' vessels require highly specialized replacement parts, and there are simply not many vendors in the world that can deliver those parts reliably.  In other cases, the Debtors have an established relationship with one vendor, and there is simply no available supply from any other vendor or the time and expense of getting another vendor "up to speed" with the Debtors' vessels and needs is not cost effective.  In other instances, due to preferred pricing from existing business relationships, procuring a particular supply of a certain product from an alternative source would be too expensive.

20.    The timing of a vendor's supply may also render it a Critical Vendor.  The Debtors are involved in a highly transactional and capital intensive business.  As a result, the Debtors are highly dependent on their ability to order and receive materials from vendors in a particular timeframe.  Current Critical Vendors are familiar with the Debtors numerous vessels and if, for example, a replacement part or specialized lube is needed at any port which the vessels frequent, the current Critical Vendors can deliver the right product.  Many of the Debtors' vessels are compensated at day rates, so any loss of time could result in financial loss.

21.    The Debtors believe that, absent the ability to pay certain prepetition amounts owed to Critical Vendors, the Debtors' access to necessary goods and services would be extinguished as the Critical Vendors will refuse to continue doing business with the Debtors or may only do business if the Debtors provide trade term accommodations such as advance deposits or payment prior to delivery.

22.    Most importantly, and unique to maritime bankruptcy cases such as these cases, the Critical Vendors supply the Debtors' vessels with goods or services that could arguably be considered "necessaries" as that term is understood under United States maritime law and the law

of other jurisdictions.[4]  Creditors alleging claims for necessaries under maritime law may claim a maritime lien against the Debtors' vessels.  Maritime liens are "secret liens" in that a lien claimant need not take any steps to attach or perfect its lien.  Any such claimant could seek to attach and arrest the respective Debtor vessel should it come to port.

23.     While the automatic stay is likely to provide protection from such attachment and arrest with regard to American vendors, there is no guarantee that international companies outside this Court's jurisdiction will respect the power of 11 U.S.C. § 362, especially as the vessels enter far flung foreign ports all over the world.[5]  Some of these jurisdictions may eventually recognize the automatic stay of United States bankruptcy law, but only after considerable delay and considerably effort on the part of the Debtors, all the while the Debtors could be losing day rate fees, as well as their reputation for timely delivering cargo.   Of course, other jurisdictions are unlikely to ever recognize United States bankruptcy law.

24.     Since the Critical Vendors may arguably be secured creditors and may have the ability to arrest the Debtors' vessels in foreign ports around the world, it is in the best interests of all parties to satisfy the Critical Vendor Claims of foreign vendors as described herein.

**Critical Vendor Payment Procedures**

25.     Prior to filing its petition under chapter 11, the Debtors assessed all of their vendors with possible outstanding claims as of the Petition Date.  The Debtors considered the following factors to determine who is a Critical Vendor:

        (a)     whether a vendor could claim a maritime lien on a vessel;

---

[4] The Debtors make no admission as to the nature of any claim or lien against any vessels based on necessaries, and reserve all rights with regard to same.

[5] For example, the Debtors' vessels recently entered port or are scheduled to enter port in Amsterdam, The Netherlands; Buenos Aires, Argentina; La Cruz, Venezuela; Cristobal, Panama; La Pampilia, Peru; Mamonal, Columbia; St. Eustatius, The Netherlands Antilles; Salina Cruz, Mexico; Freeport, Virgin Islands; Cotonou, Benin; Shanghai, China; Mombasa, Kenya.

(b)     whether a vendor is likely to make a claim for arrest of a vessel based on the existing Debtor-vendor relationship;

(c)     whether a vendor is likely to respect U.S. bankruptcy law;

(d)     whether a vendor is essential to the continued operation of the Debtor's business;

(e)     whether a vendor is replaceable without significant disruption to the Debtors' operations;

(f)     whether a vendor is entitled to a claim under § 503(b)(9);

(g)     whether a vendor is likely to continue doing business with the Debtors notwithstanding nonpayment of prepetition claims.

