**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In Re: | § | |
| | § | |
| **OMEGA NAVIGATION ENTERPRISES,** | § | **Case No. [11-      ]** |
| **INC., et al.,**[1] | § | |
| | § | **Joint Administration Requested** |
| Debtors. | § | **Chapter 11** |

**DECLARATION OF GREGORY McGRATH IN SUPPORT OF DEBTORS'**
**VOLUNTARY PETITIONS UNDER CHAPTER 11 OF TITLE 11 OF**
**THE UNITED STATES CODE AND FIRST DAY MOTIONS**

I, Gregory McGrath, state as follows:

**I.  INTRODUCTION**

1.      I am the Chief Financial Officer of Omega Navigation Enterprises, Inc., a corporation formed under the laws of the Republic of the Marshall Islands ("Omega").  Omega is the parent company for the affiliated debtors in the above captioned chapter 11 cases (together, the "Debtors").  I am familiar with the Debtors' day-to-day operations, business affairs, books and records.

2.      I submit this declaration (the "Declaration") to assist the Court and other parties-in-interest in understanding the circumstances that compelled the commencement of these chapter 11 cases and in support of (i) the Debtors' voluntary petitions for relief under chapter 11 of the Bankruptcy Code filed on July 6, 2011 (the "Petition Date") and (ii) the relief, in the form of motions, that the Debtors have requested of the Court (the "First Day Motions").  Any

---

[1] The Debtors in these chapter 11 cases are Omega Navigation Enterprises, Inc.; Galveston Navigation Inc.; Beaumont Navigation Inc.; Carrolton Navigation Inc.; Decatur Navigation Inc.; Elgin Navigation Inc.; Fulton Navigation Inc.; Orange Navigation Inc.; Baytown Navigation Inc.; and Omega Navigation (USA) LLC.

capitalized term not expressly defined herein shall have the meaning ascribed to that term in the relevant First Day Motion.

3.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtors' management and other of the Debtors' advisors and employees, my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtors' operations and financial condition.  If I were called to testify, I would testify competently to the facts set forth in this Declaration.  I am authorized to submit this Declaration on behalf of the Debtors.

4.      This Declaration is intended to provide a summary overview of the Debtors and these chapter 11 cases.  This Declaration describes the Debtors' businesses and the Debtors' debt, and summarizes the First Day Motions supported by this Declaration.

## II. DEBTORS' BUSINESSES

5.      On the Petition Date, the Debtors filed voluntary petitions for relief under chapter 11, Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Court").  Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors are operating their businesses and managing their property as debtors-in-possession.  The Debtors have requested joint administration of these chapter 11 cases by motion filed concurrently herewith.  No trustees or examiners have been appointed in these cases.

6.      With their original petitions, the Debtors contemporaneously filed a Notice of Designation as Complex Chapter 11 Bankruptcy Case.

7.      Omega is an international provider of marine transportation services focusing on seaborne transportation of refined petroleum products.  Omega was founded in 2005 and its corporate headquarters is in Athens, Greece.  Omega is the parent company of the Debtors, is

incorporated in the Marshall Islands, and completed its initial public offering in April 2006. Omega's Class A Common Shares are traded on the NASDAQ National Market under the symbol "ONAV" and are also listed on the Singapore Exchange Securities Trading Limited under the symbol "ONAV 50."

8.      Together, the Debtors wholly own a fleet of eight high specification product tankers.  Each wholly-owned vessel is owned by a separate Debtor entity (each a "Vessel Owner"), all of which are wholly-owned by Omega.  The vessels have a combined cargo capacity of 512,358 deadweight tons (dwt).  All vessels in the Omega fleet are double hull in order to meet the International Maritime Organization regulations banning all single hull tankers by 2010 or 2015, depending on the port or flag state.  Omega's product tankers are designed to transport several different refined petroleum products simultaneously in segregated, coated cargo tanks.  These cargoes typically include gasoline, jet fuel, kerosene, naphtha, gas oil and heating oil.

9.      Omega is also an ultimate parent of a non-debtor joint venture through its wholly owned subsidiary Omnicrom Holdings Ltd.  Omnicrom Holding Ltd. is a 50/50 partner in two asset owning entities—Stone Shipping Ltd. and Onest Shipping Ltd., which, in turn own Blizzard Navigation Inc. and Tornado Navigation Inc., the owners of the *Omega Duke* and the *Alpine Marina*, respectively.  Omnicrom Holdings Ltd.'s 50/50 partner in this joint venture is Topley Corporation, a wholly owned subsidiary of Glencore International AG ("Glencore").

10.      Finally, Omega wholly owns Omega Investments Ltd, which is an 80% owner of OD Investment Ltd. (Delos Shipping Ltd., a non-affiliated non-debtor third party, owns the remaining 20% interest in OD Investment Ltd.).  Until recently, OD Investment Ltd. owned 50% of Megacore Shipping Ltd., which was formed as a joint venture with Topley Corporation.

Megacore Shipping Ltd. wholly owned nine corporations, each of which owned one vessel (or one hull under construction). However, as of June 30, 2011, Topley Corporation exercised its right to terminate the Megacore Shipping, Ltd. joint venture. Pursuant to the termination provisions of the Megacore Shipping Ltd. joint venture agreement, eight of the nine vessel/hull owning subsidiaries were evenly divided among OD Investment Ltd. and Topley Corporation. Specifically, OD Investment Ltd. took possession of entities owing the *Megacore Honami* and *Megacore Philomena* as well as the rights to Hull 2299 and Hull 2295, which are currently under construction in Korea. The ninth and final vessel was sold to Topley Corporation with the net proceeds distributed between the former joint venture parties.

