**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | **Chapter 11** |
| | § | |
| | § | |
| **OMEGA NAVIGATION** | § | **Case No. 11-35926** |
| **ENTERPRISES, INC., et al.,**[1] | § | |
| | § | |
| | § | |
| **Debtors** | § | |

**OBJECTION OF HSH NORDBANK AG, AS SENIOR FACILITIES AGENT,**
**TO THE DEBTORS' EMERGENCY MOTION**
**PURSUANT TO 11 U.S.C. §§ 105, 361, 362, AND 363 AND**
**BANKRUPTCY RULES 2002, 4001, AND 9014 (I) AUTHORIZING**
**THE DEBTORS TO USE CASH COLLATERAL OF EXISTING SECURED**
**LENDERS, (II) GRANTING ADEQUATE PROTECTION**
**FOR USE THEREOF, AND (III) SCHEDULING FINAL HEARING**
[This Objection Relates to the Motion at Docket No. 13][2]

    HSH Nordbank AG ("HSH Nordbank"), as agent (in such capacity, the "Senior Facilities

Agent") for certain banks as lenders (the "Senior Facilities Lenders") under the Senior Facilities

Agreement (defined below), by and through its undersigned counsel, hereby objects to Omega

Navigation Enterprises, Inc. et al.'s, the above-captioned debtors and debtors-in-possession

(collectively, the "Debtors"), Emergency Motion Pursuant to 11 U.S.C. §§ 105, 361, 362, and 363

and Bankruptcy Rules 2002, 4001 and 9014 (I) Authorizing the Debtors to Use Cash Collateral of

Existing Secured Lenders, (II) Granting Adequate Protection for Use Thereof, and (III) Scheduling

Final Hearing (the "Debtors' Cash Collateral Motion"), and respectfully represents as follows:

---

[1]    The Debtors in these chapter 11 cases are Omega Navigation Enterprises, Inc.; Galveston Navigation Inc.;
Beaumont Navigation Inc.; Carrolton Navigation Inc.; Decatur Navigation Inc.; Elgin Navigation Inc.; Fulton Navigation
Inc.; Orange Navigation Inc.; Baytown Navigation Inc.; and Omega Navigation (USA) LLC.

[2] The Debtors connection to the United States and this District is unclear.  By filing this objection the Senior Facilities
Agent does not waive, and hereby expressly reserves all rights and defenses regarding jurisdiction, venue and dismissal.

# I. PRELIMINARY STATEMENT

1.      Omega Navigation Enterprises, Inc. ("Omega") and certain of its affiliates (collectively, the Debtors) are providers of international marine transportation services.[3]  Omega's principal operating assets are eight marine vessels (the "Ships") and all revenues generated from the operations of the Ships.  The Debtors have failed to repay at maturity over $242.72 million of senior secured debt to the Senior Facilities Lenders and over $36.2 million of junior secured debt.  The Ships and their revenues are mortgaged, assigned or pledged as security for repayment of the secured loans.  The Debtors' revenues from operations of the Ships constitute "Cash Collateral" of the Senior Facilities Lenders within the meaning of Section 363(a) of the Bankruptcy Code.  The Ships have limited useful lives and are depreciating assets.

2.       The Senior Facilities Agent believes that the only way to adequately protect the interests of the Senior Facilities Lenders, and the only realistic prospect for repayment of the senior secured loans, is through a controlled liquidation of the Ships.  However, the Court need not determine that issue now, or whether the Debtors will ultimately be able to execute on their restructuring.  By this objection, the Senior Facilities Agent seeks only to maintain the status quo on an interim basis pending a determination of the Debtors' reorganization prospects and the viability of these Chapter 11 cases (the "Cases"), so that the Senior Facilities Lenders do not suffer an irremediable diminution of their bargained-for security if the Debtors' restructuring ultimately fails.  Specifically, the Senior Facilities Agent requests that the Court deny the Debtors' Cash Collateral Motion unless the use of Cash Collateral is restricted on the terms of the proposed interim cash collateral order (the "Proposed Interim Order") attached hereto as Exhibit A.  (A summary of the terms of the Proposed Interim Order is in Section VIII below)

---

[3]      The Debtors are all organized under the laws of the Marshall Islands and the mortgaged ships are registered there or in Liberia.

3.      The Debtors filed a proposed cash collateral order which is plainly insufficient to adequately protect the Senior Facilities Lenders under these circumstances, and does not contain many of the provisions a secured creditor would normally require in cases like these.  For example, the Debtors' proposed order does not provide for the Debtors maintaining a cash management system required under the Senior Facilities Documents (defined below), pursuant to which, all revenues must be paid to and disbursements made from so-called "Earnings Accounts" (defined below) maintained with the Senior Facilities Agent.  The Debtors' proposed order also does not provide for suspension of use of cash collateral if certain events occur which impair the Senior Facilities Lenders' interests in its security.  Most egregiously, the Debtors' proposed order includes a $1 million "carve-out" from the Senior Facilities Collateral (defined below) for payment of the Debtors' professional fees.  The Senior Facilities Lenders object to any carve out from their security to pay the Debtors' professional fees or any other administrative expenses, and there is no legal basis for imposing a carve out without the Senior Facilities Agent's consent.  The Debtors' proposed order is deficient in numerous other respects, including as identified herein.

