# Exhibit 6

39.046

DATED  21 March 2007

**BAYTOWN NAVIGATION INC.**

– to –

**HSH NORDBANK AG**
**(as Agent)**

---

**GUARANTEE AND INDEMNITY**

---

**STEPHENSON HARWOOD**
**One, St Paul's Churchyard**
**London EC4M 8SH**
**Tel: +44 020 7329 4422**
**Fax: +44 020 7329 7100**
**Ref: 39.046**

BD-#4912196-v1

# Contents

| Clause | | Page |
|---|---|---|
| 1 | Interpretation | 1 |
| 2 | Guarantee | 3 |
| 3 | Payments and Taxes | 6 |
| 4 | Representations and warranties | 7 |
| 5 | Undertakings and acknowledgement | 11 |
| 6 | Set-off | 15 |
| 7 | Earnings Account | 15 |
| 8 | Benefit of this Guarantee | 17 |
| 9 | Notices and other matters | 18 |
| 10 | Law and jurisdiction | 19 |
| 11 | Contracts (Rights of Third Parties) Act 1999 | 20 |

**THIS GUARANTEE** is dated   21 March   2007 and made **BETWEEN**:

(1) **BAYTOWN NAVIGATION INC.,** a corporation incorporated under the laws of the Marshall Islands, whose registered office is at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH 96960, Marshall Islands, as guarantor (the "**Guarantor**"); and

(2) **HSH NORDBANK AG,** a company incorporated under the laws of Germany, whose registered office is at Gerhart-Hauptmann-Platz 50, 200 95 Hamburg, Germany as agent, for the benefit of itself and each of the other Finance Parties (as defined below) (the "**Agent**").

**WHEREAS:**

(A) by an agreement dated 7 April 2006 (the "**Facilities Agreement**") (as supplemented and amended by a first supplemental agreement dated 28 July 2006, a second supplemental agreement dated 21 March 2007 and as further supplemented and/or amended from time to time) and made between (1) Omega Navigation Enterprises, Inc. (therein and hereinafter referred to as the "**Borrower**"), (2) the banks and financial institutions set out at Schedule 1 to the Facilities Agreement (the "**Banks**"), (3) HSH Nordbank AG in its capacity as arranger (the "**Arranger**"), (4) HSH Nordbank AG in its capacity as swap bank (the "**Swap Bank**") and (5) HSH Nordbank AG (the "**Agent**", and together with the Banks, the Arranger and the Swap Bank, the "**Finance Parties**" and each a "**Finance Party**") as agent, security agent and trustee on behalf of the Finance Parties, the Banks agreed (inter alia) to advance to the Borrower upon the terms and conditions therein contained the aggregate sum of up to two hundred and ninety five million Dollars ($295,000,000);

(B) by a master swap agreement dated 7 April 2006 (the "**Master Swap Agreement**") and made between the Borrower and the Swap Bank, comprising an ISDA Master Agreement in the agreed form together with any Confirmations (as defined therein) supplemental thereto, the Borrower agreed the terms and conditions upon which it entered into interest rate swap transaction(s) with the Swap Bank in respect of the Loan (whether in whole or in part as the case may be from time to time);

(C) pursuant to an intra-group loan agreement dated 21 March 2007 (the "**Intra-Group Loan Agreement**") and made between (1) the Borrower and (2) the Guarantor, the Borrower has agreed to on-lend to the Guarantor the sum of forty seven million one hundred and fifty eight thousand six hundred and seventy four Dollars and fifty seven cents ($47,158,674.57) being part of the Loan to assist the Guarantor in financing the acquisition of the Ship; and

(D) the execution and delivery of this Guarantee is one of the conditions precedent to the Banks making their Commitments available under the Facilities Agreement and permitting the on-lending of part of the Loan to the Guarantor pursuant to the Intra-Group Loan Agreement.

**IT IS AGREED** as follows:

## 1   Interpretation

### 1.1   Defined expressions

In this Guarantee, unless the context otherwise requires or unless otherwise defined in this Guarantee, words and expressions defined in the Facilities Agreement and the Mortgage and used in this Guarantee shall have the same meaning where used in this Guarantee.

### 1.2   Definitions

In this Guarantee, unless the context otherwise requires:

"**Account Pledge**" means the pledge over the Earnings Account executed or (as the context may require) to be executed by the Guarantor in favour of the Agent as security agent and trustee on behalf of the Finance Parties in respect of the Earnings Account in the agreed form;

"**Assignee**" means any other bank or financial institution to who the Agent may assign all or any part of its rights under this Guarantee;

"**Charter**" means the time charterparty entered into or (as the context may require) to be entered into between the Owner and the Charterer;

"**Charterer**" means ST Shipping & Transport PTE. LTD. of Switzerland and includes its successors in title;

"**Charter Assignment**" means the specific assignment of the Charter executed or (as the context may require) to be executed by the Guarantor in favour of the Agent as security agent and trustee on behalf of the Finance Parties in the agreed form;

"**Collateral Instruments**" means notes, bills of exchange, certificates of deposit and other negotiable and non-negotiable instruments, guarantees, indemnities and other assurances against financial loss and any other documents or instruments which contain or evidence an obligation (with or without security) to pay, discharge or be responsible directly or indirectly for, any indebtedness or liabilities of the Guarantor or any other person liable and includes any documents or instruments creating or evidencing a mortgage, charge (whether fixed or floating), charge, lien, hypothecation, assignment, trust assignment or security interest of any kind;

"**Earnings Account**" means an interest bearing Dollar account of the Guarantor opened or (as the context may require) to be opened by the Guarantor with the Account Bank and includes any other account designated in writing by the Account Bank to be the Earnings Account for the purposes of the Facilities Agreement;

"**Finance Party**" means the Agent, the Arranger, the Swap Bank and the Banks;

"**General Assignment**" means the assignment collateral to the Mortgage executed or (as the context may require) to be executed by the Guarantor in favour of the Agent as security agent and trustee on behalf of the Finance Parties in the agreed form;

"**Guarantee**" includes each separate or independent stipulation or agreement by the Guarantor contained in this Guarantee;

"**Guaranteed Liabilities**" means all moneys, obligations and liabilities expressed to be guaranteed by the Guarantor in clause 2.1;

"**Incapacity**" means, in relation to a person, the death, bankruptcy, unsoundness of mind, insolvency, liquidation, dissolution, winding-up, administration, receivership, amalgamation, reconstruction or other incapacity of that person whatsoever (and, in the case of a partnership, includes the termination or change in the composition of the partnership);

"**Mortgage**" means a first preferred mortgage of the Ship executed (or as the context may require) to be executed by the Guarantor in favour of the Agent as security agent and trustee on behalf of the Finance Parties in the agreed form;

"**Relevant Jurisdiction**" means any jurisdiction in which or where the Guarantor is incorporated, resident, domiciled, has a permanent establishment, carries on, or has a place of business or is otherwise effectively connected;

"**Ship**" means the vessel m.v. "OMEGA THEODORE" owned by the Guarantor and registered under the Liberian flag under Official Number 13288; and

"**Transferee**" means any other bank or financial institution to which the Agent may transfer all or any part of its rights, benefits and/or obligations under this Guarantee.

