## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In Re: | § | |
| | § | |
| **BAYTOWN NAVIGATION INC., *et al.*,**[1] | § | **Case No. 11-35926** |
| | § | |
| | § | **Jointly Administered** |
| Debtors. | § | **Chapter 11** |

### EMERGENCY MOTION PURSUANT TO 11 U.S.C. §§ 105, 362, 363, AND 364 AND BANKRUPTCY RULES 2002, 4001, AND 9014 (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION SECURED FINANCING, AND (II) GRANTING <u>SECURITY INTERESTS AND SUPERPRIORITY CLAIMS</u>

**IF YOU WANT A HEARING, YOU MUST REQUEST ONE IN WRITING AND YOU MUST RESPOND SPECIFICALLY TO EACH PARAGRAPH OF THIS PLEADING. YOU MUST FILE YOUR RESPONSE WITH THE CLERK OF THE BANKRUPTCY COURT WITHIN TWENTY ONE (21) DAYS FROM THE DATE YOU WERE SERVED AND GIVE A COPY TO THE PERSON WHO SENT YOU THE NOTICE; OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF.**

**IF A PARTY REQUESTS EMERGENCY CONSIDERATION, THE COURT MAY ACT EXPEDITIOUSLY ON THE MATTER. IF THE COURT ALLOWS A SHORTER RESPONSE TIME THAN TWENTY ONE (21) DAYS, YOU MUST RESPOND WITHIN THAT TIME. IF THE COURT SETS AN EMERGENCY HEARING BEFORE THE RESPONSE TIME WILL EXPIRE, ONLY ATTENDANCE AT THE HEARING IS NECESSARY TO PRESERVE YOUR RIGHTS. IF AN EMERGENCY HEARING IS NOT SET, YOU MUST RESPOND BEFORE THE RESPONSE TIME EXPIRES.**

**THE DEBTORS HAVE REQUESTED EMERGENCY CONSIDERATION OF THIS MOTION. A HEARING HAS BEEN SET ON THIS MOTION ON AUGUST 22, 2011, AT 2:00 P.M. IN COURTROOM 403, 515 RUSK, HOUSTON, TEXAS 77002.**

---

[1] The Debtors in these chapter 11 cases are Omega Navigation Enterprises, Inc.; Galveston Navigation Inc.; Beaumont Navigation Inc.; Carrolton Navigation Inc.; Decatur Navigation Inc.; Elgin Navigation Inc.; Fulton Navigation Inc.; Orange Navigation Inc.; Baytown Navigation Inc.; and Omega Navigation (USA) LLC.

Omega Navigation Enterprises, Inc. ("Omega")[2] et al., the above-captioned debtors and debtors-in-possession (together, the "Debtors"), by and through their undersigned proposed attorneys, hereby file this motion (the "Motion") for an order, pursuant to Bankruptcy Code §§ 105, 362, 363, and 364 and Bankruptcy Rules 2002, 4001, and 9014, authorizing the Debtors to, among other things, (a) obtain postpetition financing of up to $10,000,000.00 in principal and (b) grant adequate protection in the form of security interests and certain superpriority administrative claims in connection therewith.  In support thereof, the Debtors would show as follows:

## I.  JURISDICTION

1.      This Court has jurisdiction over these cases and this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding within the meaning of 28 U.S.C. § 157.  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested herein are Bankruptcy Code §§ 105, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) and Bankruptcy Rules 2002, 4001, and 9014.

## II.  RELEVANT BACKGROUND

**Business Description**

2.      On July 8, 2011 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11, Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Court").  Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors are operating their businesses and managing their property as debtors-in-possession.  This Court has

---

[2] Capitalized terms used but not otherwise defined in this Motion have the meanings ascribed to such terms in the Final Cash Collateral Order (defined below).

granted the Debtors' motion for joint administration of these chapter 11 cases.   No trustees or examiners have been appointed in these cases.