26.    The Debtors seek authority, but not direction, to pay Critical Vendors in either a lump-sum payment or over time based upon negotiations with each Critical Vendor and the Debtors' available cash flow.  The Debtors will use their best efforts to condition payments as to Critical Vendors, as is practical, upon each Critical Vendor's agreement to continue supplying goods and services to the Debtors throughout the chapter 11 cases on the normal and customary trade terms, practices and programs that were in effect between the Debtors and the Critical Vendor prior to the Petition Date.

## IV. BASIS FOR RELIEF

27.    Ample authority exists to allow payment of the Critical Vendor Claims.  Courts have generally acknowledged that it is appropriate to authorize the payment (or other special treatment) of prepetition obligations in appropriate circumstances.  In authorizing payments of certain prepetition obligations, courts have relied on several legal theories, rooted in §§ 1107(a), 1108, 363(b) and 105(a) of the Bankruptcy Code.

**Sections 1107(a) and 1108 of the Bankruptcy Code and the Debtors' Fiduciary Duties**

28.    Pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code, debtors in possession are fiduciaries acting "to protect and preserve the estate, including an operating business's going-

concern value," on behalf of the debtors' creditors and other parties in interest.  *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *In re Co Serv, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002)).  Implicit in the fiduciary duties of any debtor-in-possession is the obligation to "protect and preserve the estate, including an operating business's going-concern value."  *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002).  Some courts have noted that there are instances in which a debtor can fulfill this fiduciary duty "only…by the preplan satisfaction of a prepetition claim."  *Id.*  The CoServ court specifically noted that the preplan satisfaction of prepetition claims would be a valid exercise of the debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate…."  *Id.*

**Section 363(b) of the Bankruptcy Code and a Sound Business Justification**

29.    Consistent with the debtor's fiduciary duties, courts have also authorized payment of prepetition obligations under § 363(b)(1) of the Bankruptcy Code where a sound business purpose exists for doing so.  *See* 11 U.S.C. § 363(b)(1).  *See, e.g., Tropical Sportswear*, 320 B.R. 15, 17-18 (M.D. Fla. 2005) (court authorized payment to critical vendors for prepetition amounts when a sound business justification existed because the vendors would not do business with the debtors absent the critical vendor status, and the disfavored creditors were not any worse off due to the critical vendor order); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (sound business justification existed to justify payment of prepetition wages); *see also Armstrong World Indus., Inc. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.)*, 29 B.R. 391, 397 (Bankr. S.D.N.Y. 1983) (relying on § 363, court allowed contractor to pay prepetition claims of suppliers who were potential lien claimants because the payments were necessary for general contractors to release funds owed to debtors).  To do so, "the debtor must articulate some business justification, other than the mere appeasement of major creditors."  *Ionosphere Clubs*,

98 B.R. at 175.  As discussed above, the Debtors' failure to pay the Critical Vendor Claims may severely disrupt the Debtors' operations and their business.

**Section 105(a) of the Bankruptcy Code and the Necessity of Payment Doctrine**

30.     In addition, the Court may authorize payment of prepetition claims in appropriate circumstances based on § 105(a) of the Bankruptcy Code.  Section 105(a), which codifies the inherent equitable powers of the bankruptcy court, empowers the bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  Under § 105(a), courts may permit pre-plan payments of prepetition obligations when essential to the continued operation of the debtor's business.  Specifically, the Court may use its power under § 105(a) to authorize payment of prepetition obligations pursuant to the "necessity of payment" rule (also referred to as the "doctrine of necessity").  The Court may, therefore, issue any order "necessary or appropriate" to allow a debtor-in-possession to fulfill its duty to preserve the business' going-concern value, including an order authorizing payment in full or in part of certain prepetition claims of unsecured creditors prior to confirmation of a plan. *See In re CoServ*, 273 B.R. at 496-97; *see also In re Mirant Corp., et al.*, 296 B.R. 427, 429-30 (Bankr. N.D. Tex. 2003).