11.     An organizational chart showing the Debtor entities, non-debtor affiliates, and the vessel owned by each, if any, is attached hereto as **Exhibit A**. A chart showing the Debtors' vessels' class, flag, dwt, year built and shipyard of origin is attached hereto as **Exhibit B**.

12.     All vessels in the Omega fleet are double hull in order to meet the International Maritime Organization regulations banning all single hull tankers by 2010 or 2015, depending on the port or flag state. Omega's product tankers are designed to transport several different refined petroleum products simultaneously in segregated, coated cargo tanks. These cargoes typically include gasoline, jet fuel, kerosene, naphtha, gas oil and heating oil.

13.     Omega does not own any real property or any material assets other than the vessels in the fleet.

14.     Omega generates revenues by employing its fleet of vessels on time charters as well as in the spot market. For all of the wholly-owned vessels, Omega provides the commercial management in-house through the wholly-owned non-debtor subsidiary Omega Management,

Inc.  This management includes obtaining employment for the vessels, negotiating charters, and managing relationships.

15.     Technical management of the vessels (e.g. managing day-to-day vessel operations, performing general vessel maintenance, ensuring regulatory and classification society compliance, oil majors vetting procedures, supervising the maintenance and general efficiency of vessels, arranging hire of qualified officers and crew, arranging and supervising drydocking and repairs, purchasing supplies, spare parts and new equipment for vessels, appointing supervisors and technical consultants and providing other technical support) is provided by the non-debtor Omega Management, Inc. for six of the vessels, and the remainder of the vessels are technically managed by a third party.  Omega is responsible for the strategic management of the fleet, including locating, obtaining financing for, purchasing and selling vessels and formulating and implementing overall business strategies.

16.     The global recession lessened demand for international charter shipping of refined petroleum products, and this negatively impacted Omega's business.  Additionally, at the time Omega undertook its senior debt obligations described below, and also thereafter, Omega was promised by its senior lenders that Omega would receive a three year extension on its senior debt facility if certain conditions were met.  Omega believes it has met those conditions, yet Omega's senior lenders have not consented to the agreed upon extension.  Consequently, under threat of default and acceleration, Omega has been forced to file these chapter 11 cases to protect its interests.  Omega has initiated litigation against its senior lenders, as described in more detail below.

### III.  CAPITAL STRUCTURE

**Omega Secured Debt**

17.    Omega is a borrower pursuant to that certain senior secured Facilities Agreement for a US$242,720,000.00 Term Loan dated April 7, 2006 (as amended, modified and supplemented), whereby HSH Nordbank AG is, among other things, appointed agent, security agent and trustee, and HSH Nordbank AG, Credit Suisse, The Governor and Company of the Bank of Scotland, and Dresdner Bank AG are lenders (the "Senior Facility").  Approximately $242.72 million is currently outstanding under the Senior Facility.  The Senior Facility is secured by, among other things, Vessel Owners' guarantees, first priority mortgages, first priority assignment of insurances in respect to the vessels, and first priority assignment of each of the vessels' earnings.

18.    Importantly, prior to initiating these bankruptcy proceedings, Omega filed two lawsuit in the Courts of the Hellenic Republic (the "Greece Litigation") against the lenders under the Senior Facility (the "Senior Lenders"), and Omega reserves its right to seek further damages or enforce the present lawsuits by the filing of additional suits.

19.    In the first suit, Omega asserts, among other things, that the Senior Lenders are in material breach of an agreement whereby they promised to extend the time for repayment of principal under the Senior Facility for three years from the original due date (i.e. extend to April 12, 2014).  The Senior Lenders have not honored their agreement and have refused to extend the repayment under the Senior Facility.  Omega also asserts, among other things, that the Senior Lenders have engaged in abusive exploitation of the relationship of financial dependence between the Debtors and the Senior Lenders and such conduct is opposite to the good faith and contractual ethics required by European standards of competition, and therefore such actions are invalid.  The claims of Omega for abusive exploitation of their dominant position are based on

Article 82 of the European Convention and the related European Commission Regulation 1/2003, which are applicable in Greece, as well as pursuant to Greek Law 703/77.

20.     In the second lawsuit, Omega asserts, among other things, that Omega has been and continues to be seriously damaged by, among other things, the Senior Lenders' breach and abusive actions.  Such damages amount to approximately $570,000,000.00 (plus interest) at the time of filing the second suit, and, via the second suit, Omega seeks indemnification for such damages.

21.     Based on the Greece Litigation and the allegations therein, Omega disputes the obligations under the Senior Facility and the claims of the Senior Lenders, as well as the interests granted under the security documents related to the Senior Facility.

22.     Omega is also a borrower pursuant to that certain Junior Secured Loan Agreement for a loan of up to US$42,500,000.00 (as amended, modified and supplemented), whereby by The Bank of Tokyo-Mitsubishi UFJ, Ltd, New York Branch ("BTM") and NIBC Bank N.V. are swap banks, NIBC Bank N.V. is appointed agent, and BTM and NIBC Bank N.V. are lenders (the "Junior Credit Agreement," and together with the Senior Facility, the "Prepetition Indebtedness").  Approximately $36.2 million is outstanding under the Junior Credit Agreement. The Junior Credit Agreement is secured by, among other things, Vessel Owners' guarantees, second priority mortgages, second priority assignment of insurances in respect to the vessels, and second priority assignment of each of the vessels' earnings.