4.      Conversely, the Senior Facilities Agent's Proposed Interim Order is designed to be fair to all parties.  The Ships – the Debtors' principal business assets – will continue to be maintained and operated, and all excess funds will be segregated and available in the event the Court permits the Debtors to pursue a reorganization, at which point all of the Cash Collateral and adequate protection arrangements herein may be revisited.  However, for now, it is critical that the Senior Facilities Lenders be provided the maximum possible adequate protection which is reasonable under the circumstances because its interests are at significant risk.  Ultimately, a Chapter 11 plan cannot be confirmed without the consent of the Senior Facilities Lenders absent a "cram up," which the Senior Facilities Agent believes would be impossible for the Debtors to achieve in these

HOU:3133889.4

circumstances under applicable law.  Indeed, based on the Debtors' own proposed budget, it is far from clear whether the Debtors can even avoid administrative insolvency if these Cases proceed for an extended period of time.  (Notably, the Debtors' budget only contains cash flow projections for four weeks.)  Moreover, the value of the Ships is currently far below what the market would require to refinance the secured loans, notwithstanding the Debtors' assertion that the "book value" of the Ships is $390 million.  Book value (i.e., the value in the Debtors books and records) is no proxy for actual value, and if the Ships did have such a high value the Debtors would likely have refinanced their secured loans rather than file Chapter 11.  In fact, the Debtors could not refinance and out-of-court restructuring efforts, including in the weeks immediately prior to commencement of these Cases, failed because a substantial proposed equity investment did not materialize.

5.      Additionally, as discussed below, the Debtors have admitted to diverting millions of dollars of revenues away from the Senior Facilities Lenders in violation of the Senior Facilities Documents, apparently to satisfy their obligations under the terms of certain now-terminated joint ventures.  And, several of the Ships are "managed" for a cash fee by an entity affiliated to the Debtors, but which is not subject to this Court's jurisdiction, thus potentially permitting further diversion of Cash Collateral.

6.      The Proposed Interim Order provides the minimum in terms of relief, in that it does not require payment from the Cash Collateral of current interest or the Senior Facilities Agent's considerable professional fees and expenses.  Nor does it include any stipulations or findings regarding the validity, extent, priority or nonavoidability of the Senior Facilities Agent's claims or liens, allow the Senior Facilities Lenders to exercise remedies, expand the prepetition liens of the Senior Facility Agent beyond the Ships and their revenues, waive the Debtors' rights under Section 506(c) or grant any indemnities or releases.  In short, the Senior Facilities Agent was scrupulous in

4

attempting to fashion a form of order pursuant to which it can consent to interim use of cash collateral, but which also protects its rights in a way that is reasonable under these highly uncertain circumstances and does not prejudice the rights of third parties. The Senior Facilities Agent is further willing to negotiate in good faith any issues fairly raised with respect thereto.

## II. <u>JURISDICTION</u>

7.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

8.     The statutory predicates for the relief requested herein are Sections 105, 361 and 363 of title 11 of the United States Code, as amended (the "<u>Bankruptcy Code</u>"), and Rule 4001(b)(2) of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>").

## III.     <u>PROCEDURAL HISTORY</u>

9.     On July 8, 2011 (the "<u>Petition Date</u>"), the Debtors filed voluntary petitions under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of Texas, Houston Division. The Debtors have continued in the management and operation of their business and property as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these Cases.

10.     No official committee of unsecured creditors has been appointed in these Cases.

## IV. <u>BACKGROUND</u>

### A.     **The Debtors' Businesses and Assets and Capital Structure**

11.     <u>Overview</u>. The Debtors are international providers of marine transportation services. The Debtors are organized in the Marshall Islands and have their principal offices in

Greece.  Omega, the borrower under the Senior Facilities Agreement, is the parent of each of the other Debtors (each of which is a wholly-owned subsidiary of Omega).  The Debtors' principal operating assets are the Ships and related revenues.  The Ships are registered in the Marshall Islands or in Liberia.

12.    Senior Credit Facilities Agreement.  Omega, as borrower (in such capacity, the "Borrower"), the Senior Facilities Lenders, the Senior Facilities Agent, and HSH Nordbank, as swap bank (the "Senior Swap Bank") and arranger (together with the Senior Facilities Lenders, the Senior Facilities Agent and Senior Swap Bank, the "Senior Finance Parties"), are parties to that certain Facilities Agreement dated as of April 7, 2006 (as amended, supplemented or otherwise modified, the "Senior Facilities Agreement"), pursuant to which, among other things, the Senior Facilities Lenders made Advances (as defined in the Senior Facilities Agreement, and collectively, the "Senior Loan") and other financial accommodations to or for the benefit of Omega and the other Debtors.[4]  The Senior Facilities Agreement matured on June 9, 2011 after several short agreed to and documented extensions (from an original maturity date of April 12, 2011).  As of the Petition Date, the principal Senior Loan amount of approximately $242.72 million remained outstanding under the Senior Facilities Agreement, plus interest, fees, expenses and other amounts.