1.3     **Headings**

Clause headings and the table of contents are inserted for convenience of reference only and shall be ignored in the interpretation of this Guarantee.

1.4     **Construction of certain terms**

The provisions of clause 1.4 of the Facilities Agreement shall apply to this Guarantee as if set out herein and as if references therein to "**this Agreement**" were references to "**this Guarantee**".

## 2     Guarantee

2.1     **Covenant to pay**

In consideration of the Banks making or continuing loans or advances to, or otherwise giving credit or granting banking facilities or accommodation or granting time to, the Borrower pursuant to the Facilities Agreement and agreeing to the on-lending of part of the Loan by the Borrower to the Guarantor pursuant to the Intra-Group Loan Agreement the Guarantor hereby guarantees to pay to the Agent, for the account of the Finance Parties, on demand by the Agent all moneys and discharge all obligations and liabilities now or hereafter due, owing or incurred by the Borrower to the Finance Parties or any of them and/or the Agent under or pursuant to the Facilities Agreement, the Master Swap Agreement and the other Borrower's Security Documents when the same become due for payment or discharge whether by acceleration or otherwise, and whether such moneys, obligations or liabilities are express or implied, present, future or contingent, joint or several, incurred as principal or surety, originally owing to the Finance Parties or any of them or the Agent or purchased or otherwise acquired by them or it, denominated in Dollars or in any other currency, or incurred on any banking account or in any other manner whatsoever.

Such liabilities shall, without limitation, include interest (as well after as before judgment) to date of payment at such rates and upon such terms as may from time to time be agreed, commission, fees and other charges and all legal and other costs, charges and expenses on a full and unqualified indemnity basis which may be incurred by the Finance Parties in relation to any such moneys, obligations or liabilities or generally in respect of the Borrower, the Swap Bank, the Guarantor or any Collateral Instrument.

2.2     **Guarantor as principal debtor; indemnity**

As a separate and independent stipulation, the Guarantor agrees that if any purported obligation or liability of the Borrower which would have been the subject of this Guarantee had it been valid and enforceable is not or ceases to be valid or enforceable against the Borrower on any ground whatsoever whether or not known to the Finance Parties or any of them or the Swap Bank or the Agent (including, without limitation, any irregular exercise or absence of any corporate power or lack of authority of, or breach of duty by, any person purporting to act on behalf of the Borrower or any legal or other limitation, whether under the Limitation Acts or otherwise or any disability or Incapacity or any change in the constitution of the Borrower) the Guarantor shall nevertheless be liable to the Finance Parties in respect of that purported obligation or liability as if the same were fully valid and enforceable and the Guarantor were the principal debtor in respect thereof.  The Guarantor hereby agrees to keep the Agent, the Swap Bank and the other Finance Parties fully indemnified on demand against all damages, losses, costs and expenses arising from any failure of the Borrower to perform or discharge any such purported obligation or liability.

**2.3    Statements of account conclusive**

Any statement of account, signed as correct by an officer of the Agent, showing the amount of the Guaranteed Liabilities shall, in the absence of manifest error, be binding and conclusive on and against the Guarantor.

**2.4    No security taken by Guarantor**

The Guarantor warrants that it has not taken or received, and undertakes that until all the Guaranteed Liabilities of the Borrower have been paid or discharged in full, it will not take or receive, the benefit of any security from the Borrower or any other person in respect of its obligations under this Guarantee.

**2.5    Interest**

The Guarantor agrees to pay interest on each amount demanded of it under this Guarantee from the date of such demand until payment (as well after as before judgment) at the rate specified in clause 3.4 of the Facilities Agreement which shall be compounded at the end of each period determined for this purpose by the Agent in the event of it not being paid when demanded but without prejudice to the Finance Parties' right to require payment of such interest.

**2.6    Continuing security and other matters**

This Guarantee shall:

2.6.1    secure the ultimate balance from time to time owing to the Agent and/or the other Finance Parties by the Borrower and shall be a continuing security, notwithstanding any settlement of account or other matter whatsoever;

2.6.2    be in addition to any present or future Collateral Instrument, right or remedy held by or available to the Finance Parties or any of them; and

2.6.3    not be in any way prejudiced or affected by the existence of any such Collateral Instrument, rights or remedies or by the same becoming wholly or in part void, voidable or unenforceable on any ground whatsoever or by the Agent or any of the other Finance Parties dealing with, exchanging, varying or failing to perfect or enforce any of the same or giving time for payment or indulgence or compounding with any other person liable.

**2.7    Liability unconditional**

The liability of the Guarantor shall not be affected nor shall this Guarantee be discharged or reduced by reason of:

2.7.1    the Incapacity or any change in the name, style or constitution of the Borrower or any other person liable;

2.7.2    the Agent or any of the other Finance Parties granting any time, indulgence or concession to, or compounding with, discharging, releasing or varying the liability of, the Borrower or any other person liable or renewing, determining, varying or increasing any accommodation, facility or transaction or otherwise dealing with the same in any manner whatsoever or concurring in, accepting or varying any compromise, arrangement or settlement or omitting to claim or enforce payment from the Borrower or any other person liable; or

2.7.3    any act or omission which would not have discharged or affected the liability of the Guarantor had it been a principal debtor instead of a guarantor or by anything done or omitted which but for this provision might operate to exonerate the Guarantor.

**2.8      Collateral Instruments**

Neither the Agent nor the other Finance Parties shall be obliged to make any claim or demand on the Borrower or to resort to any Collateral Instrument or other means of payment now or hereafter held by or available to them or it before enforcing this Guarantee and no action taken or omitted by the Agent or the other Finance Parties in connection with any such Collateral Instrument or other means of payment shall discharge, reduce, prejudice or affect the liability of the Guarantor under this Guarantee nor shall the Agent or the other Finance Parties be obliged to apply any money or other property received or recovered in consequence of any enforcement or realisation of any such Collateral Instrument or other means of payment in reduction of the Guaranteed Liabilities.