3.     Omega is an international provider of marine transportation services focusing on seaborne transportation of refined petroleum products.  Omega was founded in 2005 and its corporate headquarters is in Athens, Greece.  Omega is the parent company of the Debtors, is incorporated in the Marshall Islands, and completed its initial public offering in April 2006. Omega's Class A Common Shares were traded on the NASDAQ National Market under the symbol "ONAV" (but were recently delisted due to the chapter 11 filing), and are also listed on the Singapore Exchange Securities Trading Limited under the symbol "ONAV 50."

4.     Together, the Debtors wholly own a fleet of eight high specification product tankers (collectively, the "Vessels").  Each Vessel is owned by a separate Debtor entity (each a "Vessel Owner"), all of which are wholly-owned by Omega.  The Vessels have a combined cargo capacity of 512,358 deadweight tons (dwt).  All Vessels in the Omega fleet are double hull in order to meet the International Maritime Organization regulations banning all single hull tankers by 2010 or 2015, depending on the port or flag state.  The Vessels are designed to transport several different refined petroleum products simultaneously in segregated, coated cargo tanks.  These cargoes typically include gasoline, jet fuel, kerosene, naphtha, gas oil and heating oil.

5.     The Debtors generate revenues by employing the Vessels on time charters as well as in the spot market.  For all of the Vessels, Omega provides the commercial management in-house through the wholly-owned non-debtor subsidiary Omega Management, Inc.   This management includes obtaining employment for the Vessels, negotiating charters, and managing relationships.

-3-

6.     Technical management of the Vessels (e.g. managing day-to-day vessel operations, performing general vessel maintenance, ensuring regulatory and classification society compliance, oil majors vetting procedures, supervising the maintenance and general efficiency of vessels, arranging hire of qualified officers and crew, arranging and supervising drydocking and repairs, purchasing supplies, spare parts and new equipment for vessels, appointing supervisors and technical consultants and providing other technical support) is provided by the non-debtor Omega Management, Inc. for six of the vessels, and the remainder of the vessels are technically managed by a third party.  Omega is responsible for the strategic management of the Vessels, including locating, obtaining financing for, purchasing and selling vessels and formulating and implementing overall business strategies.

**Description of Secured Debt**

7.     Omega is a borrower pursuant to that certain senior secured Facilities Agreement for a US$242,720,000.00 Term Loan dated April 7, 2006 (as amended, modified and supplemented), whereby HSH Nordbank AG is, among other things, appointed agent, security agent and trustee, and HSH Nordbank AG, Credit Suisse, The Governor and Company of the Bank of Scotland, and Dresdner Bank AG are lenders (the "Senior Facility").  Approximately $242,720,000.00 is currently outstanding under the Senior Facility.  The Senior Facility is secured by, among other things, Vessel Owners' guarantees, first priority mortgages, first priority assignment of insurances in respect to the vessels, and first priority assignment of each of the vessels' earnings.

8.     Importantly, prior to initiating these bankruptcy proceedings, Omega filed two lawsuit in the Courts of the Hellenic Republic (the "Greece Litigation") against the lenders under

-4-

HOUSTON\3820924

the Senior Facility (the "<u>Senior Lenders</u>"), and Omega reserves its right to seek further damages or enforce the present lawsuits by the filing of additional suits.

9.      In the first suit, Omega asserts, among other things, that the Senior Lenders are in material breach of an agreement to extend the time for repayment of principal under the Senior Facility for three years from the original due date (i.e. extend to April 12, 2014).  The Senior Lenders have not honored their agreement and have refused to extend the repayment under the Senior Facility.  Omega also asserts, among other things, that the Senior Lenders have engaged in abusive exploitation of the relationship of financial dependence between the Debtors and the Senior Lenders and such conduct is opposite to the good faith and contractual ethics required by European standards of competition, and, therefore, such actions are invalid.  The claims of Omega for abusive exploitation of their dominant position are based on Article 82 of the European Convention and the related European Commission Regulation 1/2003, which are applicable in Greece, as well as pursuant to Greek Law 703/77.