31.     The "doctrine of necessity" or the "necessity of payment" rule originated in railway cases and was first articulated in *Miltenberger v. Logansport, C.&S.W.R. Co.*, 106 U.S. 286 (1882).  The doctrine was expanded to non-railroad debtors in the mid-century, *see Dudley v. Mealey*, 147 F.2d 268, 271 (2d Cir. 1945) (holding, in a hotel reorganization case, that the court was not "helpless" to apply the rule to supply creditors of non-railroad debtors where the alternative was the cessation of operations).  Today, the rationale for the necessity of payment rule—the rehabilitation of a debtor in reorganization cases—is "the paramount policy and goal of Chapter 11," *Ionosphere Clubs, Inc.*, 98 B.R. at 176 (Bankr. S.D.N.Y. 1989).  *See also In re*

*Lehigh & New England Ry.*, 657 F.2d 570, 581 (3d Cir. 1981) (noting that the "doctrine of necessity" permits "immediate payment of claims to creditors where those creditors will not supply services or material essential to the conduct of the business until their pre-reorganization claims shall have been paid"); *In re Boston & ME. Corp.*, 634 F.2d 1359, 1382 (1st Cir. 1980) (recognizing the existence of a judicial power to authorize trustees to pay claims for goods and services that are indispensably necessary to the debtor's continued operation); *In re CoServ*, 273 B.R. at 500 (permitting chapter 11 debtor to pay the claim of a prepetition general unsecured creditor in full because the "[d]ebtors very likely must deal with [such creditor] or risk harm to their estates or their going concern value").

32.     Courts in this district and elsewhere routinely authorize chapter 11 debtors to pay prepetition claims of non-priority general unsecured creditors when payment is necessary to preserve or enhance the value of the debtor's estate to the benefit of all creditors.  *See, In re Equalnet Commc'ns Corp.,* 258 B.R. 368, 369-70 (Bankr. S.D. Tex. 2000) (business transactions critical to the survival of the business of the debtor are exceptions to the general rule of nonpayment of prepetition claims prior to plan confirmation); *see also In re CoServ L.L.C,* 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (recognizing the "doctrine of necessity"); *In re Mirant Corp.,* 296 B.R. 427, 429 (Bankr. N.D. Tex. 2003) (noting that because payment of prepetition claims outside a plan has become commonplace, and a vendor might condition future dealings with a debtor on payment of its prepetition claim, a motion to pay critical vendors would be granted); *In re Lehigh & New England Ry. Co.,* 657 F.2d 570, 581 (3d Cir. 1981) (stating that courts may authorize payment of pre-petition claims where there "is the possibility that the creditor will employ an immediate economic sanction, failing such payment"); *In re Just For Feet,* 242 B.R. 821, 825 (Bankr. D. Del. 1999) ("to invoke the necessity of payment doctrine, a debtor must show that payment of the pre-petition claim is critical to the debtor's

reorganization"); *In re Columbia Gas Sys., Inc.,* 171 B.R. 189, 191-92 (Bankr. D. Del. 1994) (same).

33.     Oftentimes, the debtor must satisfy a prepetition claim in order to preserve its business. *In re CoServ*, 273 B.R. at 497.  Payment of prepetition claims is necessary, and may be authorized, whenever it is established that (1) it is critical that the debtor deal with the claimant, (2) a failure to deal with the claimant risks probable harm or eliminates an economic advantage disproportionate to the amount of the claim, and (3) there is no practical or legal alternative to payment of the claim (the "CoServ Test").  *Id.* at 498 (giving examples of when payment of prepetition claims is required to preserve the debtor's business and thus, justified: those that "require payment to avoid loss of a license through the exercise of a jurisdiction's police power," claims, such as warranty or refund claims, that could harm the debtor's good will and destroy its going concern value, or where payment of the prepetition unsecured claim is the "only means to effect a substantial enhancement of the estate").

34.     Advance proof of necessity of payment, however, is not required in every instance. *See In re Mirant Corp.*, 296 B.R. at 429; *In re Bombay Company, Inc., et al.*, Case No. 07-44084 (Bankr. N.D. Tex. 2007) [Docket No. 58].  A chapter 11 debtor, especially early in the case, is in a "precarious position," and serious damage could occur to the debtor's business if courts required advance proof that each payment of a prepetition claim was necessary within the meaning of the CoServ Test.  *In re Mirant*, 269 B.R. at 429.  Therefore, courts often grant the debtor general authority to pay the prepetition claims of critical vendors as necessary.  *Id.* at 429.