23.     Together, the lenders under the Senior Facility and the Junior Credit Agreement are referred to herein as the "Prepetition Lenders."  A coordination agreement governs the relative rights and priorities between the Prepetition Lenders.

24.     Omega is also the borrower under a $5,250,000.00 secured demand convertible promissory note between Omega and One Investments, Inc. dated July 16, 2010 (the "<u>Promissory Note</u>").   The Promissory Note is due on demand at any time after its first anniversary.   The Promissory Note is secured by a pledge of all shares of Omnicrom Holdings Ltd. and a guarantee by Omnicrom Holdings Ltd.   Mr. Kassiotis, president and chief executive officer of Omega, is the president of One Investments, Inc.

25.     An organizational chart showing the debt structure of the Debtors is attached hereto as **Exhibit C**.

## IV.  FIRST DAY MOTIONS

**Emergency Motion Pursuant to Rule 1015 of the Federal Rules of Bankruptcy Procedure Requesting Joint Administration of Chapter 11 Cases**

26.     The Debtors anticipate that, during the course of these cases, it will be necessary to file numerous motions and applications, as well as other pleadings and documents, seeking relief on behalf of all Debtors.   To accomplish this as efficaciously as possible, the Debtors seek joint administration of their cases under the Omega Navigation Enterprises, Inc. case.   The Debtors respectfully submit that joint administration of their chapter 11 cases is in the best interests of their estates, creditors, and other parties-in-interest; and will further the interests of judicial economy and administrative expediency by, among other things, obviating the need to: (i) file duplicate motions, (ii) enter duplicate orders, and (iii) forward unnecessary, duplicate notices and other documents to creditors and other parties-in-interest, which actions would cause the Debtors' estates to incur unnecessary costs and expenses.

**Emergency Motion to Extend Time to File Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases, and Statement of Financial Affairs**

27.     Due to the size and complexity of the Debtors' operations and these cases, the Debtors anticipate that they will be unable to complete their Schedules and Statements in the

fifteen (15) days provided under Bankruptcy Rule 1007(c).  To prepare their Schedules and Statements, the Debtors must compile information from books, records, and documents relating to numerous claims, assets, and contracts.  This information may be voluminous and is located in numerous places throughout the Debtors' organization.  Collecting the necessary information requires the Debtors and their limited staff to expend a large amount of time and effort.

28.    The Debtors believe that it will take no more than forty-five (45) days to complete, review, and file the Schedules and Statements.  No creditor or other party in interest will be prejudiced by the requested extension of time for the filing of the Schedules and Statements.

**Emergency Motion for an Order, Pursuant to Bankruptcy Code §§ 105, 361, 362, and 363 and Bankruptcy Rules 2002, 4001, and 9014, (i) Authorizing the Debtors to Use Cash Collateral of Existing Secured Lenders, (ii) Granting Adequate Protection for the Use Thereof, and (iii) Scheduling a Final Hearing.**

29.    As a consequence of the prepetition secured financing, all cash in the Debtors' possession or in which the Debtors have an interest on and after the Petition Date may constitute asserted cash collateral ("Cash Collateral") in which the Prepetition Lenders may assert an interest within the meaning of § 363(a) of the Bankruptcy Code.

30.    The Debtors have an urgent need for the immediate use of the Cash Collateral. The operation of the Debtors' eight wholly owned vessels is extremely capital intensive, and any lapse in operations, no matter how transitory, could have a devastating economic impact on the going concern value of the Debtors' business.  For example, the Debtors incur ongoing operating expenses related to navigating vessels on the high seas, which costs include crew costs, provisions, deck and engine stores, lubricating oils, insurance, maintenance and repairs, bunkers, port expenses, etc.  Absent the use of Cash Collateral, these expenses cannot be met and the sole

income producing assets of the Debtors—the vessels—will be unable to operate and could possibly be subject to maritime liens and the threat of seizure at international ports.

31.     Accordingly, the Debtors face "immediate and irreparable harm to the estate" absent the emergency consideration of the relief requested in the cash collateral motion.  The immediate use is necessary, and it will stabilize the Debtors' operations and revenue by paying ordinary, postpetition operating expenses, as well as any court approved prepetition expenses that may be at issue.  Without authority to use Cash Collateral, the Debtors will not be able to function as a going concern, and will not be able to proceed to consideration of a plan of reorganization.  Accordingly, authority to use Cash Collateral is necessary to avoid the shutdown of the Debtors' businesses, and will be in the best interests of the Debtors, their estate and their creditors.

32.     The Debtors believe that the Prepetition Lenders are adequately protected for the use of the Cash Collateral in that the orderly liquidation value of the Prepetition Lenders' collateral exceeds the amounts outstanding under the Senior Facility and Junior Credit Agreement.  Specifically, as of the Petition Date, the Prepetition Lenders' combined debt was approximately $278.9mm as of the Petition Date and the book value of the vessels exceeded $390mm.

33.     Additionally, the Debtors intend to provide further adequate protection, to the extent of any diminution in value, to the Prepetition Lenders for the use of the Cash Collateral by offering to maintain the going concern value of the Prepetition Lenders' collateral by using the Cash Collateral to continue to operate the business and by providing to the Prepetition Lenders postpetition replacement liens pursuant to 11 U.S.C. § 361(2) in accounts receivable, including cash generated or received by the Debtors subsequent to the Petition Date, but only to the extent

that the Prepetition Lenders had valid, perfected prepetition liens and security interests in such collateral as of the Petition Date.  The priority of any postpetition replacement liens granted to the Prepetition Lenders shall be the same as existed as of the Petition Date.