13.    Senior Facilities Guarantees and Security.   In summary, each Debtor other than Omega (each, a "Guarantor" and together, the "Guarantors") owns and operates one Ship and has guaranteed the Senior Loan, and all of its and Omega's other liabilities and obligations under the Senior Facilities Documents (collectively, the "Senior Facilities Obligations").  Each Guarantor has

---

[4]    The Senior Swap Bank and Omega were counterparties to that certain ISDA Master Swap Agreement, dated as of April 7, 2006 (such ISDA Master Swap Agreement, as amended, supplemented or otherwise modified, together with all related confirmations, supplements and schedules, the "Master Swap Agreement"), pursuant to which the parties entered into certain interest rate hedging arrangements in respect of the Senior Loans.  The Master Swap Agreement expired on or about April 12, 2011.

mortgaged its Ship and pledged and assigned its related revenues to the Senior Facilities Agent or the Senior Finance Parties.  Specifically, while there are some documentation variations among the other Debtors, each Guarantor executed a Senior Facilities Guarantee (guaranteeing its Senior Facilities Obligations), as well as a Mortgage (of its Ship), a General Assignment (of the Earnings (defined below) from its Ship) and a Guarantor Pledge Agreement (pledging its Earnings Accounts), in each case as security for its Senior Facilities Obligations.  Additionally, Omega as borrower, executed pledge agreements (as amended, supplemented or otherwise modified, the "Omega Pledge Agreement") pursuant to which it pledged and assigned to the Senior Facilities Agent all Earnings and Earnings Accounts.[5]

14.     Existing Senior Facilities Cash Management.  Pursuant to Section 14.1.3 of the Senior Facilities Agreement, all moneys payable to the Debtors pursuant to the earnings of the Ships (the "Earnings") are to be paid to certain bank accounts maintained at HSH Nordbank (the "Earnings Accounts").  Section 7.1.2 of each of the Senior Facilities Guarantees similarly requires that the applicable Guarantor also pay its respective Earnings into the applicable Earnings Account. See, e.g. Declaration of Scott Greissman, dated July 10, 2011 ("Greissman Decl.")  Ex. 6.  Section 2.1.1 of each General Assignment states that the applicable Debtor's Earnings shall be payable to the Earnings Account of such Debtor.  See, e.g., id., Ex. 7.

15.     Each of the General Assignments provides, in Section 2.1, that each Debtor's rights, title and interest in and to the Earnings is assigned to the Senior Facilities Agent.  See, e.g., id., Ex. 7.  Each of the Omega Pledge Agreements, in Section 1, provides that Omega pledges to the

---

[5]     The Omega Pledge Agreements, the Mortgages, the General Assignments, and the Guarantor Pledge Agreements are referred to collectively as the "Senior Facilities Security Documents"; and together with the Senior Facilities Agreement and all other documents, agreements, and instruments executed in connection therewith, the "Senior Facilities Documents".  The liens, security interests, pledges, mortgages and assignments thereunder are referred to as the "Senior Facilities Liens".  The assets and property encumbered by the Senior Facilities Lenders are referred to as the "Senior Facilities Collateral".

Senior Facilities Agent all present and future credit balances from time to time standing to the credit of certain of Omega's accounts maintained at HSH Nordbank, identified in the Omega Pledge Agreements.  See, e.g., id., Ex. 5.  Each of the Guarantor Pledge Agreements, in Section 1, provides that the respective Debtor pledges "all the present and future credit balances from time to time standing to the credit of its Earnings Account" to the Senior Facilities Agent.  See, e.g., id., Ex. 8.  Furthermore, Section 7.5 of each of the Senior Facilities Guarantees states that each Guarantor's "Earnings Account and all amounts from time to time standing to the credit thereof shall be subject to the security constituted and the rights conferred by the Account Pledge."  See, e.g., id., Ex. 6.

16.     Junior Facility.  Omega, as borrower, certain banks, as lenders (the "Junior Facility Lenders"), the Bank of Tokyo-Mitsubishi UFJ, Ltd. New York Branch and NIBC Bank, N.V. ("NIBC"), as swap banks (the "Junior Swap Banks"), and NIBC, as agent (the "Junior Facility Agent", and together with the Junior Facility Lenders and Junior Swap Banks, the "Junior Finance Parties"), are parties to that certain Junior Secured Loan Agreement, dated as of March 27, 2008 (as amended, supplemented or otherwise modified, the "Junior Facility Agreement", and together with all other loan, guaranty, mortgage and security documents executed in connection therewith, the "Junior Facility Documents")[6].  Pursuant to the Junior Facility Documents, the Guarantors issued guarantees and the Debtors granted liens, mortgages, pledges and other collateral security (the "Junior Facility Liens") for repayment of the Junior Facility Obligations, which, upon information and belief, correspond substantially to the Senior Facilities Guarantees and the Senior Facilities Liens on the Senior Facilities Collateral, but in any event on a junior and subordinated basis in accordance with the terms of the Coordination Agreement (defined below).

---

[6]        All loans, interest, fees and other liabilities and obligations of the Debtors owed to the Junior Finance Parties under or pursuant to the Junior Facility Documents are hereinafter referred to collectively as the "Junior Facility Obligations".

17.    <u>Coordination Agreement</u>.  The Debtors, the Senior Facilities Agent and the Junior Finance Parties are party to that certain Coordination Agreement, dated as of March 27, 2008 (as amended, supplemented or otherwise modified, the "<u>Coordination Agreement</u>"), pursuant to which the parties thereto agreed, among other things, that the Senior Facilities Liens granted under the Senior Facilities Security Documents to the Senior Facilities Agent for the benefit of itself and the Senior Finance Parties on the Senior Facilities Collateral are senior and prior to the liens thereon and security interests therein granted under the Junior Facility Documents to the Junior Facility Agent for the benefit of itself and the Junior Finance Parties.  The Coordination Agreement governs the relative rights, obligations and priorities of the Senior Facilities Agent, on the one hand, and the Junior Facility Agent and the Junior Finance Parties on the other hand, in respect of the Debtors and their assets and properties.