**2.9      Waiver of Guarantor's rights**

Until all the Guaranteed Liabilities have been paid, discharged or satisfied in full (and notwithstanding payment of a dividend in any liquidation or under any compromise or arrangement) the Guarantor agrees that, without the prior written consent of the Agent, it will not:

2.9.1     exercise its rights of subrogation, reimbursement and indemnity against the Borrower or any other person liable;

2.9.2     demand or accept repayment in whole or in part of any indebtedness now or hereafter due to the Guarantor from the Borrower or from any other person liable or demand or accept any Collateral Instrument in respect of the same or dispose of the same;

2.9.3     take any step to enforce any right against the Borrower or any other person liable in respect of any Guaranteed Liabilities; or

2.9.4     claim any set-off or counterclaim against the Borrower or any other person liable or claim or prove in competition with the Agent or any of the other Finance Parties in the liquidation of the Borrower or any other person liable or have the benefit of, or share in, any payment from or composition with, the Borrower or any other person liable or any other Collateral Instrument now or hereafter held by the Agent or any of the other Finance Parties for any Guaranteed Liabilities or for the obligations or liabilities of any other person liable but so that, if so directed by the Agent, it will prove for the whole or any part of its claim in the liquidation of the Borrower or any other person liable on terms that the benefit of such proof and of all money received by it in respect thereof shall be held on trust for the Agent and the other Finance Parties and applied in or towards discharge of the Guaranteed Liabilities in such manner as the Agent shall deem appropriate.

**2.10    Suspense accounts**

Any money received in connection with this Guarantee (whether before or after any Incapacity of the Borrower or the Guarantor) may be placed to the credit of a suspense account with a view to preserving the rights of the Agent and the other Finance Parties to prove for the whole of their respective claims against the Borrower or any other person liable or may be applied in or towards satisfaction of such of the Guaranteed Liabilities as the Agent may from time to time conclusively determine in its absolute discretion.

**2.11    Settlements conditional**

Any release, discharge or settlement between the Guarantor and the Agent or any of the other Finance Parties shall be conditional upon no security, disposition or payment to the Agent or any of the other Finance Parties by the Borrower or any other person liable being void, set aside or ordered to be refunded pursuant to any enactment or law relating to bankruptcy, liquidation, administration or insolvency or for any other reason whatsoever and if such condition shall not be fulfilled the Agent and the other Finance Parties shall be entitled to enforce this Guarantee

subsequently as if such release, discharge or settlement had not occurred and any such payment had not been made.

2.12    **Guarantor to deliver up certain property**

If, contrary to clauses 2.4 or 2.9, the Guarantor takes or receives the benefit of any security or receives or recovers any money or other property, such security, money or other property shall be held on trust for the Agent and shall be delivered to the Agent on demand.

2.13    **Retention of this Guarantee**

The Finance Parties shall be entitled to retain this Guarantee after as well as before the payment or discharge of all the Guaranteed Liabilities for such period as the Agent may determine.

## 3    Payments and Taxes

3.1    **No set-off or counterclaim**

All payments to be made by the Guarantor under this Guarantee shall be made in full, without any set-off or counterclaim whatsoever and, subject as provided in clause 3.2, free and clear of any deductions or withholdings, in Dollars on the due date to the account of the Agent referred to in clause 6.1 of the Facilities Agreement.   Save as otherwise expressly provided by the Facilities Agreement such payments shall be for the account of the Agent and the other Finance Parties shall forthwith distribute such payments in like funds as are received by the Agent to the Finance Parties rateably in accordance with their Commitments or Contributions, as the case may be.

3.2    **Grossing up for Taxes**

If at any time the Guarantor is required to make any deduction or withholding in respect of Taxes from any payment due under this Guarantee for the account of any Bank or the Agent (or if the Agent is required to make any such deduction or withholding from a payment to a Bank), the sum due from the Guarantor in respect of such payment shall be increased to the extent necessary to ensure that, after the making of such deduction or withholding, each Bank and the Agent receives on the due date for such payment (and retains, free from any liability in respect of such deduction or withholding) a net sum equal to the sum which it would have received had no such deduction or withholding been required to be made and the Guarantor shall indemnify each Bank and the Agent against any losses or costs incurred by any of them by reason of any failure of the Guarantor to make any such deduction or withholding or by reason of any increased payment not being made on the due date for such payment.  The Guarantor shall promptly deliver to the Agent any receipts, certificates or other proof evidencing the amounts (if any) paid or payable in respect of any deduction or withholding as aforesaid.

3.3    **Currency indemnity**

If any sum due from the Guarantor under this Guarantee or any order or judgment given or made in relation hereto has to be converted from the currency (the "**first currency**") in which the same is payable under this Guarantee or under such order or judgment into another currency (the "**second currency**") for the purpose of (a) making or filing a claim or proof against the Guarantor, (b) obtaining an order or judgment in any court or other tribunal or (c) enforcing any order or judgment given or made in relation to this Guarantee, the Guarantor shall indemnify and hold harmless the Agent and each Finance Party from and against any loss suffered as a result of any difference between (i) the rate of exchange used for such purpose to convert the sum in question from the first currency into the second currency and (ii) the rate or rates of exchange at which the Agent or such Finance Party may in the ordinary course of business purchase the first currency with the second currency upon receipt of a sum paid to it in

satisfaction, in whole or in part, of any such order, judgment, claim or proof. Any amount due from the Guarantor under this clause 3.3 shall be due as a separate debt and shall not be affected by judgment being obtained for any other sums due under or in respect of this Guarantee and the term "**rate of exchange**" includes any premium and costs of exchange payable in connection with the purchase of the first currency with the second currency.

# 4      Representations and warranties

## 4.1      Continuing representations and warranties

The Guarantor represents and warrants that:

### 4.1.1      Due incorporation

the Guarantor and its Related Companies are duly incorporated and validly existing under the laws of the respective countries of their incorporation as corporations having limited liability and have power to carry on their respective businesses as they are now being conducted and to own their respective property and other assets;

### 4.1.2      Corporate power to guarantee

the Guarantor has power to execute, deliver and perform its obligations under this Guarantee and the Security Documents and the Underlying Documents to which it is, or is to be, a party; all necessary corporate, shareholder and other action has been taken to authorise the execution, delivery and performance of the same and no limitation on the powers of the Guarantor to borrow or give guarantees will be exceeded as a result of this Guarantee;

### 4.1.3      Binding obligations

this Guarantee and the Security Documents and the Underlying Documents to which the Guarantor is, or is to be, a party constitute or will, when executed, constitute valid and legally binding obligations of the Guarantor enforceable in accordance with their respective terms;