10.     In the second lawsuit, Omega asserts, among other things, that Omega has been and continues to be seriously damaged by, among other things, the Senior Lenders' breach and abusive actions.  Such damages amount to approximately $570,000,000.00 (plus interest) at the time of filing the second suit, and, via the second suit, Omega seeks indemnification for such damages.

11.     Based on the Greece Litigation and the allegations therein, Omega disputes the obligations under the Senior Facility and the claims of the Senior Lenders, as well as the interests granted under the security documents related to the Senior Facility.

12.     Omega is also a borrower pursuant to that certain Junior Secured Loan Agreement for a loan of up to US$42,500,000.00 (as amended, modified and supplemented), whereby by

-5-

The Bank of Tokyo-Mitsubishi UFJ, Ltd, New York Branch ("BTM") and NIBC Bank N.V. are swap banks, NIBC Bank N.V. is appointed agent, and BTM and NIBC Bank N.V. are lenders (the "Junior Credit Agreement," and together with the Senior Facility, the "Prepetition Indebtedness"). Approximately $36,200,000.00 is outstanding under the Junior Credit Agreement. The Junior Credit Agreement is secured by, among other things, Vessel Owners' guarantees, second priority mortgages, second priority assignment of insurances in respect to the vessels, and second priority assignment of each of the vessels' earnings.

13.     Together, the lenders under the Senior Facility and the Junior Credit Agreement are referred to herein as the "Prepetition Lenders." All collateral securing the Prepetition Indebtedness is referred to herein as the "Prepetition Collateral."

14.     Omega is also the borrower under a $5,250,000.00 secured demand convertible promissory note between Omega and One Investments, Inc. dated July 16, 2010 (the "Promissory Note"). The Promissory Note is due on demand at any time after its first anniversary. The Promissory Note is secured by a pledge of all shares of Omnicrom Holdings Ltd. and a guarantee by Omnicrom Holdings Ltd. Georgios Kassiotis is the president of One Investments, Inc. Mr. Kassiotis is also an officer of each of the Debtors and a director of each of the Debtors (except for Omega Navigation (USA) LLC, which is member managed).

15.     On July 11, 2011, the Court entered an order authorizing the Debtors to use cash collateral of the Prepetition Lenders (the "Cash Collateral") on an interim basis through August 1, 2011 (the "Interim Cash Collateral Order," (doc. no. 33)).

16.     On August 2, 2011, the Court entered a final order authorizing the Debtors to use the Cash Collateral for the period specified, and under the terms agreed upon, in such order (the "Final Cash Collateral Order," (doc. No. 101)).

**Material Terms of the Proposed Postpetition Financing (the "DIP Facility")**

17.     The Debtors presently believe that they have sufficient liquidity to support their operations.  However, the Debtors' business is capital intensive and at any time an unforeseen occurrence related to operating the Vessels on the high seas could stretch the Debtors' resources. Consequently, the Debtors have concluded that it is in their best interests to arrange for standby postpetition financing, as necessary, to meet their ongoing working capital and general business needs while the Debtors continue to work towards formulating a plan of reorganization in these cases.

18.     The Debtors, in consultation with their legal and financial advisors and subject to the Court's approval, have negotiated and entered into a binding Debtor-in-Possession Loan Term Sheet (the "DIP Term Sheet") with Omega Investments Ltd., a wholly-owned non-debtor subsidiary of Omega.  A true and correct copy of the DIP Term Sheet, which outlines the material terms of a standby junior secured debtor-in-possession term loan credit facility (the "DIP Facility"), is attached hereto as **Exhibit A**.

19.     Bankruptcy Rule 4001 requires that motions requesting authority to incur postpetition financing begin with a concise statement of the relief requested that summarizes the material terms and sets forth where the material terms can be found in the documents.  Such summary is set forth below.[3]  The Debtors believe that these terms will (i) reasonably address their need for standby financing, and (ii) constitute the best financing option available to them given the circumstances of their business, their capital structure, and these chapter 11 cases.