35.     The Debtors' request for relief is appropriate under the foregoing standards. As stated above, the payment of the Critical Vendor Claims is essential to the uninterrupted operation of the Debtors' business. In turn, the maintenance of the Debtors' business during these chapter 11 cases is crucial to the Debtors' ability to rehabilitate for the benefit of all stakeholders.

Courts in this district have granted similar relief in other chapter 11 cases where the payment of critical vendor claims was necessary to the debtors' continued operation. *See, e.g., In re Mirant,* 296 B.R. 427 (Bankr. N.D. Tex. 2003); *In re Equalnet Commc'ns Corp.,* 258 B.R. at 367-70 (Bankr. S.D. Tex. 2000); *In re U.S. InterMex Transp., LLC*, Case No. 10-70033, Docket No. 83 (Bankr. S.D. Tex. March 3, 2010); *In re Express Energy Servs. Operating, LP*, Case No. 09-38044, Docket No. 37 (Bankr. S.D. Tex. Oct. 29, 2009); *In re Edge Petroleum Corp.*, Case No. 09-20644, Docket No. 46 (Oct. 5, 2009); *In re Corpus by the Sea, LLC*, Case No. 09-20491, Docket No. 19 (Bankr. S.D. Tex. Aug. 6, 2009); *In re Texas Petrochemicals, LP,* Case No. 03-40258-H3-11, Docket No. 85, (Bankr. S.D. Tex. July 31, 2003); *In re Philip Servs. Corp., et al.,* Case No. 03-37718-H2-11, Docket Nos. 24, 56 and 526 (Bankr. S.D. Tex. June 2, 2003, June 9, 2003 and Aug. 4, 2003); *In re TransCom USA Mgmt. Co.,* Case No. 01-35158-H5-11, Docket No. 44 (Bankr. S.D. Tex. May 16, 2001); *In re Agrifos Fertilizer,* Case No. 01-35220-H2-11, Docket No. 23 (Bankr. S.D. Tex. May 10, 2001); *In re Drypers Corp.,* Case No. 00-39360-H4-11, Docket No. 43 (Bankr. S.D. Tex. Oct. 13, 2000); *In re Pioneer Cos., Inc., et al.,* Case No. 01-38259-H3-11, Docket Nos. 30 and 78 (Bankr. S.D. Tex. Aug. 1, 2001 and Aug. 17, 2001); *In re Highland Health Servs., Inc.,* Case No. 01-35491-H5-11, Docket No. 23 (Bankr. S.D. Tex. May 16,2001).

**Request for Immediate Relief**

36.     Pursuant to the recently revised Bankruptcy Rule 6003, to the extent that relief is necessary to avoid immediate and irreparable harm, a court may grant relief regarding a motion to pay all or part of a prepetition claim that arose before the Petition Date prior to twenty-one (21) days after the filing of the petition.  As described above, the Critical Vendors are vital to the Debtors' business operations because they supply the Debtors with goods, materials and services without which the Debtors' business operations either could not operate or would operate at

significantly reduced profitability. Additionally, the Critical Vendors may have the power to attach and arrest the Debtors' vessels in foreign ports of call and such actions would cripple the Debtors' operations.

37.     Taken together, the nature of the prepetition claims of the Critical Vendors, the substantial harm to the Debtors' business that would be caused if those obligations are not honored and the related potential for loss of value in the Debtors' estates, all lead to the conclusion that the prepetition claims of the Critical Vendors fall well within the scope of obligations whose payment may be authorized, but not directed, pursuant to the doctrine of necessity and the other legal theories set forth above.