34.     The Debtors seek permission to use Cash Collateral solely to pay the expenses described in the expenditures contained in the budget attached to the cash collateral motion (the "Interim Budget") for the Interim Period, solely up to the amounts, at the times and for the purposes identified in the Interim Budget.  The Debtors shall not, without the prior written consent of the Prepetition Lenders, use Cash Collateral with respect to any single week in the Interim Budget in an amount in excess of the aggregate amount budgeted for that week, provided however, that there shall be a permitted variance of 15% in the aggregate for any amounts listed in the Interim Budget for a particular week.  Notwithstanding the foregoing, for exceptional, unanticipated expenditures that are not contemplated by the budget, the Debtors and the Prepetition Lender may agree that such expenditures, if approved, are not credited against the permitted aggregate variance.  Any amounts listed in the Interim Budget that are unused in any week may be carried over and used by the Debtors in any subsequent week and any unused amounts may be utilized for any other line item within the week or a subsequent week or weeks.

**Emergency Motion for an Order (i) Authorizing Continued Use of Existing Business Forms and Records, (ii) Authorizing Maintenance of Existing Corporate Bank Accounts and Cash Management System, and (iii) Waiving the Requirements of 11 U.S.C. § 345(b)**

35.     Prior to commencing these cases, in the ordinary course of their businesses, the Debtors used a cash management system (the "Cash Management System") to efficiently collect, transfer, and disburse funds generated by their business operations.

36.     The Debtors respectfully request authority to maintain the Accounts and the Cash Management System in accordance with their usual and customary practices to ensure a smooth

transition into chapter 11 with minimal disruption to operations. The Debtors also request authority to close any of the Accounts if, in the exercise of their business judgment, the Debtors determine that such action is in the best interest of their estates.

37.     In order to conduct their postpetition business, the Debtors need to be able to issue checks to vendors, service providers, employees, and others. The Accounts are maintained with financial institutions that are financially stable. For instance, the Cash Intake Accounts and Concentration Account are maintained at HSH Nordbank AG, which keeps a Moody's rating of A3 and a Fitch Rating of A- on unguaranteed liabilities. To open new accounts and obtain checks for those accounts will cause delay and disruption to the Debtors' business and a delay in receipt of funds needed for the Debtors' operations.

38.     The Debtors shall add the designation "Debtor in Possession" or "DIP" to any checks in their possession and instruct the appropriate banks to add the designation to current and future Accounts.

39.     The Debtors' Cash Management System constitutes an ordinary course, essential business practice providing significant benefits to the Debtors including, among other things, the ability to (i) control funds, (ii) ensure the availability of funds when necessary, and (iii) reduce costs and administrative expenses by facilitating the movement of funds and the development of more timely and accurate account balance information. Any disruption of the Cash Management System could have a severe and adverse impact upon the Debtors' reorganization efforts.

40.     The relief requested in this motion is vital to ensuring the Debtors' seamless transition into bankruptcy. Authorizing the Debtors to maintain their Cash Management System, as modified, will avoid many of the possible disruptions and distractions that could divert the Debtors' attention from more pressing matters during the initial days of these chapter 11 cases.

41.     The Debtors seek a waiver of the Guidelines' requirement that they open a new set of books and records as of the Petition Date.  Opening a new set of books and records would create unnecessary administrative burdens and hardship and would cause unnecessary expense, utilization of resources, and delay.  The Debtors, in the ordinary course of their business, use many invoices, stationery, and other business forms.  By virtue of the nature and scope of the business in which the Debtors are engaged and the numerous other parties with whom they deal, the Debtors need to use their existing business forms without alteration or change.  Printing new business forms would take an undue amount of time and expense.  Accordingly, the Debtors respectfully request that they be authorized to continue to use their existing business forms and to maintain their existing business records.

42.     Additionally, certain banks charge monthly fees to the Debtors for maintaining the Accounts, which may vary monthly based on actual usage.  The fees are assessed according to the kind of transaction.  The Debtors were current on payment of these monthly fees as of the Petition Date.  The Debtors request authority to continue paying the monthly fees in the ordinary course of business, including any portion of the fee attributable to pre-petition services.

**Emergency Motion for an Order (i) Authorizing the Debtors to Pay or Honor Prepetition Obligations to Foreign Vendors, Service Providers and Governments, and Certain Critical Vendors, and (ii) Authorizing Financial Institutions to Honor all Related Checks and Electronic Payment Requests**

43.     The Debtors rely in the ordinary course of business on the Critical Vendors to supply goods, materials and services without which the Debtors' business either could not operate or would operate at significantly reduced profitability.  The Critical Vendors provide the Debtors with the following categories of goods and services:

(a)     <u>Agents' Expenses and Costs</u>.  Agents provide the crew with assistance in joining/signing off of the vessels.  Moreover, they arrange for necessary ship provisions and

repairs, and organize the supply, transport and the handling of goods.  It is essential that the agents are paid so as not to disturb the smooth operations of the vessels worldwide.

(b)     Port Expenses.  Numerous port expenses are accrued by the vessels as they conduct their business throughout the world.  Pilotage, docking masters, towage, mooring, tugs, harbor dues, tonnage dues, etc. are incurred in ports throughout the world.  It is essential that such foreign debts be paid in order to ensure the vessels can continue to conduct business in foreign ports of call.

(c)     Lubes.  Lube oil is crucial to the operation of the engine and most other mechanical functions on board the vessels.  The Debtors obtain lube oil through long-term relationships that offer significant volume discounts.  Any disruption to those relationships could have adverse economic consequences.