## V.    <u>PREPETITION CASH DIVERSIONS</u>

18.    As discussed above, the Senior Facilities Documents provide detailed and carefully constructed protections of the Earnings generated by the Ships which are pledged and assigned to the Senior Finance Parties.  The Debtors have, by their own admission, diverted millions of dollars of Earnings in breach of such contractual protections.

19.    In a letter from Omega to the Senior Facilities Agent, dated February 3, 2011, Omega identified $9,284,065.88 of payments made to bank accounts other than the Earnings Accounts, $4,134,659.88 of which was improperly purportedly used for "New Buildings".  Greissman Decl., Ex. 1.  The Senior Facilities Agent, by a letter dated February 18, 2011, notified Omega that these diversions were a breach of the Senior Facilities Agreement and were required to be paid to the Senior Facilities Agent within 14 days from the date of the letter.  <u>Id.</u>, Ex. 2.  In that letter, the Senior Facilities Agent stated that "[b]ased on your concessions during our recent telephone

conversation, and the contents of your letter, we understand that you admit to conducting the Earnings Accounts in a manner which amounts to an Event of Default." Id.

20.    Omega responded to the Senior Facilities Agent in a letter dated March 9, 2011, stating that the "erroneous payment" of Earnings to accounts other than the Earnings Accounts was due to an "administrative error." Id., Ex. 3.  Omega pledged to properly deposit Earnings in the future, but never returned the $4,134,659.88 it had diverted from the Earnings Accounts.  Id.

21.    The Senior Facilities Agent, in a letter to Omega dated March 17, 2011, stated that Omega's explanation for diversion of funds was not accepted as sufficient and demanded that $4,134,659.88 of the diverted funds be deposited into the Earnings Accounts.  Id., Ex. 4.  To date, those funds have not been deposited in the Earnings Accounts.

## VI.  THE DEBTORS' FUTILE ATTEMPT TO AVOID THEIR OBLIGATIONS

22.    The Debtors say it is the Senior Facilities Lenders' fault that Omega failed to repay its loans.  The Debtors in their "Greece Litigation" go so far as to seek to convert their $242 million debt to the Senior Facilities Lenders into a $570 million damages claim.  Specifically, the Debtors' position appears to be, essentially, that the Senior Facilities Lenders already agreed to extend the maturity date for the Senior Loans from 2011 to 2014.  While the Senior Facilities Agent understands that the Court will not address this issue now, This is specious as a matter of law.  The maturity date for the loans under the Senior Facilities Agreement was April 12, 2011.  It was extended in writing several times, finally to June 9, 2011.  The Senior Facilities Agreement contains no obligation on the Senior Facilities Lenders to refinance the loans or to even consider doing so. Section 17.1.1 of the Senior Facilities Agreement provides that any amendments or modifications to the Senior Facilities Agreement must be made in writing.  Not surprisingly, that is exactly how these sophisticated parties who were represented by able counsel at every step of the way conducted

themselves when they entered into several written agreements, not one of which recites a new maturity date or an extension to 2014. The Debtors' attempt to shirk their obligations and "blame the victim" is a desperation move and further supports the need for adequate protection and strict limitations on the Debtors' use of Cash Collateral. The Debtors' allegations merely serve to distract attention from the legal and commercial merits of this reorganization effort.[7]

## VII. PROJECTED CASH FLOWS AND POTENTIAL FOR ADMINISTRATIVE INSOLVENCY

23. The Debtors' cash flow projections show net cash flow of only $612,736 over the first month of these Cases. The Senior Facilities Lenders currently view that projection as optimistic, but even at that level there is a substantial risk of these Cases becoming administratively insolvent if these Cases proceed for an extended period. This risk is exacerbated because the Debtors' cash flows are exposed in part to the volatile spot charter market. If that market fails to live up to expectations, the Senior Facilities Lenders will pay the price. The projection also does not include a line item for expected administrative expenses and does not contemplate paying current interest on the secured indebtedness (which item alone would render the projections cash flow negative). Moreover, the Ships have limited useful lives and are depreciating at a rate that will exceed $1 million per month, so each day that passes erodes any equity cushion that may exist.

24. Moreover, while the Debtors allege a "book value" for the Ships of $390 million, book value is hardly a proxy for actual value, which the Senior Facilities Lenders unfortunately believe is far less than $390 million. In fact, if the actual value of the Ships were

---

[7] The Senior Facility Lenders strenuously deny the claims made in the Greece Litigation and reserve all of their rights, including without limitation in relation to jurisdiction in circumstances where the Greece Litigation has been commenced in flagrant breach of the English jurisdiction clauses in the Senior Facilities Security Documents. Prior to the bankruptcy, the Senior Facilities Lenders commenced proceedings against the Debtors in London in accordance with the Senior Facilities Documents.

anywhere near to $390 million, the secured debt would likely have been refinanced or restructured and these Cases never would have been filed.