### 4.1.4      No conflict with other obligations

the execution and delivery of, the performance of its obligations under, and compliance with the provisions of, this Guarantee and the Security Documents and the Underlying Documents to which the Guarantor is, or is to be, a party by the Guarantor will not (i) contravene any existing applicable law, statute, rule or regulation or any judgment, decree or permit to which the Guarantor is subject, (ii) conflict with, or result in any breach of any of the terms of, or constitute a default under, any agreement or other instrument to which the Guarantor is a party or is subject or by which it or any of its property is bound, (iii) contravene or conflict with any provision of the Guarantor's memorandum and articles of association/articles of incorporation/by-laws/statutes or other constitutional documents or (iv) result in the creation or imposition of or oblige the Guarantor or any of its Related Companies to create any Encumbrance (other than a Permitted Encumbrance) on any of the Guarantor's or its Related Companies' undertakings, assets, rights or revenues;

### 4.1.5      No litigation

no litigation, arbitration or administrative proceeding is taking place, pending or, to the knowledge of the officers of the Guarantor, threatened against the Guarantor or any of its Related Companies which could have a material adverse effect on the business, assets or financial condition of the Guarantor or any of its Related Companies;

### 4.1.6      Financial Statements

the Form F-1 Registration Statement registered with the United States Securities and Exchange Commission and or the Singapore prospectus registered with the Singapore Exchange

Securities Trading Limited and the pro forma historical consolidated financial statements of the Borrower's Group for the 2003 and 2004 Financial Years and the pro forma opening balance sheet of the Borrower's Group attach to such Registration Statement have been prepared in accordance with GAAP which have been consistently applied and present fairly and accurately the financial position of the Borrower and the Borrower's Group and at such date neither the Borrower nor any member of the Borrower's Group had any significant liabilities (contingent or otherwise) or any unrealised or anticipated losses which are not disclosed by, or reserved against or provided for in, such financial statements;

4.1.7    **No filings required**

save for the registration of the Mortgage in Liberia, it is not necessary to ensure the legality, validity, enforceability or admissibility in evidence of this Guarantee or any of the Security Documents and the Underlying Documents to which the Guarantor is, or is to be, a party that it or any other instrument be notarised, filed, recorded, registered or enrolled in any court, public office or elsewhere in any Relevant Jurisdiction or that any stamp, registration or similar tax or charge be paid in any Relevant Jurisdiction on or in relation to this Guarantee or any of the Security Documents and the Underlying Documents to which the Guarantor is, or is to be, a party and this Guarantee and the Security Documents and the Underlying Documents to which the Guarantor is, or is to be, a party are in proper form for their enforcement in the courts of each Relevant Jurisdiction;

4.1.8    **Choice of law**

the choice of English law to govern the Guarantee, the Underlying Documents and the Security Documents to which the Guarantor is, or is to be, a party (other than the Mortgage and the Account Pledge) and the choice of the laws of the Flag State to govern the Mortgage and the laws of Germany to govern the Account Pledge and the submission by the Guarantor to the non-exclusive jurisdiction of the English courts are valid and binding;

4.1.9    **No immunity**

neither the Guarantor nor any of its assets is entitled to immunity on the grounds of sovereignty or otherwise from any legal action or proceeding (which shall include, without limitation, suit, attachment prior to judgment, execution or other enforcement);

4.1.10    **Consents obtained**

every consent, authorisation, licence or approval of, or registration with or declaration to, governmental or public bodies or authorities or courts required by the Guarantor to authorise, or required by the Guarantor in connection with, the execution, delivery, validity, enforceability or admissibility in evidence of this Guarantee or any of the Security Documents and the Underlying Documents to which the Guarantor is, or is to be, a party or the performance by the Guarantor of its obligations under this Guarantee or under any of the Security Documents and the Underlying Documents to which the Guarantor is, or is to be, a party has been obtained or made and is in full force and effect and there has been no default in the observance of the conditions or restrictions (if any) imposed in, or in connection with, any of the same;

4.1.11    **No money laundering**

in the performance and discharge of the Guarantor's obligations and liabilities under this Guarantee, the Security Documents and the Underlying Documents to which it is, or will be a party and the transactions and other arrangements effected or contemplated thereunder, the Guarantor is acting for its own account and that the foregoing will not involve or lead to contravention of any law, official, requirement or other regulatory measure or procedure implemented to combat "**money laundering**" (as defined in Article 1 of the Directive (91/308/EEC) of the Council of the European Communities); and

4.1.12      **Ownership**

it is a wholly owned subsidiary of the Borrower.

4.2      **Initial representations and warranties**

The Guarantor further represents and warrants that:

4.2.1      **No material adverse change**

there has been no material adverse change in the financial position of the Guarantor or the consolidated financial position of the Borrower's Group from that set forth in the financial statements referred to in clause 4.1.6;

4.2.2      **Pari passu**

the obligations of the Guarantor under this Guarantee are direct, general and unconditional obligations of the Guarantor and rank at least pari passu with all other present and future unsecured and unsubordinated Indebtedness of the Guarantor;

4.2.3      **No default under other Indebtedness**

neither the Guarantor nor any of its Related Companies is (nor would with the giving of notice or lapse of time or the satisfaction of any other condition or any combination thereof be) in breach of or in default under any agreement relating to Indebtedness to which it is a party or by which it may be bound;

4.2.4      **Information**

the information, exhibits and reports furnished by the Guarantor to the Agent and the Banks in connection therewith or with the negotiation and preparation of this Guarantee and the other Security Documents to which the Guarantor is, or is to be, a party are true and accurate in all material respects and not misleading, do not omit material facts and all reasonable enquiries have been made to verify the facts and statements contained therein; there are no other facts the omission of which would make any fact or statement therein misleading;

4.2.5      **No withholding Taxes**

no Taxes are imposed by withholding or otherwise on any payment to be made by the Guarantor under this Guarantee or under the Security Documents and the Underlying Documents to which the Guarantor is, or is to be, a party or are imposed on or by virtue of the execution or delivery by the Guarantor of this Guarantee or the Security Documents and the Underlying Documents to which the Guarantor is, or is to be, a party or any document or instrument to be executed or delivered thereunder;

4.2.6      **No Default**

no Default has occurred and is continuing:

4.2.7      **Ship**

the Ship is:

(a)      in the absolute ownership of the Guarantor who is the sole, legal and beneficial owner of that Ship;

(b)      registered in the name of the Guarantor under the laws and flag of the relevant Flag State through the relevant Registry;

(c)    operationally seaworthy and in every way fit for service; and

(d)    classed with the relevant Classification free of all requirements and recommendations of the relevant Classification Society affecting class;