(a)     **The DIP Facility Parties and Other General Terms.**  Extensions of credit under the DIP Facility will be made by Omega Investments Ltd. or its agent, as lender (the

---

[3] This summary is qualified in its entirety by reference to the provisions of the DIP Term Sheet and any order of this Court relating to the proposed postpetition financing described herein.

"Lender"), to Omega, as borrower.  The Vessel Owners will act as guarantors under the DIP Facility.[4]

        (b)    **Total Facility.**  The DIP Facility shall be a standby facility in the total amount of up to $10,000,000.00 in principal.

        (c)    **Security.**

        (i)    *Liens Junior to Liens of Prepetition Lenders.*  Pursuant to Bankruptcy Code § 364, the Lender shall be granted perfected liens (the "DIP Liens") on all Prepetition Collateral and all Adequate Protection Collateral (as defined in the Final Cash Collateral Order) (collectively, the "DIP Collateral"), with the DIP Liens being (a) junior to all the liens of the Prepetition Lenders, and (b) senior to any and all other liens that may exist on the DIP Collateral.

        (ii)    *Superpriority Claims.*  Pursuant to Bankruptcy Code § 364(c)(1), the Lender shall be granted an allowed superpriority administrative claim in these chapter 11 cases (the "Superpriority Administrative Claims"), having priority over all administrative expenses of the kind specified in or arising under any sections of the Bankruptcy Code (including, without limitation, Bankruptcy Code §§ 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), 546(c), or 726 thereof), but nonetheless having junior priority to the Adequate Protection Superpriority Claims (as defined in the Final Cash Collateral Order).

        (iii)    *Carve Out.*  The liens granted to the Lender pursuant to the DIP Facility shall be subject, in addition to the liens of the Prepetition Lenders, to a carve out (the "Carve Out") for (i) quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the Clerk of the Bankruptcy Court, (ii) the disbursements set forth in the "Cash Outflows" section of the Budget (as other than in respect of the Budget line item for "Professional Fees," to the extent accrued during the Specified Period and remaining unpaid upon termination thereof, (iii) the allowed (pursuant to Bankruptcy Court order) fees and expenses of the professionals engaged (pursuant to Bankruptcy Court order) by the Debtors (including, without limitation, Bracewell & Giuliani LLP and Jefferies & Co., Inc.) or any Committee, if appointed, to the extent accrued during the Specified Period and remaining unpaid upon termination thereof, and regardless of whether already approved or pending approval by the Bankruptcy Court, but subject to the limitations for payment of "Professional Fees" set forth for such line item in the Budget (plus any permitted variance), and (iv) the allowed (pursuant to Bankruptcy Court order) fees and expenses of Estate Professionals which accrue after the Specified Period, in an aggregate amount not to exceed $1,500,000.00.

        (d)    **Use of Proceeds.**  The Debtors may draw down funds under the DIP Facility only to the extent (i) the Debtors do not have sufficient Cash Collateral to make payments under the budget approved as part of the Final Cash Collateral Order (the "Budget") or (ii) the Debtors exceed the permitted variance from the Budget as set forth in the Final Cash Collateral Order.  All such draws shall be used solely for such Budget items.  After any

---

[4] The Vessel Owners are (1) Galveston Navigation Inc; (2) Beaumont Navigation Inc; (3) Carrolton Navigation Inc; (4) Decatur Navigation Inc; (5) Elgin Navigation Inc; (6) Fulton Navigation Inc; (7) Orange Navigation Inc; and (8) Baytown Navigation Inc.

termination of the Final Cash Collateral Order, the Debtors shall be entitled to draw on the DIP Facility (i) to pay necessary expenses to operate, insure and maintain the Vessels, subject to a Bankruptcy Code § 506(c) surcharge lien and (ii) to pay other administrative expenses, including allowed professional fees and expenses of the Debtors and any committee that may be appointed. To the extent the Prepetition Lenders have final allowed adequate protection claims under the Final Cash Collateral Order for a diminution in value (as more particularly described in the Final Cash Collateral Order), the Debtors shall be required to draw on the DIP Facility to pay such claims.