**Honoring Prepetition Checks and Electronic Transfers**

38.     The Debtors further seek entry of an order authorizing and directing all applicable banks and other financial institutions to receive, process, honor and pay any and all checks drawn on electronic funds transferred to pay Critical Vendor Claims, whether such checks were presented prior to or after the Petition Date; provided, however, that such checks or electronic transfers are identified by the Debtors as relating to the authorized payment of Critical Vendor Claims.   The Debtors also seek authority to issue new postpetition checks, or effect new electronic fund transfers, on account of such claims to replace any prepetition checks or electronic fund transfer requests that may be dishonored or rejected as a result of the commencement of the Debtors' chapter 11 cases.

39.     The Debtors represent that they have sufficient availability of funds to pay the amounts described herein in the ordinary course of business by virtue of cash reserves and expected cash flows from ongoing business operations.   Also, under the Debtors' existing cash management system, the Debtors represent that checks or wire transfer requests can be readily identified as relating to an authorized payment made to a Critical Vendor.   Accordingly, the

Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently and that all applicable financial institutions should be authorized, when requested by the Debtors, to receive, process, honor and pay any and all checks or wire transfer requests in respect of the Critical Vendor Claims.

## V.  DEBTORS' RESERVATION OF RIGHTS

40.     Nothing contained herein is or should be construed as: (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' right to dispute any claim on any grounds; (c) a promise to pay any claim; (d) an assumption or rejection of any executory contract or unexpired lease pursuant to Bankruptcy Code § 365; or (e) otherwise affect the Debtors' rights under Bankruptcy Code § 365 to assume or reject any executory contract with any party subject to this Order.  If this Court grants the relief sought herein, any payments made pursuant to the Court's order is not intended and should not be construed as an admission to the validity of any claim or a waiver of the Debtor's rights to dispute such claim subsequently.

## VI. NOTICE

41.     Notice of this Motion has been or will be provided to (a) the Office of the United States Trustee for the Southern District of Texas, (b) all known or alleged secured creditors, (c) the 30 largest unsecured non-insider creditors of the Debtors (on a consolidated basis), (d) all known shareholders holding over 5% of a class of equity interests of Omega Navigation Enterprises, Inc., (e) all Debtor professionals, (f) all members of any official committee of unsecured creditors that may be appointed, (g) counsel for, and any professionals retained by, any official committee of unsecured creditors that may be appointed, (h) the United States Attorney's Office for the Southern District of Texas, (i) the Internal Revenue Service, (j) any persons who have filed a request for notice pursuant to Bankruptcy Rule 2002, and (k) any such

other government agencies to the extent required by the Bankruptcy Rules and Local Rules.  The

Debtors submit that no further notice of this Motion is required.

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that the Court enter an order, (a) authorizing, but not directing, the Debtors to pay the prepetition claims of the Critical Vendors up to the aggregate amount of the Critical Vendor Fund and (b) authorizing financial institutions to receive, process, honor and pay checks presented for payment and electronic payment requests related to the Critical Vendor Claims.

Respectfully submitted,

**BRACEWELL & GIULIANI LLP**

By:  _/s/ William A. (Trey) Wood III_____
       William A. (Trey) Wood III
       Texas Bar No. 21916050
       Trey.Wood@bgllp.com
       Jason G. Cohen
       Texas Bar No. 24050435
       Jason.Cohen@bgllp.com
       711 Louisiana, Suite 2300
       Houston, Texas 77002
       Telephone: (713) 223-2300
       Facsimile:  (713) 221-1212

       -and-

       Evan Flaschen
       Conn. Bar No. 304232
       Evan.Flaschen@bgllp.com
       Ilia M. O'Hearn
       Conn. Bar No. 423613
       Ilia.OHearn@bgllp.com
       Goodwin Square
       225 Asylum Street, Suite 2600
       Hartford, CT 06103
       Telephone: (860) 947-9000
       Facsimile:  (860) 246-3201

       **PROPOSED COUNSEL FOR THE DEBTORS AND DEBTORS-IN-POSSESSION**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on July 8, 2011, a true and correct copy of this document was served on all parties on the attached master service list by electronic means as listed on the court's ECF noticing system, by electronic mail as indicated, and by United States first class mail, postage prepaid.

*/s/ Jason G. Cohen*

Jason G. Cohen