(d)     Crew Costs.  Like most international shipping companies, the Debtors retain third party agents that employ and compensate the mostly foreign born highly skilled crew that work on their vessels.  The Debtors cannot risk any impairment to their relationship with these foreign third party manning agents or crews.

(e)     Cabin, Deck and Engine Stores.  Stores consist of materials necessary to keep the vessels operating.  This may include communication systems, engineer's tools, chemicals, spare parts, safety equipment, cloth and linen products, rigging equipment, etc.  Stores are often supplied by foreign vendors in close physical proximity to the vessels.  Stores are of a specialized nature, which makes it imperative that relationships with these vendors are maintained.

(f)     Bunkers.  Bunker fuel is liquid fuel which powers the Debtors' vessels.  Bunker fuel is typically provided by foreign vendors because it is necessary for such vendors to be in close physical proximity to the vessels.  It is essential to the locomotion of the vessels that the Debtors maintain healthy relationships with those vendors who provide them with bunker fuel.

(g)     Maintenance and Repair.  It is essential that the vessels (e.g. engines, decks, communications equipment, radar, etc.) be maintained and repaired for safe and efficient operation.  Vendors providing these services, as well as spares, are typically foreign, as close physical proximity to the vessels is required.

44.     The Debtors believe that the payment of the Critical Vendor Claims is vital to the Debtors' reorganization efforts because, in various instances, the Critical Vendors are the only source or the most preferred source from which the Debtors can procure certain goods and services within a timeframe and at a price that will permit the Debtors to continue to smoothly operate their businesses.  A failure to pay the Critical Vendor Claims would likely result in many

of the Critical Vendors refusing to provide goods and services to the Debtors postpetition and may force the Debtors to obtain such goods and services elsewhere at a higher price or in a quantity or quality that is insufficient to satisfy the Debtors' requirements.

45.     A vendor may be the exclusive or preferred supplier of products or services to the Debtors for a number of reasons.  In some cases, it may be the case that the only way that the Debtors are able to purchase products or services in quantities of the desired amount is through a particular vendor.  For example, the Debtors' vessels require highly specialized replacement parts, and there are simply not many vendors in the world that can deliver those parts reliably.  In other cases, the Debtors have an established relationship with one vendor, and there is simply no available supply from any other vendor or the time and expense of getting another vendor "up to speed" with the Debtors' vessels and needs is not cost effective.  In other instances, due to preferred pricing from existing business relationships, procuring a particular supply of a certain product from an alternative source would be too expensive.

46.     The timing of a vendor's supply may also render it a Critical Vendor.  The Debtors are involved in a highly transactional and capital intensive business.  As a result, the Debtors are highly dependent on their ability to order and receive materials from vendors in a particular timeframe.  Current Critical Vendors are familiar with the Debtors numerous vessels and if, for example, a replacement part or specialized lube is needed at any port which the vessels frequent, the current Critical Vendors can deliver the right product.  Many of the Debtors' vessels are compensated at day rates, so any loss of time could result in financial loss.

47.     The Debtors believe that, absent the ability to pay certain prepetition amounts owed to Critical Vendors, the Debtors' access to necessary goods and services would be extinguished as the Critical Vendors will refuse to continue doing business with the Debtors or

may only do business if the Debtors provide trade term accommodations such as advance deposits or payment prior to delivery.

48.    Most importantly, and unique to maritime bankruptcy cases such as these cases, the Critical Vendors supply the Debtors' vessels with goods or services that could arguably be considered "necessaries" as that term is understood under United States maritime law and the law of other jurisdictions.[2]  Creditors alleging claims for necessaries under maritime law may claim a maritime lien against the Debtors' vessels.  Maritime liens are "secret liens" in that a lien claimant need not take any steps to attach or perfect its lien.  Any such claimant could seek to attach and arrest the respective Debtor vessel should it come to port.

49.    There is no guarantee that international companies outside this Court's jurisdiction will respect the automatic stay, especially as the vessels enter far flung foreign ports all over the world.[3]  Some of these jurisdictions may eventually recognize the automatic stay of United States bankruptcy law, but only after considerable delay and considerable effort on the part of the Debtors, all the while the Debtors could be losing day rate fees, as well as their reputation for timely delivering cargo.   Of course, other jurisdictions are unlikely to ever recognize United States bankruptcy law.

50.    Since the Critical Vendors may arguably be secured creditors and may have the ability to arrest the Debtors' vessels in foreign ports around the world, it is in the best interests of all parties to satisfy the Critical Vendor Claims of foreign vendors as described herein.

---

[2] The Debtors make no admission as to the nature of any claim or lien against any vessels based on necessaries, and reserve all rights with regard to same.

[3] For example, the Debtors' vessels recently entered port or are scheduled to enter port in Amsterdam, The Netherlands; Buenos Aires, Argentina; La Cruz, Venezuela; Cristobal, Panama; La Pampilia, Peru; Mamonal, Columbia; St. Eustatius, The Netherlands Antilles; Salina Cruz, Mexico; Freeport, Virgin Islands; Cotonou, Benin; Shanghai, China; Mombasa, Kenya.

51.     The Debtors seek authority, but not direction, to pay Critical Vendors in either a lump-sum payment or over time based upon negotiations with each Critical Vendor and the Debtors' available cash flow.  The Debtors will use their best efforts to condition payments as to Critical Vendors, as is practical, upon each Critical Vendor's agreement to continue supplying goods and services to the Debtors throughout the chapter 11 cases on the normal and customary trade terms, practices and programs that were in effect between the Debtors and the Critical Vendor prior to the Petition Date.