## VIII.  **RELIEF REQUESTED**

25.     The Senior Facilities Agent submits that at this stage of the case the interests of the Senior Facilities Lenders cannot be adequately protected unless the Court enters an order with the protections reflected in the Proposed Interim Order attached as <u>Exhibit A</u>.  The following is a summary of the terms and conditions of the Proposed Interim Order.[8]  As discussed more fully below, the Senior Facilities Agent respectfully submits that its proposal is reasonable and necessary to protect the interests of the Senior Facilities Lenders in the Senior Facilities Collateral, is supported by applicable authority, and that, if not implemented, would required denial of the Debtors' Cash Collateral Motion.

| | |
|---|---|
| <u>Senior Facilities Collateral</u> (¶E(i)(d)(1)-(4)): | Mortgages on the Ships as well as assignment and/or pledges of all Earnings arising out of use or operation of the ships and of the Earnings Accounts. |
| <u>Specified Period</u> (¶1): | Cash Collateral may be used until the earliest of (i) 45 days after the Petition Date, (ii) the date a Final Order acceptable to the Senior Facilities Agent shall be entered and (iii) the expiration of the Notice Period (defined below). |
| <u>Adequate Protection</u> (¶¶F, 6(a)-(b)): | The Debtors shall provide the Senior Finance Parties the following adequate protection under Sections 361, 362 and 363 of the Bankruptcy Code: (a) adequate protection liens on all of the Debtors' now existing or after acquired assets or property, including the Ships, all Earnings and the Earnings Accounts, (b) adequate protection superpriority claims, (c) use of Cash Collateral solely to operate, maintain and preserve the Ships, (d) cash management (set forth below) and (e) segregation of excess Earnings in an account maintained by and subject to the first priority lien of the Senior Facilities Agreement, pending further court order. |
| | The Debtors shall also provide the Junior Finance Parties with adequate protection liens and adequate protection superpriority claims which correspond, and shall be subordinate and junior, to the adequate protection |

---

[8]     Reference is made to the Proposed Interim Order for its full terms and conditions.  In the event of any inconsistency between this summary and the Proposed Interim Order, the latter shall control.

liens and superiorpriorty claims provided to the Senior Facilities Agent and/or the Senior Finance Parties.

| | |
|---|---|
| Budget (¶3): | Each Debtor shall comply with an acceptable cash flow forecast depicting on a weekly basis the Debtors' anticipated cash revenue, receipts, expenses, expenditures and disbursements.  Expenses shall be limited to amounts sufficient to continue operations, maintenance and preservation of Ships.  All excess Earnings shall be maintained in the applicable Earnings Account and subject to the first priority lien of the Senior Facilities Agent. |
| Cash Management (¶6(a)): | Each Debtor shall maintain its respective Earnings Accounts and shall cause amounts in respect of its Earnings and all other revenues to be paid directly to, and all of its cash to be held in, its own Earnings Account (and not comingled) in accordance with the terms of the applicable Senior Facilities Documents. In no event shall such Earnings be transferred out of the Earnings Account unless expressly authorized by the Interim Order. To the extent the Court enters an order in respect of the Debtors' cash management or bank accounts, such order shall not be inconsistent herewith and, in any event, shall be satisfactory to the Senior Facilities Agent. |
| Debtor's Stipulations: | None. |
| Carve Out: | None. |
| Section 506(c) Waiver: | None. |
| Release and Indemnity: | None. |
| Events of Default (¶10): | Customary and reasonable for ship financing transactions under these circumstances and consistent with the Senior Facilities Documents. |
| Rights and Remedies Upon Event of Default (¶11): | The Senior Facilities Agent shall have the right to terminate or restrict the Debtors' use of Cash Collateral under the terms of the Interim Order after the occurrence and during the continuance of an Event of Default, provided that the Senior Facilities Agent shall have first given three business days prior notice thereof (the "Notice Period"), by facsimile or email (or other electronic means) to counsel to the Debtors and to the U.S. Trustee.  During the Notice Period, and if the Debtors timely seek an emergency hearing, until the conclusion of such emergency hearing, the Debtors may use Cash Collateral only to pay, with prior notice to and |

approval of the Senior Facilities Agent, and subject to the Budget (as
defined in the Order), critical expenses necessary to maintain and preserve
the Ships and the other Collateral.

## IX.  BASIS FOR RELIEF

### A.    The Debtors Bear The Burden Of Showing That
### The Senior Secured Lenders Are Adequately Protected

26.    A secured creditor's interest in collateral is entitled to adequate protection

under Section 363(e) of the Bankruptcy Code.  This section of the Bankruptcy Code recognizes that

property interests of secured creditors are entitled to protection under the Fifth Amendment and

"insure[s] that the secured creditor receives the value for which he bargained."  S. Rep. No. 95-989,

at 53 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5839; accord H.R. Rep. No. 95-595, at 339

(1978), reprinted in 1978 U.S.C.C.A.N. 5963, 6295; see United Savings Assoc. of Texas v. Timbers

of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.), 793 F.2d 1380, 1397

(5th Cir. 1986), aff'd, 484 U.S. 365 (1988) ("Although the stay temporarily prevents that aspect of

bargain from being fulfilled, a creditor should not be prejudiced by a debtors' continued use of

collateral during the proceeding.  That bargain must be protected by compensating for a decline in the

value of the collateral through its use during the pendency of the stay."); see also In re O.P. Held,

Inc., 74 B.R. 777, 782-84 (Bankr. N.D.N.Y. 1987) (holding that secured lender must be assured of the

maintenance and recoverability of its lien, and that debtor must prove that secured creditor will

realize the value of its bargain).