4.2.8    **Ship's employment**

other than the Charter, the Ship will not on or before the relevant Delivery Date be subject to any charter or contract or to any agreement to enter into any charter or contract which, if entered into after the date of the Mortgage would have required the consent of the Agent and on such Delivery Date there will not be any agreement or arrangement whereby the Earnings for such Ship may be shared with any other person;

4.2.9    **Freedom from Encumbrances**

neither the Ship, nor its Earnings, Insurances or Requisition Compensation (each as defined in the Mortgage) nor the Earnings Account nor any other properties or rights which are, or are to be, the subject of any of the Security Documents nor any part thereof will, on the Delivery Date for the Ship, be subject to any Encumbrance other than a Permitted Encumbrance;

4.2.10    **Environmental matters**

to the best of the knowledge and belief of the Guarantor and its officers:

(a)    all Environmental Laws applicable to any Fleet Vessel have been complied with and all consents, licences and approvals required under such Environmental Laws have been obtained and complied with; and

(b)    no Environmental Claim has been made or threatened or is pending against any member of the Borrower's Group or any Fleet Vessel and not fully satisfied; and

(c)    there has been no Environmental Incident;

4.2.11    **Parent company**

the Guarantor is a wholly owned Subsidiary of the Borrower; and

4.2.12    **Copies true and complete**

the copies of each of the Underlying Documents delivered or to be delivered to the Banks pursuant to clause 9.1 of the Facilities Agreement and the Master Swap Agreement are, or will when delivered be, true and complete copies of such documents and each of such documents will when delivered constitutes valid and binding obligations of the parties thereto enforceable in accordance with its terms and there have been no amendments or variations thereof or defaults thereunder.

4.3    **Repetition of representations and warranties**

On and as of each day from the date of this Guarantee until all moneys due or owing by the Borrower under the Facilities Agreement, the Master Swap Agreement and/or the other Borrower's Security Documents and/or by the Guarantor under this Guarantee have been paid in full the Guarantor shall (a) be deemed to repeat the representations and warranties in clause 4.1 (and so that for this purpose the representation and warranty in clause 4.1.6 shall refer to the then latest audited financial statements delivered to the Agent under clause 5.1) as if made with reference to the facts and circumstances existing on each such day and (b) be deemed to further represent and warrant that the then latest audited financial statements delivered to the Agent (if any) under clause 5.1 have been prepared in accordance with GAAP which have been consistently applied and present fairly and accurately the financial position of the Borrower's Group and the Guarantor as at the end of the financial year to which the same

relate and the results of the operations of each of the Borrower's Group and the Guarantor for the financial period to which the same relate and, as at the end of such financial period, neither the Borrower's Group nor the Guarantor had any significant liabilities (contingent or otherwise) any unrealised or anticipated losses which are not disclosed by, or reserved against or provided for in, such financial statements.

## 5    Undertakings and acknowledgement

### 5.1    General

The Guarantor undertakes with the Agent and each of the other Finance Parties that, from the date of this Guarantee and so long as any moneys are owing under this Guarantee, it will:

#### 5.1.1    Notice of default

promptly inform the Agent and each of the Finance Parties of any occurrence of which it becomes aware which might adversely affect its ability to perform its obligations under this Guarantee or any of the Security Documents and the Underlying Documents to which the Guarantor is, or is to be, a party and without limiting the generality of the foregoing, will inform the Agent and each of the Finance Parties of any Default forthwith upon becoming aware thereof and will from time to time, if so requested by the Agent or any Finance Party confirm to the Agent and each of the Finance Parties in writing that, save as otherwise stated in such confirmation, no Default has occurred and is continuing;

#### 5.1.2    Consents and licences

without prejudice to clause 4.1, obtain or cause to be obtained, maintain in full force and effect and comply in all material respects with the conditions and restrictions (if any) imposed in, or in connection with, every consent, authorisation, licence or approval of governmental or public bodies or authorities or courts and do, or cause to be done, all other acts and things which may from time to time be necessary or desirable under applicable law for the continued due performance of all its obligations under this Guarantee and the Security Documents and the Underlying Documents to which the Guarantor is, or is to be, a party;

#### 5.1.3    Pari passu

ensure that its obligations under this Guarantee and the Security Documents and the Underlying Documents to which the Guarantor is, or is to be, a party shall, without prejudice to the provisions of clause 5.2, at all times rank at least pari passu with all its other present and future unsecured and unsubordinated Indebtedness with the exception of any obligations which are mandatorily preferred by law and not by contract;

#### 5.1.4    Financial statements

prepare financial statements of the Guarantor in accordance with GAAP consistently applied in respect of each Financial Year and cause the same to be reported on by its auditors (which shall be acceptable to the Agent in its sole discretion) and prepare quarterly unaudited financial statements of the Guarantor in respect of each Financial Quarter on the same basis as the annual statements and deliver sufficient copies of the same to the Agent for distribution to all the Banks as soon as practicable but not later than one hundred and eighty (180) days (in the case of audited financial statements) or sixty (60) days (in the case of unaudited financial statements) after the end of the financial period to which they relate;

#### 5.1.5    Delivery of reports

deliver to the Finance Parties, sufficient copies for all the Banks of each of the following documents, in each case at the time of issue thereof every report, circular, notice or like document issued by the Guarantor to its shareholders or creditors generally;

5.1.6    **Provision of other information**

provide the Finance Parties with such financial and other information concerning the Guarantor, its Related Companies and their respective affairs as the Finance Parties may from time to time reasonably require; and

5.1.7    **Security Documents**

(a)    execute and (where necessary or appropriate) register in favour of the Agent (as security agent and trustee for and on behalf of the Finance Parties) the Mortgage and the General Assignment collateral thereto over the Ship, the Charter Assignment and the Account Pledge;

(b)    immediately upon the Ship becoming subject to a charter, execute and (where necessary or appropriate) register in favour of the Agent (as security agent and trustee for and on behalf of the Finance Parties) the Charter Assignment; and

(c)    duly and punctually perform each of the obligations expressed to be assumed by it under this Guarantee and the other Security Documents and the Underlying Documents to which it is, or is to be, a party;

5.1.8    **Compliance with ISM Code**

and will procure that any Operator will, comply with and ensure that the Ship and any Operator comply with the requirements of the ISM Code, including (but not limited to) the maintenance and renewal of valid certificates pursuant thereto throughout the Security Period;

5.1.9    **Withdrawal of DOC and SMC**

and will procure that any Operator will, immediately inform the Agent if there is any threatened or actual withdrawal of its or an Operator's DOC or the SMC in respect of the Ship;