      (e)    **Term.**  The maturity date ("<u>Maturity Date</u>") of the DIP Facility is the earlier of (i) August 31, 2012, subject to the extension thereof for one or more 3-month periods in the exclusive discretion of the Debtors; (ii) the effective date of any plan of reorganization with respect to any Debtor; (iii) the date of conversion of any of the Debtors' chapter 11 cases to a case under chapter 7 of the Bankruptcy Code; (iv) the date of any termination of the exclusivity period for any Debtor; and (v) the date of any appointment of a chapter 11 trustee or other disinterested person with expanded powers pursuant to Bankruptcy Code § 1104(c) in any of the Debtors' cases.

      (f)    **Interest Rate.**  The DIP Facility will bear interest at a base rate of five percent (5%) per annum (the "<u>Base Rate</u>").  Interest shall accrue until and shall be due and payable at the Maturity Date.  Interest will be computed on the basis of a 360-day year.

      (g)    **Fees.** None.

      (h)    **Representations and Warranties.**  None.

      (i)    **Covenants.**  The Debtors covenant to make draws under the DIP Facility solely for the purposes described in paragraph 19(d) under "Use of Proceeds."  The Lender covenants that it will not incur or pay any non-operating expenses or any other expenses outside of the ordinary course of its business without reasonable prior notice to the Debtors and the Prepetition Lenders.

      (j)    **Events of Default.**  None other than the events triggering the Maturity Date as described in paragraph 19(e) above.

      (k)    **Remedies upon Default.**  At the option of the Lender, repayment in full or conversion into equity pursuant to a plan of reorganization, or any combination of the foregoing.

      (l)    **Governing Law**. Texas.

### III.  RELIEF REQUESTED

20.     By this Motion, pursuant to Bankruptcy Code §§ 105, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) and Bankruptcy Rules 2002, 4001, and 9014, the Debtors request:

(a)     authorization for the Debtors to borrow up to $10,000,000.00 in principal amount of postpetition financing on the terms and conditions set forth in the DIP Term Sheet as attached hereto and as summarized in this Motion;

(b)     authorization for the Debtors to execute and deliver any necessary documents, to perform such other and further acts as may be necessary or appropriate in connection therewith, and to grant the liens and security interests to the Lender as provided for in the DIP Term Sheet;

(c)     authorization pursuant to Bankruptcy Code §§ 364(c)(1), 364(c)(2), 364(c)(3), and 364(d)(1) to grant certain liens and superpriority claims to the Lender to secure the Debtors' obligations under the DIP Term Sheet; and

(d)     authorization for the Lender to require repayment of the DIP Facility in full or conversion into equity pursuant to a plan of reorganization, or any combination of the foregoing, upon an event triggering the Maturity Date in accordance with the DIP Term Sheet, subject to the provisions of this Motion and any order granting this Motion.

### IV.  BASIS FOR RELIEF

**Request for Approval of the DIP Facility and Related Actions**

21.     As described above, it is essential to the success of the Debtors' chapter 11 cases that the Debtors immediately obtain access to standby postpetition financing in order to protect themselves against unforeseen events requiring high levels of cash outflows that, absent the additional liquidity provided for by standby financing, could stretch the Debtors' resources and jeopardize the Debtors' successful reorganization.  The preservation of estate assets, the Debtors' continuing viability, and their ability to timely reorganize successfully under a plan of reorganization all depend heavily upon the approval of the DIP Facility and the related actions requested herein.

-10-

22.     Bankruptcy Code § 364 distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business, and (c) obtaining credit with specialized priority or with security.  If a debtor-in-possession cannot obtain postpetition credit on an unsecured basis, pursuant to Bankruptcy Code § 364(c), a court may authorize the obtaining of credit or the incurring of debt, repayment of which is entitled to superpriority administrative expense status or is secured by a senior lien on unencumbered property or a junior lien on encumbered property, or a combination of the foregoing.