**Emergency Motion for Entry of an Order Authorizing Maintenance of Insurance Policies and Payment of Insurance Premiums and Related Obligations**

52.     The Debtors carry insurance to protect them against most of the accident-related risks involved in the conduct of their business.  The operation of any vessel includes risks such as mechanical failure, collision, property loss, cargo loss or damage, and business interruption due to political circumstances in foreign countries, hostilities and labor strikes.  Additionally, there is an inherent possibility of marine disaster, including oil spills and other environmental mishaps, and the liabilities arising from owning and operating vessels in international trade.  To safeguard against these risks, the Debtors' Insurance Programs include coverage for (i) protection and indemnity; (ii) freight, demurrage and defense; (iii) marine hull, machinery, gear and equipment; (iv) war risks; (v) loss of hire (for certain vessels as explained below).

53.     The protection and indemnity policies generally provide insurance against loss, damage, liability or expense, including liabilities in respect of oil pollution and wreck removal, injury or death of crew, passengers and other third parties, and the loss or damage to cargo, incurred by the insured with respect to the insured's interest in a vessel and in connection with the operation of the owned vessel during the effective terms of the policies.  The Debtors also have insurance policies in place to protect against risks involving freight, demurrage, and

defending against claims brought with respect to an owned vessel.  The Debtors' "hull and machinery" policies provide coverage against damages or total loss of the vessel caused, among other things, by perils of the sea, fire, explosion, and liabilities resulting from a collision.  The "war risks" policies protect the Debtors against losses to the vessels caused by acts of war, revolution or rebellion, labor disturbances, terrorists and piracy.  Additionally, certain Vessel Owners (Beaumont Navigation Inc., Galveston Navigation Inc., Carrolton Navigation Inc., Fulton Navigation Inc., and Orange Navigation Inc.) carry insurance to protect them against loss of hire of their vessels, which policy covers business interruptions that result in the loss of use of a vessel.

54.     The hull and machinery policy and the increased value policy, each insures the entire fleet.  The loss of hire policy insures the five vessels corresponding to the Vessel Owners which carry such policy.  With respect to protection and indemnity; freight, demurrage and defense; and war risks, each Vessel Owner has its own certificate of entry under the respective Insurance Programs maintained by the Debtors, which evidences the terms and conditions and coverage of the insured vessel.  All of these policies also cover the non-debtor Omega Management, Inc., as managing owner of each Vessel Owner, and Omega Navigation Enterprises, Inc., as the parent-holding company of the Omega group.

55.     The Debtors are required to pay premiums based upon a fixed rate established and billed by each Insurance Carrier.  The premiums for these policies are generally determined annually, semi-annually or quarterly; and are paid either directly to the Insurance Carrier, or through a broker (who pays the Insurance Carrier).  As of the Petition Date, the Debtors owed over $400,000 in premiums for these policies.  The Insurance Programs are essential to the preservation of the Debtors' business, property and assets and, in certain instances, such coverage

is required by various regulations, laws, loan agreements and the contracts that govern the Debtors' maritime and commercial activity.

56.    Lastly, the Debtors maintain Directors & Officers Insurance (the "D&O Insurance") to indemnify their directors and officers from claims brought against such individuals in their capacities as executives for the Debtors.  The Debtors carry two D&O Insurance policies: (1) XL Insurance, which has a coverage limit of $15 million and an annual premium of approximately $190,000; and (2) Beazley, which has a coverage limit of $5 million and an annual premium of approximately $140,000.  Both D&O Insurance policies cover the period from April 7, 2011 to April 7, 2012.  The Debtors financed the premiums for both policies under a financing agreement with AON Premium Finance LLC.  Payment terms under the financing agreement consist of a cash payment of $99,347.81 and eight equal monthly installments of $29,524.26, which become due monthly starting on June 7, 2011.  As of the Petition Date, the Debtors are current on their obligations under this financing agreement.

57.    The Debtors seek authorization to (i) maintain and continue to make payments with respect to the Insurance Programs, including the D&O Insurance policies, on an uninterrupted basis, and (ii) pay all prepetition premiums, deductibles, and other amounts due under the Insurance Programs and the D&O Insurance policies, including any applicable retrospective adjustments.  The Debtors also propose to continue making all postpetition payments in connection with the Insurance Programs and the D&O Insurance policies.  The Debtors propose to pay all obligations arising under, or related to, these programs and policies subsequent to the Petition Date in the ordinary course of business, not on an accelerated basis, and in accordance with the terms of these programs and policies.  To the extent a premium or deductible reimbursement relating to a period prior to the Petition Date is outstanding with

respect to any insurance policy, the Debtors seek authority to make such payment in the same manner that such payments were made prior to the Petition Date.

58.     The Debtors further request that the Court authorize and direct those banks at which the Debtors maintain accounts to receive, process, honor and pay any and all checks drawn or electronic funds transferred to pay any obligations arising under the Insurance Programs, including the D&O Insurance policies, (the "<u>Insurance Obligations</u>"), whether such checks were presented prior to or after the Petition Date; *provided, however*, that such checks or electronic transfers are identified by the Debtors as relating directly to the authorized payment of the Insurance Obligations.  The Debtors also seek authority to issue new postpetition checks, or effect new electronic fund transfers, on account of the Insurance Obligations to replace any prepetition checks or electronic fund transfer requests that may be dishonored or rejected as a result of the commencement of the Debtors' chapter 11 cases.