27.    Under Section 361 of the Bankruptcy Code, adequate protection can take the

form of, inter alia, periodic cash payments (11 U.S.C. § 361(1)), additional or replacement liens (11

U.S.C. § 361(2)), or such other relief as will provide the "indubitable equivalent" of the secured

creditor's interest in the collateral (11 U.S.C. § 361(3)).  The law is clear that Section 361 of the

Bankruptcy Code does not limit adequate protection to the enumerated examples, and courts have the authority to fashion adequate protection as they deem appropriate under the circumstances.  See, e.g., In re O.P. Held, Inc., 74 B.R. at 782 (noting that Section 361 "has been consistently interpreted as not containing an exclusive list" of forms of adequate protection).

28.     The Debtors bear the burden of proving by clear and convincing evidence that the Senior Facilities Lenders are adequately protected.  See 11 U.S.C. § 363(p)(1); see In re Polzin, 49 B.R. 370, 371-72 (Bankr. D. Minn. 1985) ("[D]ue to the fact that the collateral is consumed or used up in a § 363 context and the creditor's use is not merely delayed as in a § 362 context, the adequate protection standard is a strict one. . . .  It is the Debtor's burden to demonstrate that the secured party is adequately protected.") (citations omitted); In re O.P. Held, Inc., 74 B.R. at 784 (holding that debtor requesting court authorization for use of cash collateral "must prove by clear and convincing evidence that the secured creditor will realize the value of its bargain in light of all the facts and circumstances of the case" (quoting Northern Trust Co. v. Leavell (In re Leavell), 56 B.R. 11, 13 (Bankr. S.D. Ill. 1985))).

B.     **The Bankruptcy Code Provides For Additional Restrictions On And Protections For The Use Of Cash Collateral**

29.     All of the Debtors' cash revenues from the Ships and all proceeds of the other Senior Facilities Collateral clearly fall within the definition of "cash collateral" under Section 363(a) of the Bankruptcy Code.  See 11 U.S.C. § 363(a) (defining "cash collateral" to include "cash, negotiable instruments, documents of title, securities, deposit accounts or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes, the proceeds, products, offspring, rent, or profits of property").

30.     The Bankruptcy Code provides special protections to ensure that secured creditors are not deprived of their interests in cash collateral by the unauthorized use thereof.  See,

e.g., In re Kleather, 208 B.R. 406, 416 (Bankr. S.D. Ohio 1997) (noting that, in enacting Section 363 of the Bankruptcy Code, Congress gave "special treatment to 'cash collateral' in order to assure that a holder of a lien on 'cash collateral' is not deprived of its collateral through unprotected use by the Debtor") (quoting In re Mickler, 9 B.R. 121, 123 (Bankr. M.D. Fla. 1981)).  Consequently, although Section 363(c)(1) otherwise permits a debtor to use property of the estate in the ordinary course of business without notice and a hearing, Section 363(c)(2) prohibits a debtor from using cash collateral for any purpose without first obtaining court approval or the consent of the secured lender.  See 11 U.S.C. § 363(c)(2).

31.     Critically, a court is prohibited from authorizing non-consensual use of cash collateral unless the secured party's interest therein is adequately protected.  See 11 U.S.C. § 363(e) (providing that a court "shall", upon request by an entity with an interest in property proposed to be used, sold or leased by a debtor, "prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest.") (emphasis added); see, e.g., Metromedia Fiber Network Servs. v. Lexent, Inc. (In re Metromedia Fiber Network, Inc.), 290 B.R. 487, 491 (Bankr. S.D.N.Y. 2003) ("Section 363(e) is not permissive or discretionary – it states that the court 'shall' grant the relief specified, at any time, on request of the secured entity.") (citation omitted).

32.     Moreover, "[t]he standard of adequate protection to be afforded a creditor when its cash collateral is being used should be a high one. . . .  To ask a creditor to release cash requires a strong likelihood of return."  In re Berens, 41 B.R. 524, 528 (Bankr. D. Minn. 1984). Courts have noted that the volatile character of cash collateral entitles lienholders to special protections under the Bankruptcy Code.  See, e.g., In re Kleather, 208 B.R. 406, 416 (Bankr. S.D. Ohio 1997) (noting that, in enacting Section 363 of the Bankruptcy Code, Congress gave "special treatment to 'cash collateral' for the obvious reason that cash collateral is highly volatile, subject to

rapid dissipation and requires special protective safeguards." (quoting <u>In re Mickler</u>, 9 B.R. 121, 123 (Bankr. M.D. Fla. 1981))); 3 <u>Collier on Bankruptcy</u> ¶363.03[4][c] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2011) (noting the "unique nature of cash collateral, and the risk to the entity with an interest in such collateral, arising from the dissipation or consumption of the collateral").

33.     Finally, any substitute adequate protection offered in lieu of cash must be of the "most indubitable equivalence" that "must both compensate for present value and insure the safety of the principal." <u>Crocker Nat'l Bank</u> v. <u>Am. Mariner Indus., Inc.</u> (<u>In re Am. Mariner Indus. Inc.</u>), 734 F.2d 426, 433 (9th Cir. 1984), <u>abrogated on other grounds by</u> <u>United Savings Ass'n of Texas</u> v. <u>Timbers of Inwood Forest Assoc., Ltd.</u>, 484 U.S. 365, 368, 382 (1988); <u>see</u> <u>also</u> <u>Aetna Realty Investors, Inc.</u> v. <u>Monarch Beach Venture, Ltd (In re Monarch Beach Venture, Ltd.)</u>, 166 B.R. 428, 434 (C.D. Cal. 1993) (noting that an indubitable equivalent "(1) provides the creditor with the present value of its claim, and (2) insures the safety of its principle [sic]").