5.1.10    **Issuance of DOC and SMC**

and will procure that any Operator will, promptly inform the Agent upon the issue to the Borrower or any Operator of a DOC and to the Ship of an SMC or the receipt by any of the Borrower or any Operator of notification that its application for the same has been refused;

5.1.11    **Compliance with ISPS Code**

and will procure that the Ship will comply with the requirements of the ISPS Code including (but not limited to) the maintenance and renewal of the ISSC for the Ship pursuant to the ISPS Code and will immediately inform the Agent if there is any actual or threatened withdrawal of the ISSC for the Ship;

5.1.12    **Know your customer and money laundering compliance**

provide the Banks with such documents and evidence as the Banks shall from time to time require, based on applicable law and regulations from time to time and the Banks' own "know your customer" internal guidelines from time to time to identify the Guarantor and the other Security Parties, including the ultimate legal and beneficial owner or owners of such entities, and any other persons involved or affected by the transaction(s) contemplated by this Facilities Agreement;

5.1.13    **Minimum Liquidity**

maintain and procure that the Borrower maintains on a consolidated basis Minimum Liquidity;

5.1.14    **Cashflow**

ensure and procure that all its and each of the Borrower's free and unencumbered undertakings, assets, rights or revenues (including without limitation all cash and cashflow) shall be immediately available to meet any and all of the Guarantor's obligations under this Guarantee.

5.2    **Negative undertakings**

The Guarantor undertakes with the Agent and each of the other Finance Parties that, from the date of this Guarantee and so long as any moneys are owing under this Guarantee, it will not, without the prior written consent of the Agent:

5.2.1    **Negative charge**

permit:

(a)    any Encumbrance (other than a Permitted Encumbrance) by the Guarantor to subsist, arise or be created or extended over all or any part of its present or future undertaking, assets, rights or revenues to secure any present or future Indebtedness of the Guarantor or any other person; or

(b)    any Indebtedness of the Guarantor to be guaranteed or otherwise assured against financial loss by any person other than the Guarantor;

5.2.2    **No merger**

merge or consolidate with any other company or person;

5.2.3    **Disposals**

and will procure that none of its Related Companies will and will not itself sell, transfer, lend or otherwise dispose of or cease to exercise direct control over any part (being either alone or when aggregated with all other disposals falling to be taken into account pursuant to this clause 5.2.3 material in the opinion of the Agent in relation to the undertakings, assets, rights and revenues of the Guarantor and its Related Companies taken as a whole) of its present or future undertakings, assets, rights or revenues (otherwise than by transfers, sales or disposals for full consideration in the ordinary course of trading) whether by one or a series of transactions related or not;

5.2.4    **Ownership of Guarantor**

permit any change to the legal or beneficial ownership of the Guarantor specified in clause 4.2.11;

5.2.5    **Other business**

undertake any business other than the ownership and operation of the Ship and the chartering of the Ship to third parties;

5.2.6    **Acquisitions**

acquire any further assets other than the Ship and rights arising under contracts entered into by or on behalf of the Guarantor in the ordinary course of its business of owning, operating and chartering the Ship;

5.2.7   **Other obligations**

incur any obligations except for obligations arising under the Underlying Documents or the Security Documents to which the Guarantor is, or is to be, a party or contracts entered into in the ordinary course of its business of owning, operating and chartering the Ship;

5.2.8   **No borrowing**

incur any Borrowed Money except for Borrowed Money pursuant to the Security Documents and the Intra-Group Loan Agreement;

5.2.9   **Repayment of borrowings**

repay the principal of, or pay interest on or any other sum in connection with any of its Borrowed Money except, subject always to the provisions of clause 7.4, for Borrowed Money pursuant to the Security Documents and the Intra-Group Loan Agreement;

5.2.10   **Guarantees**

issue any guarantees or indemnities or otherwise become directly or contingently liable for the obligations of any person, firm, or corporation except pursuant to the Security Documents and except for guarantees or indemnities from time to time required in the ordinary course by any protection and indemnity or war risks association with which the Ship is entered, guarantees required to procure the release of the Ship from any arrest, detention, attachment or levy or guarantees or undertakings required for the salvage of the Ship);

5.2.11   **Loans**

make any loans or grant any credit (save for normal trade credit in the ordinary course of business) to any person or agree to do so;

5.2.12   **Sureties**

permit any Indebtedness of the Guarantor to any person (other than the Banks) to be guaranteed by any person (save for guarantees or indemnities from time to time required in the ordinary course by any protection and indemnity or war risks association with which the Ship is entered, guarantees required to procure the release the Ship from any arrest, detention, attachment or levy or guarantees or undertakings required for the salvage of such Ship);

5.2.13   **Share capital**

purchase or otherwise acquire for value any shares of its capital;

5.2.14   **Dividends and distribution**

declare or pay any dividends or distribute any of its present or future assets, undertakings, rights or revenues to any of its shareholders:

(a)   where a Default has occurred and is continuing or would occur as a result of or following the declaration of such dividend; or

(b)   where during period commencing from the date of the Facilities Agreement and terminating on the date falling twenty four (24) months thereafter (for the purposes of this clause 5 the "**Second Anniversary**") the Fleet Market Value is less than one hundred and thirty five per cent (135%); or

(c)   where during the period commencing from the Second Anniversary and terminating on the date falling thirty six (36) months after the date of the Facilities Agreement (for the purposes of this clause 5 the "**Third Anniversary**") the Fleet Market Value is less than one hundred and forty per cent (140%); or

BD-#4912196-v1                                   14

(d)     where during the period commencing from the Third Anniversary until all sums due and payable hereunder have been paid in full the Fleet Market Value is less than one hundred and forty five per cent (145%); and

5.2.15   **Financial Year**

make any change to the Financial Year for the Guarantor.

5.3   **Pre-delivery undertakings**

The Guarantor undertakes with the Agent and each of the other Finance Parties, that from the date of this Guarantee and so long as any moneys are owing under this Guarantee, it will comply with the provisions of clauses 8.4 and 8.5 of the Facilities Agreement as if such clauses were incorporated in this Guarantee *mutatis mutandis* and all references therein to the Borrower were to the Guarantor.

5.4   **Financial Covenants**

The Guarantor undertakes with the Agent and each of the other Finance Parties, that from the date of this Guarantee and so long as any moneys are owing under this Guarantee, it will procure compliance by the Borrower with the provisions of clause 8.7 of the Facilities Agreement.

5.5   **Acknowledgement**

The Guarantor hereby acknowledges and agrees that all the Borrower's rights, title, interests in and to the Intra-Group Loan Agreement, including without limiting the generality or the foregoing, its right to receive repayment of the intra-group loan made available by the Borrower to the Guarantor, has been assigned by the Borrower to the Agent (as security agent and trustee for and on behalf of the Finance Parties) as security for the Loan.