23.     Because the Debtors propose to obtain financing under the DIP Facility that is secured by liens with respect to certain of the Debtors' property and to prime certain liens that may exist on the DIP Collateral, the approval of the DIP Facility is governed by Bankruptcy Code § 364(c) and 364(d).

**Financing Under Bankruptcy Code § 364(c)**

24.     Pursuant to Bankruptcy Code § 364(c), a debtor may, in the exercise of its business judgment, incur secured debt if the debtor has been unable to obtain unsecured credit, and the proposed borrowing is in the best interests of its estate.  *See, e.g., In re Ames Dep't Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to postpetition credit, courts "permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties"); *In re Simasko Prod. Co.*, 47 B.R. 444, 448-49 (D. Colo. 1985) (authorizing interim financing where debtor's best business judgment indicated financing was necessary and reasonable for benefit of estate); *see also* 3 COLLIER ON BANKRUPTCY ¶ 364.03, at 364-7-18 (15th ed. rev.).

25.    The statutory requirement for obtaining postpetition credit under Bankruptcy Code § 364(c) is a finding, made after notice and hearing, that the debtor-in-possession is "unable to obtain unsecured credit allowable under § 503(b)(l) of [the Bankruptcy Code] as an administrative expense."  *See Ames Dep't Stores*, 115 B.R. at 37-39 (a debtor must show that it has made a reasonable effort to seek other sources of financing under Bankruptcy Code §§ 364(a) and (b)); *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987), *modified on other grounds*, 75 B.R. 553 (Bankr. E.D. Pa. 1987) (debtor seeking secured credit under Bankruptcy Code § 364(c) must prove that it was unable to obtain unsecured credit pursuant to Bankruptcy Code § 364(b)).

26.    Courts have articulated a three-part test to determine whether a debtor may obtain financing under Bankruptcy Code § 364(c):

- the debtor is unable to obtain unsecured credit solely under Bankruptcy Code § 364(b) (i.e., by granting a lender administrative expense priority);

- the credit transaction is necessary to preserve the assets of the estate; and

- the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

*In re Aqua Assocs.*, 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991) (applying the above test and holding that "[o]btaining credit should be permitted not only because it is not available elsewhere, which could suggest the unsoundness of the basis for the use of the funds generated by credit, but also because the credit acquired is of significant benefit to the debtor's estate and the terms of the proposed loan are within the bounds of reason, irrespective of the inability of the debtor to obtain comparable credit elsewhere"); *Ames Dep't Stores*, 115 B.R. at 37-39.

27.    To show that the credit required is not obtainable on an unsecured basis, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of Bankruptcy Code § 364(c).  *In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir.

-12-

1986).  Thus, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Id*. at 1088.  Moreover, where few lenders are likely to be able and willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing."  *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

28.     The Lender is an affiliated party to the Debtors and consequently, the terms of the DIP Facility are very favorable for the Debtors.  The Debtors' advisors are familiar with the market for debtor-in-possession financing and are confident that the terms of the DIP Facility are better than prevailing market terms.  Based on the Debtors' relationship with the Lender and the Debtors' knowledge of prevailing market terms and rates for similar credit facilities, as well as the poor state of the credit markets, the Debtors' own assets and liabilities, and the general state of the marine transportation industry, the Debtors strongly believe that they are unable to obtain unsecured financing from any capital source on similar or more favorable terms.

29.     The Debtors believe that the terms and conditions outlined in the DIP Term Sheet are reasonable and justified under the circumstances because the DIP Facility will ensure that the Debtors have sufficient liquidity to adequately respond to unforeseen events that may require large capital expenditures, thereby enabling the Debtors to continue with their operations and the plan process in a manner that will best serve all parties-in-interest in these cases.