59.     The Debtors must continue their Insurance Programs (including the D&O Insurance policies), which provide a comprehensive range of coverage for the Debtors and their business and properties, in full force and effect.  If these policies were allowed to lapse, the Debtors would be exposed to substantial liability for any damages resulting to persons and property of the Debtors and others.  For instance, absent adequate insurance coverage, damages from a catastrophic oil spill could have a material adverse effect on the Debtors' business and financial condition.  Furthermore, maintenance of the directors' and officers' liability policy is necessary to the retention of the Debtors' senior management, who are critical to the success of the Debtors' business and reorganization, and to enable the Debtors to financially indemnify their officers and directors per the requirements set forth in their corporate bylaws.

**Emergency Motion For an Order (i) Authorizing the Debtors to (A) Pay or Prepetition Wages and Salaries to Employees and (B) Pay Prepetition Benefits and to Continue Benefit**

**Programs in the Ordinary Course, and (ii) Directing Banks to Honor Prepetition Checks for Payment of Prepetition Employee Obligations**

60.     Because of the filing of the bankruptcy petitions, the Debtors cannot pay prepetition claims, including salaries and wages incurred before the Petition Date, absent specific Court authorization.

61.     The Debtors employ twenty-nine twenty-seven (27) onshore employees, including officers directly through Omega and/or the non-debtor Omega Management Inc.  In order to avoid the undue hardship that would undoubtedly befall the employees if they went unpaid, the Debtors request the Court to enter an order granting the Debtors the authority, in their discretion and in the exercise of their business judgment, (a) to pay all obligations of the Debtors owing to or on behalf of employees, including prepetition claims, whether accrued or currently due and payable, of all of the Debtors' employees, and (b) directing all financial institutions to honor prepetition checks for payment of Employee Claims and prohibiting such financial institutions from placing any holds on, or attempting to reverse, any automatic transfers made on Employee Claims.

62.     The Debtors pay their employees once a month at the end of each month.  As of the end June, the Debtors were timely on all payments to non-executive employees.  Given the Petition Date, the Debtors anticipate that they will only owe non-executive employees prepetition sums for the first days of July.  The amounts owed for each employee are listed on Exhibit A, attached to the motion.  None of the amounts owed for any Employee Claim exceeds the Bankruptcy Code § 507(a) caps.  Thus, granting the relief requested is consistent with the Bankruptcy Code's purpose of ensuring that employees are paid in full up to the statutorily imposed limit due to the priority status of their claims.

**Emergency Motion for Entry of an Order (I) Authorizing the Debtors to File a Consolidated Creditor Matrix and (II) Granting Authority to Establish the Master Service List Applicable to these Cases**

63.     By this motion, the Debtors seek authority to (a) file a consolidated creditor matrix, and (b) establish the master service list to be used in these cases.  Because many creditors are shared among the Debtors, the Debtors request authority to file a single, consolidated matrix of their general unsecured creditors.

64.     Requiring each of the Debtors to file a separate creditor matrix in each of their respective cases would be unduly burdensome and would consume an excessive amount of the Debtors' scarce time and resources.  Therefore, it is in the best interest of the Debtors' estates to avoid the cost and risks associated with preparing separate matrices.  Accordingly, the Debtors submit that authority to file a single, consolidated creditor matrix in these cases is in the best interests of the estate and will facilitate the efficient and orderly administration of these cases.

65.     A large number of creditors and parties in interest may be entitled to receive notice in these cases.  As such, notice of all documents filed in these cases to each creditor and party in interest would be extremely burdensome and costly to the estates.

66.     The Debtors, therefore, propose to establish a consolidated Master Service List that would include (a) the Office of the United States Trustee for the Southern District of Texas, (b) all known or alleged secured creditors, (c) the 30 largest unsecured non-insider creditors of the Debtors (on a consolidated basis), (d) all known shareholders holding over 5% of a class of equity interests of Omega Navigation Enterprises, Inc., (e) all Debtor professionals, (f) all members of any official committee of unsecured creditors that may be appointed, (g) counsel for, and any professionals retained by, any official committee of unsecured creditors that may be appointed, (h) the United States Attorney's Office for the Southern District of Texas, (i) the

Internal Revenue Service, (j) any persons who have filed a request for notice pursuant to Bankruptcy Rule 2002, and (k) any such other government agencies to the extent required by the Bankruptcy Rules and Local Rules.

67.     The initial Master Service List will be filed within three (3) calendar days after the Order approving this Motion. The Debtors will update the Master Service List to include the name and address of any party in interest, who has made a written request for notice, weekly for the first month after filing of the initial Master Service List (as necessary), then monthly until confirmation of a plan of restructuring (or conversion or dismissal of these cases).

68.     The Debtors shall have the option to serve the parties on the Master Service List by U.S. mail, e-mail, hand delivery, or facsimile (the choice being in the Debtors' sole discretion).

69.     The proceedings with respect to which notice would be limited to the Master Service List shall include all matters covered by Bankruptcy Rule 2002, with the express exception of the following: (a) notice of (i) the first meeting of creditors pursuant to section 341 of the Bankruptcy Code, (ii) the time fixed for filing proofs of claim pursuant to Bankruptcy Rule 3003(c), and (iii) the time fixed for filing objections to, and the hearings to consider, approval of a disclosure statement and confirmation of a plan of reorganization; and (b) notice and transmittal of ballots for accepting or rejecting a plan of reorganization. Notice of the foregoing matters would be given to all parties in interest in accordance with Bankruptcy Rule 2002, unless the Court orders, or the Bankruptcy Code prescribes, otherwise.

**Request for Emergency Consideration of Certain "First Day" Matters**

70.     Emergency consideration of the First Day Matters is critical to the maintenance of the Debtors' estates.  The Debtors presently lack sufficient liquidity to support their operations.