**C.     The Court Should Restrict The Use Of Cash Collateral And Only Grant Debtors' Motion If It Grants Adequate Protection As Requested By The Senior Facilities Agent**

**1.     The Protections In The Debtors' Order Are Insufficient Under the Circumstances**

34.     The Debtors filed these Cases after having failed to (i) repay the Senior Loans at maturity; (ii) refinance the Senior Loans; (iii) obtain an equity investment; or (iv) agree to liquidate the Ships in a prompt and responsible fashion.  Without a substantial paydown of the Senior Loans, the net cash flows expected to be generated by the Ships over time are simply insufficient to service and ultimately repay the Senior Loans on market terms.  This is clear from the Debtors' own projections which show net cash flow of only $612,736 for the next month and which do not include any payment of interest on the Senior Loans.  The Debtors have no meaningful sources of revenue other than the revenues generated by the Ships and the Ships themselves are rapidly depreciating

assets.  Moreover, the shipping revenues are dependant on shipping rates, which can fluctuate dramatically.  And, as discussed above, the Debtors have previously diverted cash in direct breach of the Senior Facilities Documents.  The Debtors also have no way to compensate the Senior Facilities Lenders for any depreciation of the Ships or to replace any Cash Collateral expended for a purpose other than the Ships' operation, preservation and maintenance.  Accordingly, the Senior Facilities Agent currently believes that the only way the Senior Facilities Lenders can be repaid is through the orderly liquidation of the Ships.

35.     The Senior Facilities Agent expects that it will have no choice but ultimately to move to dismiss or convert these Cases to Chapter 7, to lift the automatic stay as a result, or for similar relief.  In the meantime, every dollar of Cash Collateral expended for any purpose other than maintenance, preservation and operation of the Ships will be potentially lost if such relief is ultimately granted.  The Senior Facilities Agent requests that if, in the interim, Cash Collateral is to be expended, its use be restricted in such a way as to protect the Senior Facilities Lenders' interest and maintain the status quo pending judicial determination of the bona fides of these Cases.

36.     The Debtors' argument that the Senior Secured Lenders are sufficiently oversecured is unsupported and likely untrue.  The Senior Loan has matured with almost the full principal amount unpaid.  In support of their position that the Ships are worth more than the $242 million owed to the Senior Facilities Lenders the Debtors put forth only a purported accounting "book value" for the Ships of $390 million.  If that "value" had any basis in reality, the Debtors presumably would have been able to sell the Ships, refinance the Ships or achieve an out-of-court restructuring. The Senior Lenders expect to show that the Ships, unfortunately, are worth far less than the Debtors assert.  It also cannot be disputed that the Ships are rapidly depreciating.  In the present circumstances, any equity cushion the Senior Facilities Lenders may have in the Senior Facilities

Collateral is, at best, very thin to begin with and could quickly erode.  The Senior Facilities Lenders should not be forced to rely solely on a precarious and rapidly diminishing equity cushion for their adequate protection.  See, e.g., Kost v. First Interstate Bank of Greybull (In re Kost), 102 B.R. 829, 833 (D.Wyo. 1989) (finding lack of adequate protection where equity cushion was diminishing); In re McDaniel, 89 B.R. 861, 876 (Bankr. E.D. Wash. 1988) (same); see also Sanders v. Tucker (In re Tucker), 5 B.R. 180, 183-84 (Bankr. S.D.N.Y. 1980) (lifting automatic stay where equity cushion was deteriorating and there was "no realistic prospect for a successful rehabilitation or reorganization under Chapter 11").

2.     **The Court Should Not Allow Use of Cash Collateral
To Pay For Administrative Expenses Or Order A Carve Out**

37.     The Debtors have no unencumbered cash, have no way to compensate the Senior Facilities Lenders for any dissipation or diminution of their collateral, are unlikely to consummate a Chapter 11 reorganization and are at risk of administrative insolvency.  Nonetheless, the Debtors request a $1 million carve-out for the Debtors' professionals which apparently (although not entirely clear from the Debtors' pleadings) would apply if these Cases fail and there are insufficient unencumbered assets after satisfaction of the secured claims to pay administrative expenses in a liquidation.  The Senior Facilities Lenders do not consent to allow the Senior Facilities Collateral to backstop payment of Debtors' administrative expenses.

38.     The law is clear that a secured lenders' cash collateral may only be used to pay administrative expenses if the secured lender consents: "absent an agreement to the contrary, a secured creditor's collateral may only be charged for administrative expenses, including attorney's fees, to the extent these expenses directly benefited that secured creditor." Harvis Trien & Beck, P.C. v. Fed. Home Loan Mortg. Corp. (In re Blackwood Assocs., L.P.), 153 F.3d 61, 69 (2d Cir. 1998) (emphasis added); see also In re Cal. Webbing Indus., Inc., 370 B.R. 480, 486 (Bankr. D.R.I. 2007)

(refusing to use secured creditor's cash collateral to pay legal fees for the debtor and creditors' committee where the secured creditor did not consent to such use of its collateral in the cash collateral stipulation); cf. Borrego Springs Bank, N.A. v. Skuna River Lumber, L.L.C. (In re Skuna River Lumber, LLC), 564 F.3d 353, 355 (5th Cir. 2009) ("Generally, administrative expenses . . . are satisfied out of unencumbered assets in the bankruptcy estate.").