6   **Set-off**

The Guarantor authorises each Bank to apply any credit balance to which the Guarantor is then entitled on any account of the Guarantor with such Bank at any of its branches in or towards satisfaction of any sum then due and payable from the Guarantor to such Bank under this Guarantee. For this purpose each Bank is authorised to purchase with the moneys standing to the credit of such account such other currencies as may be necessary to effect such application. No Bank shall be obliged to exercise any right given to it by this clause 6. Each Bank shall notify the Agent and the Guarantor forthwith upon the exercise or purported exercise of any right of set-off giving full details in relation thereto and the Agent shall inform the other Banks.

7   **Earnings Account**

7.1   **General**

The Guarantor undertakes with the Agent and each of the other Finance Parties that it will:

7.1.1   on or before the first Drawdown Date open the Earnings Account; and

7.1.2   procure that all moneys payable to the Guarantor in respect of the Earnings (as defined in the General Assignment) of the Ship shall, unless and until the Agent directs to the contrary pursuant to proviso (a) to clause 2.1 of the General Assignment be paid to the Earnings Account Provided however that if any of the moneys paid to the Earnings Account are payable in a currency other than Dollars, the Guarantor shall instruct the Account Bank to convert such moneys into Dollars at the Account Bank's spot rate of exchange at the relevant time for the

purchase of Dollars with such currency and the term "**spot rate of exchange**" shall include any premium and costs of exchange payable in connection with the purchase of Dollars with such currency.

7.2     **Earnings Accounts terms**

7.2.1   The Guarantor shall, unless and until a Default shall occur and the Agent shall direct to the contrary, be entitled from time to time, subject to the agreement of the Account Bank, to require that moneys for the time being standing to the credit of the Earnings Account be transferred in such amounts and for such periods as the Guarantor selects to fixed-term deposit accounts ("**deposit accounts**") opened in the name of the Guarantor with the Account Bank.   The Guarantor hereby acknowledges that it shall not be entitled pursuant to clause 7.3 to withdraw moneys standing to the credit of the Earnings Account which are the subject of a fixed term deposit until the expiry of the period of such deposit unless the Guarantor shall, on withdrawing such moneys pay to the Account Bank on demand any loss or expense which the Account Bank shall certify that it has sustained or incurred as a result of such withdrawal being made prior to the expiry of the period of the relevant deposit and the Account Bank shall be entitled to debit the Earnings Account for the amount so certified prior to such withdrawal being made.   In the event that any moneys so deposited are to be applied pursuant to clause 7.4, the Guarantor shall, on such application being made, pay to the Account Bank on demand any loss or expense which the Account Bank shall certify that it has sustained or incurred as a result of such application being made prior to the expiry of the period of the relevant deposit and the Account Bank shall be entitled to debit the Earnings Account for the amount so certified prior to such application being made.   Any deposit accounts shall, for all the purposes of the Security Documents, be deemed to be sub-accounts of Earnings Account from which the moneys deposited in the deposit accounts were transferred and all references in the Security Documents to the Earnings Accounts shall be deemed to include the deposit accounts deemed as aforesaid to be sub-accounts thereof.

7.3     **Earnings Accounts: withdrawals**

Unless the Agent otherwise agrees in writing, the Guarantor shall not be entitled to withdraw any moneys from the Earnings Account at any time during the Security Period save that, unless and until a Default shall occur and the Agent shall direct to the contrary, the Guarantor may, subject to clause 7.1, withdraw moneys from the Earnings Account:

7.3.1   following the Delivery of the Ship to pay the proper and reasonable operating expenses (including costs of insuring, repairing and maintaining the Ship) of the Ship and the proper and reasonable expenses of administering the affairs of the Guarantor;

7.3.2   to pay any Manager's remuneration under the Management Agreement in the amounts and at the times therein stated;

7.3.3   to pay or discharge liabilities or obligations to third parties not exceeding the aggregate of any deductible under the Ship's insurances applicable to such liabilities or obligations and the amount of any insurance moneys in respect of such liabilities or obligations which have been paid by such Ship's insurers to the Earnings Account with the knowledge and approval of the Agent; and

7.3.4   to pay for the making good and/or repair of any loss or damage resulting from a casualty to the Ship not exceeding the aggregate of any deductible under the Ship's insurances applicable to such casualty and the amount of any insurance moneys in respect of such casualty and not exceeding the costs of making good and/or repairing any such loss or damage which have been paid by the Ship's insurers to the Earnings Account with the knowledge and approval of the Agent.

7.4        **Application of account**

7.4.1      Until such time as all sums due and payable under the Facilities Agreement, the Master Swap Agreement and each of the other Security Documents have been satisfied in full the obligation of the Guarantor to pay all sums of principal and interest and any of the sums payable under the Intra-Group Loan Agreement shall be fully satisfied by the Guarantor crediting the relevant sums to the Earnings Account and the Guarantor hereby irrevocably and unconditionally agrees that it shall not without the prior written consent of the Agent pay any moneys whatsoever to the Borrower or for the Borrower's account and acknowledges that all moneys from time to time standing to the credit of the Earnings Account shall be fully available to the Agent for application towards payment of any instalments of principal or interest or any other amounts then payable by the Borrower pursuant to the Facilities Agreement, the Master Swap Agreement and any of the other Security Documents.

7.4.2      At any time after the occurrence of an Event of Default, the Agent and/or the Banks may, without notice to the Guarantor or the Borrower, instruct the Account Bank to apply all moneys then standing to the credit of the Earnings Account (together with interest from time to time accruing or accrued thereon) in or towards satisfaction of any sums due to the Banks under the Security Documents in the manner specified in clause 13.1 of the Facilities Agreement.

7.5        **Security over account**

           The Earnings Account and all amounts from time to time standing to the credit thereof shall be subject to the security constituted and the rights conferred by the Account Pledge.

8          **Benefit of this Guarantee**

8.1        **Benefit and burden**

           This Guarantee shall be binding upon the Guarantor and its successors in title and shall enure for the benefit of the Agent, for the benefit of itself and each of the Finance Parties and their respective successors in title and (in the case of the Banks) their Assignees and Transferees. The Guarantor expressly acknowledges and accepts the provisions of clause 15 of the Facilities Agreement and agrees that any person in favour of whom an assignment or a transfer is made in accordance with such clause shall be entitled to the benefit of this Guarantee.