**Financing and Adequate Protection Under Bankruptcy Code § 364(d)(l)**

30.     The Debtors seek approval of the DIP Facility under Bankruptcy Code § 364(d)(l).  Specifically, pursuant to the DIP Term Sheet, the Lender would receive perfected liens upon the DIP Collateral that are junior only to the liens of the Prepetition Lenders.  The

-13-

only alleged liens upon the DIP Collateral that the Debtors are aware of are those claimed by the Prepetition Lenders, as described above.

31.     The statutory requirement for obtaining postpetition credit under Bankruptcy Code § 364(d)(l) is a finding, made after notice and hearing, that the debtors-in-possession are "unable to obtain such credit otherwise."  Based on the Debtors' relationship with the Lender and the Debtors' knowledge of prevailing market terms and rates for similar credit facilities, the Debtors and their advisors are confident that the Debtors would be unable to obtain financing on a junior or unsecured basis from any other lender on similar or more favorable terms and, therefore, do not believe that it would have been possible for the Debtors to obtain postpetition financing absent the granting of the DIP Liens.

**Requirement under Bankruptcy Code § 364(d) of Providing Adequate Protection**

32.     Any prepetition secured creditors whose liens are being "primed" postpetition by the DIP Facility under Bankruptcy Code § 364(d) must be provided with adequate protection of their interests in collateral.  *See In re Swedeland Dev. Group., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (*en banc*) (noting that adequate protection is required under Bankruptcy Code § 364(d)(l)(B) to ensure that the creditor receives the value for which it bargained pre-bankruptcy).

33.     "A sufficient equity cushion is itself a recognized form of adequate protection." *Baybank-Middlesex v. Ralar Distrib., Inc.*, 69 F.3d 1200, 1203 (1st Cir. 1995).  Further, "[a] classic method for finding adequate protection is the existence of an equity cushion.  In fact, it has been found that an equity cushion standing alone can provide evidence of adequate protection for a secured claim." *In re Patrician St. Joseph Partners Ltd.*, 169 B.R. 669, 677 (D. Ariz. 1994) (citing *In re Mellor*, 734 F.2d 1396, 1400 (9th Cir. 1984)); *see also*, *Mendoza v.*

-14-

*Temple Inland Mortgage Corp. (In re Mendoza)*, 111 F. 3d 1264, 1272 (5th Cir. 1997) (stating that case law is nearly uniform in holding that an equity cushion of 20% or more constitutes adequate protection); *In re Las Torres Dev., L.L.C.*, 413 B.R. 687, 697 (Bankr. S.D. Tex. 2009) ("It is clear that an equity cushion of 20% or more constitutes adequate protection"); *WMC Mortgage Corp. v. Cartwright (In re Cartwright)*, 2003 Bankr. LEXIS 2296 (Bankr. N.D. Tex. 2003) (finding that creditor was adequately protected by equity cushion); *In re Brokmeyer*, 51 B.R. 704, 706 (Bankr. S.D. Tex. 1985) (finding that equity cushion constitutes adequate protection).

34.     The DIP Liens being requested herein are junior to the liens of the Prepetition Lenders and, therefore, would not "prime" those existing liens.  Furthermore, the Debtors are not aware of any other liens on the DIP Collateral.  In addition, the Debtors currently believe that the value of the DIP Collateral, including but not limited to the Vessels, exceeds the amount of the DIP Facility and the liens alleged by the Prepetition Lenders.

**Protections Under Bankruptcy Code § 364(e)**

35.     The Debtors believe that the terms and conditions of the DIP Facility are the best possible under the circumstances of these cases, and were negotiated in good faith.  Accordingly, the Lender should be provided with the benefit and protection of Bankruptcy Code § 364(e), such that if any of the provisions of any order granting this Motion are later modified, vacated, stayed, or terminated by subsequent order of this Court or any other court, the Lender would be fully protected with respect to any amounts disbursed before such modification, vacation, stay, or termination.

**The DIP Facility is Necessary to Preserve the Assets of the Estates**

36.     It is essential that the Debtors obtain standby financing to ensure that the Debtors will be able to satisfy their working capital requirements in the event certain unforeseen circumstances arise that would require large capital expenditures that would otherwise substantially disrupt the Debtors' business.  As discussed earlier, the Debtors' business is capital intensive and certain unforeseen events relating to the Vessels, or otherwise, could stretch the Debtors' resources dangerously thin and threaten their ability to successfully reorganize. Accordingly, the Debtors need an alternative source of cash, such as the DIP Facility requested herein, to continue funding their operations under those circumstances.  The standby financing proposed under the DIP Facility is, therefore, essential to provide the Debtors' various stakeholders, including customers, employees, vendors, lessors, charter parties, and other key constituencies, with confidence in the Debtors' ability to administer these cases without disruption and conclude their reorganization in a timely manner.  Thus, approval of borrowing under the DIP Term Sheet is crucial to maximizing the value of the Debtors' estates.

**The Terms of the DIP Facility Are Fair, Reasonable, and Appropriate**

37.     The proposed DIP Term Sheet provides, generally, that the security interests and superpriority administrative expense claims granted to the Lender are subject to the Carve Out described above.  In *Ames Department Stores*, the bankruptcy court found that such "carve outs" are not only reasonable, but are necessary to insure that debtors' estates are adequately assisted by counsel and other professionals.  *Ames*, 115 B.R. at 40.

**Application of the Business Judgment Standard**

38.     As described above, after appropriate investigation and analysis, the Debtors' management and advisors have concluded that the DIP Facility provides the best alternative

HOUSTON\3820924

available under the circumstances of these chapter 11 cases.  Bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision is arbitrary and capricious.  *See In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that the interim loan, receivables facility, and asset-based facility were approved because they "reflect[ed] sound and prudent business judgment on the part of TWA . . . [were] reasonable under the circumstances and in the best interest of TWA and its creditors").  In fact, "[m]ore exacting scrutiny would slow the administration of the Debtor's estate and increase its costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially."  *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

39.     The Debtors have exercised sound business judgment in determining that a postpetition credit facility is appropriate and have satisfied the legal prerequisites to incur debt under the DIP Term Sheet.  Accordingly, the Court should grant the Debtors the authority to enter into any necessary documents and obtain funds from the Lender on the secured and administrative superpriority basis described above, pursuant to Bankruptcy Code § 364(c) and (d).

WHEREFORE, premises considered, the Debtors request that this Court enter an Order authorizing the Debtors to obtain the postpetition financing described herein, and granting such other and further relief as the Court may deem just and proper.

Respectfully submitted,

**BRACEWELL & GIULIANI LLP**

By:   */s/ William A. (Trey) Wood III*
          William A. (Trey) Wood III

-17-

Texas Bar No. 21916050
Trey.Wood@bgllp.com
Jason G. Cohen
Texas Bar No. 24050435
Jason.Cohen@bgllp.com
711 Louisiana, Suite 2300
Houston, Texas 77002
Telephone: (713) 223-2300
Facsimile:  (713) 221-1212

-and-

Evan Flaschen
Conn. Bar No. 304232
Evan.Flaschen@bgllp.com
Ilia M. O'Hearn
Conn. Bar No. 423613
Ilia.OHearn@bgllp.com
Goodwin Square
225 Asylum Street, Suite 2600
Hartford, CT 06103
Telephone: (860) 947-9000
Facsimile:  (860) 246-3201

**PROPOSED COUNSEL FOR THE DEBTORS
AND DEBTORS-IN-POSSESSION**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on August 12, 2011, a true and correct copy of this Motion

was served on all parties on the attached master service list by electronic means as listed on the

court's ECF noticing system, by electronic mail as indicated, and/or by United States first class

mail, postage prepaid.

*/s/ Jason G. Cohen*
Jason G. Cohen

-18-