In fact, the Debtors have almost no cash with which to operate.  The Debtors need emergency consideration of the First Day Matters in order to meet payroll and other current operating expenses, including, without limitation, insurance, fuel, docking fees, maintenance, lease, and employee obligations.  Without emergency consideration of the First Day Matters, the value of the Debtors' assets could be negatively affected.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this _____8_____ day of _____JULY_____, 2011.

Gregory McGrath

**EXHIBIT A**



Omega Navigation Enterprises, Inc.
100%
Shipowning
Galveston Navigation Inc
Omega Lady Miriam
Beaumont Navigation Inc
Omega Lady Sarah
Carrolton Navigation Inc
Omega Prince
Decatur Navigation Inc
Omega Princess
Elgin Navigation Inc
Omega Queen
Fulton Navigation Inc
Omega King
Orange Navigation Inc
Omega Emmanuel
Baytown Navigation Inc
Omega Theodore
100%
Management
Omega Management, Inc.
Omega Navigation (USA) LLC
100%
Omega Investments Ltd
80%
OD Investment Ltd
100%
Fire Navigation Inc – Megacore Honami
Hurricane Navigation Inc – Megacore Philomena
Lightning Navigation Inc – Hull 2299
Rain Navigation Inc – Hull 2295
100%
Omnicrom Holdings Ltd
50%
Stone Shipping Ltd
JV Holding Company
100%
Blizzard Navigation Inc
Omega Duke – Lloyds TSB Bank
50%
Onest Shipping Ltd
JV Holding Company
100%
Tornado Navigation Inc
Alpine Marina – Lloyds TSB Bank
denotes Debtor entity

**EXHIBIT B**



# OMEGA VESSELS

| Debtors' Vessels | Class and Flag* | Dwt | Year Built | Shipyard |
|---|---|---|---|---|
| Omega Queen | LR/Liberian | 74,999 | 2004 | Hyundai H.I. (S. Korea) |
| Omega King | DNV/Marshall | 74,999 | 2004 | Hyundai H.I. (S. Korea) |
| Omega Emmanuel | LR/Liberian | 73,000 Ice 1A | 2007 | STX (S. Korea) |
| Omega Theodore | LR/Liberian | 73,000 Ice 1A | 2007 | STX (S. Korea) |
| Omega Lady Sarah | ABS/Marshall | 71,500 Ice 1C | 2004 | STX (S. Korea) |
| Omega Lady Miriam | ABS/Marshall | 71,500 Ice 1C | 2003 | STX (S. Korea) |
| Omega Princess | LR/Marshall | 36,680 Ice 1A | 2006 | Hyundai Mipo (S. Korea) |
| Omega Prince | LR/Marshall | 36,680 Ice 1A | 2006 | Hyundai Mipo (S. Korea) |

*Classification Societies – American Bureau of Shipping (ABS); Det Norske Veritas (DNV); Lloyd's Register of Shipping (LR)

**EXHIBIT C**

## OMEGA DEBT CHART



**Omega Navigation Enterprises, Inc. (DEBTOR)**
ONE Senior Term Loan (~$243 MM) – HSH Nordbank AG/Credit Suisse/Bank of Scotland/Dresdner Bank
ONE Junior Secured Loan (~$36 MM) – BTMU Capital Corporation/NIBC Bank N.V.
ONE Promissory Note ($5.25 MM) – One Investments, Inc.

**(DEBTORS)**

**100%**

### Shipowning

| Galveston Navigation Inc<br>Omega Lady Miriam |
| Beaumont Navigation Inc<br>Omega Lady Sarah |
| Carrolton Navigation Inc<br>Omega Prince |
| Decatur Navigation Inc<br>Omega Princess |
| Elgin Navigation Inc<br>Omega Queen |
| Fulton Navigation Inc<br>Omega King |
| Orange Navigation Inc<br>Omega Emmanuel |
| Baytown Navigation Inc<br>Omega Theodore |

**100%**

### Management

Omega Management, Inc

Omega Navigation (USA) LLC **(DEBTOR)**

**100%**

Omega Investments Ltd

**80%**

OD Investment Ltd

**100%**

Fire Navigation Inc – **BOS Facility (~$24 MM) – Bank of Scotland** *
Megacore Honami

Hurricane Navigation Inc – **BOS Facility (~$40 MM) – Bank of Scotland** *
Megacore Philomena

Lightning Navigation Inc – **Bremer Facility (~$8 MM) – Bremer Landesbank** **
Hull 2299

Rain Navigation Inc – **Bremer Facility (~$32 MM) – Bremer Landesbank** **
Hull 2295

**100%**

Omnicrom Holdings Ltd

**50%**

Stone Shipping Ltd.
JV Holding Company

**100%**

Blizzard Navigation Inc.
**Senior Term Loan (~$29 MM) – Lloyds TSB Bank**
**Omega Duke**

**50%**

Onest Shipping Ltd
JV Holding Company

**100%**

Tornado Navigation Inc.
**Senior Term Loan (~$27 MM) – Lloyds TSB Bank**
**Junior Loan (~$1.95 MM) – Glencore Int'l. AG**
**Alpine Marina**

Guarantor of Megacore BOG Facility, BOS Facility and Bremer Facility

Guarantors of Omnicrom Senior Loan and Omnicrom Junior Loan

Guarantor of ONE Promissory Note, Blizzard Senior Term Loan and Tornado Senior Term Loan

Guarantors of ONE Senior Term Loan and ONE Junior Secured Loan

*    Same BOS Facility          **    Same Bremer Facility