39.    The Bankruptcy Court for the Eastern District of Pennsylvania explained carve outs as follows:

> The term "carve out" is one of those uniquely bankruptcy phrases . . . that appears nowhere in the bankruptcy statute but connotes definite meaning to parties. It is an agreement by a party secured by all or some of the assets of the estate to allow some portion of its lien proceeds to be paid to others, *i.e.,* to carve out of its lien position. It commonly arises in two contexts. . . . Carve outs are . . . common in Chapter 11 cases in favor of debtor's attorneys as part of cash collateral  agreements. In . . . these circumstances, it is essential to note that the carve out is a product of agreement between the secured party and the beneficiary of the carve out. As the Second Circuit stated:
>
>> The Code thus deliberately protects and preserves the interests of secured creditors in property in which they have a security interest, and accordingly takes the concept of adequate protection very seriously. The Code also establishes that a secured creditor's collateral may only be diminished to the extent that the secured creditor waives its right to the protections afforded by the Code, or to the extent that the expense priority directly confers a benefit on the secured creditor.
>
> (citing Blackwood Assocs., 153 F.3d at 68). Reasoning thusly, the Court refused debtor's counsel demand that it be paid from cash collateral returned to the mortgage lender when the debtor failed to meet the terms of the cash collateral stipulation. This opinion underscores the consensual underpinnings of the carve-out concept.

In re White Glove, No. 98-12493, 1998 WL 731611, at *6 (Bankr. E.D. Pa. Oct. 14, 1998) (emphasis added).  The Senior Secured Lenders do not consent to the proposed carve-out, and consequently the Debtors' proposed cash collateral order cannot be granted.  This result is consistent with Fifth Circuit authority.  See In re Grimland, Inc., 243 F.3d 228, 233 (5th Cir. 2001) ("The

default rule in bankruptcy is . . . that administrative expenses are paid out of the estate and not by the secured creditors of the debtor.").

**3.      There Are Other Respects in Which Debtors' Proposed Order Is Deficient**

40.      The Senior Facilities Agent is continuing its review of the first day motions, and reserves the right to supplement its objection.  However, in addition to the foregoing, the Senior Facilities Agent believe that the proposed order suffers at least the following defects:

- There is no assurance that Cash Collateral (i.e., Earnings) will only be used for necessary expenses associated with operations, preservation and maintenance of the Ships;

- There is no assurance that Earnings of each Debtor is not comingled with Earnings from another Debtor or any other cash;

- Cash management of Earnings in accordance with the Senior Facilities Documents (without comingling) is not required;

- The Budget is only for four weeks and does not have sufficient line item detail, so there is no way to assess administrative insolvency risk or whether the expenditures are in fact necessary;

- The Budget should at a minimum be broken down into expense categories used by the Debtors in their first day motions (e.g., insurance costs, various categories of critical vendor payments, employees, etc.);

- The 15% expense variance is excessive, exposes the Senior Facilities Lender to unnecessary risk, and is inappropriate given the lack of detail in the Budget and the short period covered by the Budget;

- There are no events which would allow suspension of use of cash collateral under the Interim Order if the Senior Facilities Collateral becomes impaired;

- No superpriority administrative claim is granted;

- There is no requirement that the Debtors provide the Senior Facilities Agent with financial reporting or other information;

- Adequate protection liens should encumber all of the Debtors assets and property (other than avoidance actions and claims against the Senior Facilities Lenders);

- The description of the Senior Facilities Documents and transaction is wholly inadequate; and

- The description of the Greek proceedings is completely inappropriate.

## CONCLUSION

WHEREFORE, the Senior Facilities Agent respectfully requests that the Court deny the Debtors' Cash Collateral Motion to the extent it differs from the Proposed Interim Order, attached hereto as Exhibit A, restricting the use of the Cash Collateral pursuant to 11 U.S.C. §§ 363(c)(2) and 363(e).

Dated:  July 10, 2011

Respectfully submitted,

By:   /s/ Timothy A. Davidson II

ANDREWS KURTH LLP
Timothy A. Davidson II
State Bar No. 24012503
Joseph P. Rovira
State Bar No. 24066008
Andrews Kurth LLP
600 Travis, Suite 4200
Houston, Texas 77002
(713) 220-4200 (Telephone)
(713) 220-4285 (Facsimile)

WHITE & CASE LLP
Thomas E Lauria (pro hac vice motion to be filed)
Scott Greissman (pro hac vice motion to be filed)
David Hille (pro hac vice motion to be filed)
Douglas P. Baumstein (pro hac vice motion to be filed)
1155 Avenue of the Americas
New York, New York  10036
Telephone:  (212) 819-8200

Attorneys for HSH Nordbank AG, as Senior Facilities Agent

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the forgoing Objection was served this 10th day of July, 2011 via ECF notice on those parties set up for ECF notice.

*/s/ Timothy A. Davidson II*
Timothy A. Davidson II

HOU:3133889.4