8.2        **Changes in constitution or reorganisation of Banks or Agent**

           For the avoidance of doubt and without prejudice to the provisions of clause 8.1, this Guarantee shall remain binding on the Guarantor notwithstanding any change in the constitution of the Banks or any of them or the Agent or their or its absorption in, or amalgamation with, or the acquisition of all or part of their or its undertaking or assets by, any other person, or any reconstruction or reorganisation of any kind, to the intent that this Guarantee shall remain valid and effective in all respects in favour of any assignee, transferee or other successor in title of the Banks and the Agent in the same manner as if such assignee, transferee or other successor in title had been named in this Guarantee as a party instead of, or in addition to, the relevant Bank or the Agent, as the case may be.

8.3        **No assignment by Guarantor**

           The Guarantor may not assign or transfer any of its rights or obligations under this Guarantee.

8.4        **Disclosure of information**

           Any Bank or the Agent may disclose to a prospective assignee or transferee or to any other person who may propose entering into contractual relations with such Bank or the Agent in

relation to the Facilities Agreement such information about the Guarantor as such Bank or the Agent shall consider appropriate.

## 9 Notices and other matters

### 9.1 Notice

Every notice, request, demand or other communication under this Guarantee shall:

9.1.1 be in writing delivered personally or by first-class prepaid letter (airmail if available) or facsimile transmission or other means of telecommunication in permanent written form;

9.1.2 be deemed to have been received, subject as otherwise provided in this Guarantee, in the case of a letter, when delivered personally or three (3) days after it has been put into the post, in the case of a facsimile transmission or other means of telecommunication in permanent written form, at the time of despatch (provided that, if the date of despatch is not a business day in the country of the addressee or if the time of despatch is after the close of business in the country of the addressee it shall be deemed to have been received at the opening of business on the next such business day); and

9.1.3 be sent:

(a) to the Guarantor at:

24 Kanigos St
Kastella
18534 Piraeus
Greece
Fax:          + 30 210 422 2541

(b) to the Agent at:

HSH NORDBANK AG
Gerhart-Hauptmann-Platz 50
20095 Hamburg
Germany

Fax:          +49 40 3333 34118
Attention:    Shipping, Greek Clients

or to such other address or facsimile number as is notified by the Guarantor or the Agent to the other party to this Guarantee.

### 9.2 No implied waivers, remedies cumulative

No failure or delay on the part of the Agent, the Finance Parties or any of them to exercise any power, right or remedy under this Guarantee shall operate as a waiver thereof, nor shall any single or partial exercise by the Agent, the Finance Parties or any of them of any power, right or remedy preclude any other or further exercise thereof or the exercise of any other power, right or remedy. The remedies provided in this Guarantee are cumulative and are not exclusive of any remedies provided by law.

### 9.3 English translations

All certificates, instruments and other documents to be delivered under or supplied in connection with this Guarantee shall be in the English language or shall be accompanied by a certified English translation upon which the Agent and the Banks shall be entitled to rely.

9.4     **Other guarantors**

The Guarantor accepts and acknowledges that guarantees (for the purposes of this clause 9.4 the "**Owner Guarantees**" and each an "**Owner Guarantee**") similar to this Guarantee will be executed by other Owners.   The Guarantor agrees to be bound by this Guarantee notwithstanding that any other Owner or other person intended to execute or to be bound by any Owner Guarantee or other assurance under or pursuant to the Facilities Agreement may not do so or may not be effectually bound and notwithstanding that such Owner Guarantee or other assurance may be determined or be or become invalid or unenforceable against any Owner or any other person, whether or not the deficiency is known to the Banks or any of them or the Agent.  The Finance Parties shall be at liberty to release any other Owner from its obligations under any Owner Guarantee and to compound with or otherwise vary or agree to vary the liability or to grant time and indulgence to or make other arrangements with any other Owner without prejudicing or affecting the rights and remedies of the Finance Parties against the Guarantor.

9.5     **Expenses**

The Guarantor agrees to reimburse the Finance Parties or any of them or the Agent on demand for all legal and other costs, charges and expenses on a full and unqualified indemnity basis which may be incurred by the Finance Parties or any of them or the Agent in relation to the enforcement of this Guarantee against the Guarantor.

9.6     **Partial Invalidity**

If, at any time, any provision of this Guarantee is or becomes illegal, invalid or unenforceable in any respect under any law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions nor the legality, validity or enforceability of such provision in any other respect or under the law of any other jurisdiction will be affected or impaired in any way.

# 10     Law and jurisdiction

10.1    **Law**

This Guarantee is governed by and shall be construed in accordance with English law.

10.2    **Submission to jurisdiction**

The Guarantor agrees for the benefit of the Agent and the other Finance Parties that any legal action or proceedings arising out of or in connection with this Guarantee against the Guarantor or any of its assets may be brought in the English courts, irrevocably and unconditionally submits to the jurisdiction of such courts and irrevocably designates, appoints and empowers HTD Services Limited at present of Irongate House, Duke's Place, London EC3A 7HX to receive for it and on its behalf, service of process issued out of the English courts in any such legal action or proceedings.  The submission to such jurisdiction shall not (and shall not be construed so as to) limit the right of the Agent and/or the other Finance Parties to take proceedings against the Guarantor in the courts of any other competent jurisdiction, nor shall the taking of proceedings in any one or more jurisdictions preclude the taking of proceedings in any other jurisdiction, whether concurrently or not.

The Guarantor further agrees that only the courts of England and not those of any other State shall have jurisdiction to determine any claim which the Guarantor may have against the Agent or the Banks arising out of or in connection with this Guarantee.

## 11        Contracts (Rights of Third Parties) Act 1999

No term of this Guarantee is enforceable under the Contracts (Rights of Third Parties) Act 1999 by a person who is not a party to this Guarantee.

**IN WITNESS** whereof the parties to this Guarantee have caused this Guarantee to be duly executed as a deed on the date first above written.

**SIGNED, SEALED** and **DELIVERED**    )
as a **DEED**    )
by  CHARILAOS LOUKOPOULOS  )
for and on behalf of    )
**BAYTOWN NAVIGATION INC.**    )
pursuant to a power of attorney    )  ...............................
dated  21 March    2007  )  Attorney-in-Fact
in the presence of:    )

    DIMITRIOS BEIS

...........................
Witness

Name:

Address:

Occupation:


**SIGNED, SEALED** and **DELIVERED**    )
as a **DEED**    )
by  ALEXANDROS DAMIANIDIS  )
for and on behalf of    )
**HSH NORDBANK AG**    )
pursuant to a power of attorney    )  ...............................
dated  21 March    2007  )  Attorney-in-Fact
in the presence of:  DIMITRIOS BEIS

...........................
Witness

Name:

Address:

Occupation: