IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| IN RE: | § | Chapter 11 |
| | § | |
| | § | |
| BAYTOWN NAVIGATION INC., et al., | § | Case No. 11-35926 |
| | § | |
| | § | Jointly Administered |
| | § | |
| Debtors | § | |

MOTION OF HSH NORDBANK AG, AS SENIOR FACILITIES AGENT,
FOR AN ORDER DISMISSING THE DEBTORS' CASES OR CONVERTING THE
DEBTORS' CASES TO CHAPTER 7 PURSUANT TO 11 U.S.C. § 1112(b)

> A HEARING WILL BE CONDUCTED ON THIS MATTER
> ON OCTOBER 24, 2011 AT 2:00 P.M. IN COURTROOM 403,
> UNITED STATES BANKRUPTCY COURT FOR THE
> SOUTHERN DISTRICT OF TEXAS, 515 RUSK AVENUE,
> HOUSTON, TX 77002. IF YOU OBJECT TO THE RELIEF
> REQUESTED, YOU MUST RESPOND IN WRITING,
> SPECIFICALLY ANSWERING EACH PARAGRAPH OF
> THIS PLEADING. UNLESS OTHERWISE DIRECTED BY
> THE COURT, YOU MUST FILE YOUR RESPONSE WITH
> THE CLERK OF THE BANKRUPTCY COURT WITHIN
> TWENTY-THREE DAYS FROM THE DATE YOU WERE
> SERVED WITH THIS PLEADING. YOU MUST SERVE A
> COPY OF YOUR REPONSE ON THE PERSON WHOSE
> SENT YOU THE NOTICE; OTHERWISE, THE COURT
> MAY TREAT THE PLEADING AS UNOPPOSED AND
> GRANT THE RELIEF REQUESTED.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..........................................................................................................iii

PRELIMINARY STATEMENT ....................................................................................................1

RELIEF REQUESTED....................................................................................................................5

JURISDICTION ..............................................................................................................................6

BACKGROUND ..............................................................................................................................6

ADDITIONAL FACTS ...................................................................................................................8

A.    The Debtors Were and Are Unable To Refinance or Restructure on Market
      Terms ....................................................................................................................................8

B.    The Senior Facilities Lenders' Claims Exceed the Value of the Ships ..................8

C.    The Debtors' Cash Flow Is Insufficient To Support These Cases or Their
      Business ..............................................................................................................................10

D.    Certain Prepetition Transfers Were Improper or Warrant Investigation ...............10

E.    The Debtors' Improper Proposal To Have a Subsidiary Provide Standby
      Debtor-in-Possession Financing ...........................................................................12

ARGUMENT..................................................................................................................................13

THE COURT SHOULD DISMISS OR CONVERT THE DEBTORS' CASES TO
CHAPTER 7 FOR "CAUSE"........................................................................................................13

A.    Cause Exists to Dismiss or Convert the Cases Because the Debtors Have Not
      Filed Their Cases in Good Faith ...........................................................................14

B.    The Estates Are Suffering Substantial and Continuing Loss and Diminution
      and the Debtors Have No Reasonable Likelihood of Rehabilitation.....................21

      1.    There Is a Substantial and Continuing Loss to and Diminution of the
            Debtors' Estates ........................................................................................21

            a.    The Estates Are Diminishing and Suffering Loss..........................21

            b.    The Estates Are Suffering Net Cash Losses and Are Likely To Be
                  Administratively Insolvent..............................................................23

      2.    These Cases Have No Reasonable Likelihood of Rehabilitation ..............25

i

|  | a. | Waiting for a Market Rebound Is Insufficient To Constitute a Reasonable Likelihood of Rehabilitation ..........................................26 |
|  | b. | The Debtors Cannot Cram Down the Senior Facilities Lenders....26 |
|  | c. | The Debtors' Pursuit of the "Greece Litigation" Is Not a Plan To Rehabilitate ..............................................................................29 |
|  | d. | Creditor Resistance Is Immutable ...................................................30 |

CONCLUSION ...............................................................................................................................31

## TABLE OF AUTHORITIES

### CASES

Canpartners Realty Holding Co. IV, L.L.C. v. Vallambrosa Holdings, L.L.C.
(In re Vallambrosa Holdings, L.L.C.), 419 B.R. 81 (Bankr. S.D. Ga. 2009) ...................... passim

Elmwood Dev. Co. v. Gen. Elec. Pension Trust (In re Elmwood Dev. Co.), 964 F.2d 508
(5th Cir. 1992).................................................................................................................................14

Fort Knox Mini Warehouse Inc., No. 01-03493, 2002 WL 1842452 (Bankr. N.D. Iowa
July 31, 2002)..................................................................................................................................21

Humble Place Joint Venture v. Fory (In re Humble Place Joint Venture), 936 F.2d 814
(5th Cir. 1991)...................................................................................................................15, 22, 26

In re Action Roofing & Supply Co., 137 B.R. 217 (Bankr. S.D. Tex. 1991)....................................20

In re AdBrite Corp., 290 B.R. 209 (Bankr. S.D.N.Y. 2003)...................................................... passim

In re Becker, 38 B.R. 913 (Bankr. D. Minn. 1984) ..........................................................................21

In re BHS&B Holdings, LLC, 439 B.R. 342 (Bankr. S.D.N.Y. 2010).............................................29

In re Briggs-Cockerham, L.L.C., No. 10-34222-BJH-11, 2010 WL 4866874 (Bankr. N.D.
Tex. Nov. 23, 2010) ................................................................................................................ passim

In re Canion, 129 B.R. 465 (Bankr. S.D. Tex. 1989) ......................................................................20

In re Citi-Toledo Partners, 170 B.R. 602 (Bankr. N.D. Ohio 1994).................................................20

In re Fall, 405 B.R. 863 (Bankr. N.D. Ohio 2009) ..........................................................................30

In re FRGR Managing Member LLC, 419 B.R. 576 (Bankr. S.D.N.Y. 2009).................................29

In re Great Am. Pyramid Joint Venture, 144 B.R. 780 (Bankr. W.D. Tenn. 1992) ....................25, 26

In re Kellogg Square P'ship, 160 B.R 343 (Bankr. D. Minn. 1993).................................................27

In re Landmark Atl. Hess Farm, LLC, 448 B.R. 707 (Bankr. D. Md. 2011).....................................20

In re Ledges Apartments, 58 B.R. 84 (Bankr. D. Vt. 1986) ..............................................................31

In re LJH Enters., No. 10-34355-H3-11, 2011 WL 597034
(Bankr. S.D. Tex. Feb. 11, 2011)...............................................................................13, 15, 17, 26

In re Moore Constr., Inc., 206 B.R. 436 (Bankr. N.D. Tex. 1997)...................................16, 21, 23, 26

In re Quail Farm, LLC, No. 09-bk-298, 2010 WL 1849867 (Bankr. N.D. W. Va. May 5, 2010) ............................................................................................................................................27

In re Sal Caruso Cheese, Inc., 107 B.R. 808 (Bankr. N.D.N.Y. 1989).............................................20

In re Sherwood Enters., Inc., 112 B.R. 165 (Bankr. S.D. Tex. 1989) ...............................................18

In re Starmark Clinics, LP, 388 B.R. 729 (Bankr. S.D. Tex. 2008) ..................................................17

In re Tolco Props., Inc., 6 B.R. 482 (Bankr. E.D. Va. 1980)..............................................................22

In re Westgate Props., Ltd., 432 B.R. 720 (Bankr. N.D. Ohio 2010).................................................27

In re WN Truck Stop, LLC, No. 10-33156-HDH-11, 2011 WL 65928 (Bankr. N.D. Tex. Jan. 10, 2011).......................................................................................................................................28

In re Woodbrook Assocs., 19 F.3d 312 (7th Cir. 1994)......................................................................31

In re Yukos Oil Co., 321 B.R. 396 (Bankr. S.D. Tex. 2005).................................................13, 14, 16

Loop Corp. v. U.S. Trustee, 379 F.3d 511 (8th Cir. 2004).....................................................23, 25, 26

Official Comm. of Unsecured Creditors v. Nucor Corp. (In re SGL Carbon Corp.), 200 F.3d 154 (3d Cir. 1999).......................................................................................................................19

Stage I Land Co. v. U.S. Dep't of Hous. & Urban Dev., 71 B.R. 225 (D. Minn. 1986)..................20

## STATUTES

11 U.S.C § 362.....................................................................................................................................25

11 U.S.C. § 1112............................................................................................................................ passim

11 U.S.C. § 1129...........................................................................................................................26, 27

28 U.S.C. § 157......................................................................................................................................6

28 U.S.C. § 1334....................................................................................................................................6

28 U.S.C. § 1408....................................................................................................................................6

28 U.S.C. § 1409....................................................................................................................................6

HOU:3186335.3 (2K)

HSH Nordbank AG ("HSH Nordbank"), as agent (in such capacity, the "Senior Facilities Agent") for certain banks as lenders (the "Senior Facilities Lenders") under the Senior Facilities Agreement (defined below), by and through its undersigned counsel, hereby files this motion for an order, pursuant to section 1112(b) of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), dismissing the Chapter 11 cases (the "Cases") of Omega Navigation Enterprises, Inc. ("Omega"), Galveston Navigation Inc., Beaumont Navigation Inc., Carrolton Navigation Inc., Decatur Navigation Inc., Elgin Navigation Inc., Fulton Navigation Inc., Orange Navigation Inc. and Baytown Navigation Inc.[1] (collectively, the "Debtors" and each, a "Debtor") or converting the Cases to cases under Chapter 7 of the Bankruptcy Code (the "Motion").[2] In support of the Motion, the Senior Facilities Agent respectfully states as follows:

## PRELIMINARY STATEMENT

1.      The Debtors filed these Cases solely as a litigation tactic in their ongoing campaign against the Senior Facilities Lenders and to avoid repayment of their senior secured loan obligations. The Senior Facilities Lenders' claims ($242.72 million in outstanding principal plus unpaid prepetition interest, fees and expenses) already exceed the value of their collateral — eight ships (the "Ships") with an aggregate current value of $239 million. The Senior Facilities Lenders are suffering substantial and irremediable injury through the continuation of these Cases in Chapter 11 and are subject to unacceptable risk. The value of the Ships is diminishing. The Debtors are operating the Ships and using the Senior Facilities Lenders' cash collateral to fund these Cases while paying nothing to the Senior Facilities Lenders. The Debtors have suggested

---

[1] One debtor in these consolidated Cases, Omega Navigation (USA) LLC ("Omega (USA)"), is not a guarantor or otherwise obligated under the Senior Facilities Documents (defined below). Consequently, the Senior Facilities Agent is not making any motion with respect to Omega (USA). All rights in respect of Omega (USA) are full preserved.

[2] In accordance with the local rules, the Senior Facilities Agent will also be filing shortly a separate and alternative Motion for Relief from the Automatic Stay so that it may exercise its legal and contractual rights and remedies against the Ships.

no steps they intend to take to reorganize and emerge from Chapter 11 as viable entities. Rather, the Debtors' entire reorganization plan is an open ended wager by entrenched management with the Senior Facilities Lenders' collateral at stake. The law demands that the Senior Facilities Lenders are not required to bear such risk, and the Cases should be dismissed or converted to Chapter 7 as soon as possible.

2.      Cause exists to dismiss or convert the Cases because they were not filed in good faith. As an initial matter, the Debtors have stated that they hope to wait out the "cyclicality" of the shipping industry. See Hr'g Tr., July 11, 2011, 17:9-13. In the Fifth Circuit, however, merely "mowing the grass and waiting for market conditions to turn" does not constitute a good faith basis for filing.

3.      The Debtors' lack of meaningful contacts with the United States further supports dismissal or conversion for "cause." These are foreign Debtors, organized under foreign law, whose employees are located overseas (except for their CFO). Each Debtor has one principal asset, a single foreign-registered Ship (or, in the case of Omega, equity in the eight Ship-owning Debtors and other entities). The Debtors' principal secured creditors are non-U.S. banks, and their loan agreements were negotiated outside the United States, are governed by English law and provide that the courts of England are the exclusive forum for resolution of disputes thereunder. Moreover, the Debtors are being sued by the Senior Facilities Lenders in England and the Debtors' reorganization hopes hinge on the so-called "Greece Litigation" commenced by the Debtors against the Senior Facilities Lenders in Greece in violation of the jurisdiction clause of the Senior Facilities Agreement. The Court should not embroil itself in what is essentially a two-party foreign dispute.

HOU:3146357.3

4.     The Debtors' prepetition cash diversions and questionable transfers, and postpetition conduct, as described below, also demonstrate a lack of good faith.

5.     Cause to dismiss or convert the Cases also exists because the Debtors' estates are suffering substantial loss and diminution and there is no reasonable prospect of rehabilitation. The Ships have no equity value in excess of the Senior Loan (defined below) even before considering the $36.2 million lien of the junior secured lenders. Moreover, the Senior Facilities Lenders' interests in the Ships are at risk simply by virtue of the passage of time and their continued operations. The Ships are, by the Debtors' own accounting, depreciating on their books at approximately $1.6 million per month in the aggregate. In addition, vessels like the Ships are generally worth about 5-7% less than vessels of the same kind that are one year younger (i.e., under current market conditions, if the Ships here were one year older, they could be expected to be worth approximately $12 to $16.7 million less than they currently are). Clearly the passage of time is subjecting the Senior Facilities Lenders to more risk, not less.

6.     In addition, the Debtors' current projections indicate that the Ships, which are not operating under long-term charter contracts, generate a negative cash flow once the Debtors' professional fees or other expenses are taken into account. Although the Debtors project a positive cash position at the end of the current budget period, that is only because they are not making any payments to the Senior Facilities Lenders. The Debtors' projections also do not reflect potentially significant operating expenses or take into account the current uncertainty in the shipping industry and the overall economy. The Debtors are also accruing substantial Chapter 11 administrative expenses, including a diminution-in-value superpriority claim under the cash collateral orders entered by this Court [Dkt. Nos. 33, 101], which must ultimately be paid in cash, but which is not reflected in the Debtors' cash flow projections. So, the Debtors are

3

losing money even though they are not paying any principal or interest on the Senior Loan. Even if the Debtors were not in Chapter 11 and not incurring administrative expenses, they would be required to pay interest and debt service on the Senior Loan and would be incurring continuing operational losses.

7.      The Debtors have acknowledged that their rehabilitation prospects hinge entirely upon (i) a shipping market rebound, (ii) a legally suspect and potentially infeasible "cram-up" of the Senior Facilities Lenders' claims and (iii) their frivolous lender-liability type claims in the Greece Litigation, which will not be addressed until at least 2013, if not later. None of these "strategies" provides adequate grounds to continue these Cases in Chapter 11.

8.      As noted above, simply waiting for shipping market conditions to improve does not provide a sufficient basis to avoid dismissal or conversion. Moreover, the Debtors' own financial advisor, Jefferies & Company, Inc., has recently forecasted that the strongly-correlated shipping market for crude tankers has deteriorated in recent months and is not likely to rebound soon, stating:

> With weaker than expected economic conditions, we believe the required crude oil inventory destocking required to stimulate crude oil tanker demand is unlikely to materialize before [year-end] reducing the probability of a significant recovery in charter rates before [year-end].

See infra p. 15.

9.      The law is also clear that an intent to cram down nonconsenting secured creditors is insufficient to establish a likelihood of rehabilitation. And here, because the Senior Facilities Lenders are at the top of the capital structure, the Debtors require an even more ambitious "cram-up" to confirm a plan. Even if the Court were inclined to consider the prospects of a cram-up plan, it is readily apparent that the Debtors have no hope of confirming one, which would essentially require that the Senior Facilities Lenders retain their liens on the

4

Ships and that payment be made to the Senior Facilities Lenders of the full value of the collateral over time <u>on market terms</u>.  The Debtors could not refinance or restructure the Senior Loan prior to filing for Chapter 11 because they could not grant market terms (which would include a substantial up-front paydown to deleverage).  The Debtors have no prospect of accomplishing essentially the same thing in Chapter 11.

10.    As to the Greece Litigation, the Debtors may not avoid dismissal or conversion here by relying on such ancillary litigation, which could take years to resolve (the <u>first</u> scheduled hearing is in 2013).  Moreover, the Debtors do not actually dispute the existence of the Senior Facilities Lenders' liens and claims in the Greece Litigation.  This Court should not refrain from dismissing or converting a Chapter 11 case merely because a debtor has an unproven monetary counterclaim against its creditor in some other court.

11.    The Senior Facilities Agent believes that the Debtors are prosecuting these Cases without consideration of the fiduciary duties they owe creditors, including the Senior Facilities Lenders.  The Cases should be dismissed, or they should be converted and an independent Chapter 7 fiduciary should be appointed to implement a controlled liquidation of the Ships and to assess the Debtors' prepetition litigation claims to determine whether they should be prosecuted.  There is no basis for these Cases to continue in Chapter 11.

## RELIEF REQUESTED

12.    By this Motion, the Senior Facilities Agent seeks entry of an order dismissing the Cases with prejudice to refiling or, in the alternative, converting the Cases from Chapter 11 to Chapter 7.  The statutory predicate for such relief is 11 U.S.C. § 1112.  Pursuant to 11 U.S.C. § 1112(b)(3), the Senior Facilities Agent consents to a hearing on this Motion on October 24, 2011, which is more than 30 days after filing of the Motion.

## JURISDICTION

13.     The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is alleged to be proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

## BACKGROUND

14.     Overview.      The  Debtors  are  international  providers  of  marine transportation services.  The Debtors are organized in the Marshall Islands and their principal offices are in Greece.  Omega, the borrower under the Senior Facilities Agreement, is a holding company and the parent of each of the other Debtors (each of which is a wholly-owned subsidiary of Omega).  Each of the other Debtors is a single-asset entity, owning and operating one Ship, with no other assets, property or operations.  The Ships are registered either in the Marshall Islands or Liberia.  The Debtors are effectively controlled by George Kassiotis, a Greek national, who is Omega's President, Chief Executive Officer and Director, as well as its largest shareholder.

15.     Procedural History.  On July 8, 2011 (the "Petition Date"), the Debtors commenced voluntary cases under Chapter 11 of the Bankruptcy Code.  The Debtors have continued in the management and operation of their business and property as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.  An official committee of unsecured creditors was appointed on August 11, 2011.  [Dkt. No. 122]  No trustee or examiner has been appointed in these Cases.

16.     Senior Credit Facilities Agreement.  Omega, as borrower, the Senior Facilities Lenders, the Senior Facilities Agent, and HSH Nordbank, as swap bank (the "Senior Swap Bank") and arranger (together with the Senior Facilities Lenders, the Senior Facilities Agent and Senior Swap Bank, the "Senior Finance Parties"), are parties to that certain Facilities

6

Agreement, dated as of April 7, 2006 (as amended, supplemented or otherwise modified, the "Senior Facilities Agreement"), pursuant to which, among other things, the Senior Facilities Lenders made Advances (as defined in the Senior Facilities Agreement) (collectively, the "Senior Loan") and other financial accommodations to or for the benefit of Omega and the other Debtors. The Senior Facilities Documents (defined below) originally provided that the Senior Loan matured on April 12, 2011, but the parties entered into several written extensions of the maturity date, ultimately to June 9, 2011. As of the Petition Date, the principal Senior Loan amount of approximately $242.72 million remained outstanding, plus prepetition interest, fees, expenses and other amounts. At the default rate, postpetition interest would accrue at approximately $700,000 per month, as would an additional amount for the Senior Facilities Lenders' legal fees and expenses.

17. Senior Facilities Guarantees and Security. Each of the guarantor Debtors (each a "Guarantor") owns and operates one Ship, has guaranteed the Senior Loan and all of Omega's other liabilities and obligations and has incurred its own obligations under the Senior Facilities Documents (collectively, the "Senior Facilities Obligations"). Each Guarantor has mortgaged its Ship and pledged and assigned its related earnings to the Senior Facilities Agent or the Senior Finance Parties. Each Guarantor has executed a "Senior Facilities Guarantee" (undertaking its Senior Facilities Obligations), as well as a "Mortgage" (of its Ship), a "General Assignment" (of the Earnings (defined below) from its Ship) and a "Guarantor Pledge Agreement" (pledging its Earnings Accounts (defined below)), in each case as security for its Senior Facilities Obligations. Additionally, Omega, as borrower, executed pledge agreements

7

(the "Omega Pledge Agreements") pursuant to which it pledged and assigned to the Senior Facilities Agent all Earnings and Earnings Accounts.[3]

18.    Cash Management.   The Senior Facilities Documents require that all moneys payable to the Debtors as proceeds of the Ships (the "Earnings") be deposited into certain bank accounts maintained at HSH Nordbank (the "Earnings Accounts").   The Earnings Accounts are also pledged and assigned to the Senior Facilities Lenders.

## ADDITIONAL FACTS

### A.    The Debtors Were and Are Unable To Refinance or Restructure on Market Terms

19.    The Debtors had ample notice and opportunity to, among other things, seek refinancing or restructure the Senior Loan on market terms long before filing these Cases. The Debtors were unable to propose a transaction on terms the market would accept.   The Debtors could not pay down the Senior Loan to achieve an appropriate loan-to-value ratio and the Debtors' cash flows would not have been able to service a refinanced loan on market terms (i.e., with a market interest rate, tenor and amortization).

### B.    The Senior Facilities Lenders' Claims Exceed the Value of the Ships

20.    Each of the eight Ship-owning Debtors owns and operates but a single asset, its respective Ship.

21.    As set forth in the declaration of Paul Willcox, Chairman of The Eggar Forrester Group Ltd, which is the parent of C.W. Kellock,[4] executed on August 25, 2011, the

---

[3] The Omega Pledge Agreements, Mortgages, the General Assignments and the Guarantor Pledge Agreements are referred to collectively as the "Senior Facilities Security Documents;" and together with the Senior Facilities Agreement and all other documents, agreements, and instruments executed in connection therewith, the "Senior Facilities Documents."

[4] Since at least the 1850s, C.W. Kellock has been the appointed ship broker and ship valuer of the Admiralty Marshal of the Courts of Justice in England and Wales. See Declaration of Paul Willcox, executed on August 25, 2011 ("Willcox Decl."), ¶ 6.

Ships have a current value, in aggregate, of $239 million.  Mr. Willcox has been valuing ships for 36 years, including having served as a court-appointed ship valuer of the Admiralty Marshal of the Courts of Justice in England and Wales for the past 24 years and the only valuer used by the Admiralty Marshal for the past 11 years.  The value of each Ship is as follows:

| Name: | Value: |
|---|---|
| Omega Lady Miriam | $28 million |
| Omega Lady Sarah | $29.5 million |
| Omega Prince | $26.25 million |
| Omega Princess | $26.25 million |
| Omega Queen | $29.5 million |
| Omega King | $29.5 million |
| Omega Emmanuel | $35 million |
| Omega Theodore | $35 million |
| **Total** | **$239 million** |

Moreover, the Ships are clearly depreciating assets.  At any one point in time the values of two ships of the same specification but differing in age can be expected to vary by between 5% and 7% per year of age.  The Debtors themselves state that the Ships' depreciation in 2009 was, aggregately, $19.17 million, or almost $1.6 million per month.  See Omega, Form 20-F for Year End Dec. 31, 2009.  Although this is accounting and not actual depreciation, it clearly reflects that the value of the Ships is diminishing as time passes.

C.   **The Debtors' Cash Flow Is Insufficient
To Support These Cases or Their Business**

22.   The Debtors' current budget extends only through October 16, 2011, and
projects a positive cash position ranging from a high of $3.2 million to a low of $200,000.  It
does not include significant one-time expenses to be incurred outside the budget period, like dry-
dock expenses or potential unanticipated expenses.  Nor does it include any payments to the
Senior Facilities Lenders, whether they be toward principal, interest and fees, to compensate for
diminution in collateral value or for other amounts including fees paid to their financial and legal
advisors in accordance with the terms of the Senior Facilities Agreement and incurred in
connection with these Cases.  It also does not take into account the current economic volatility
and continuing decline in shipping rates.

D.   **Certain Prepetition Transfers Were
Improper or Warrant Investigation**

23.   <u>Prepetition Cash Diversions</u>.   In letters to Omega dated January 26,
January 28, and February 1, 2011, the Senior Facilities Agent raised concerns that, in violation of
the Senior Facilities Documents, Omega was failing to direct all Earnings into the Earnings
Accounts.  In a letter to the Senior Facilities Agent, dated February 3, 2011, Omega identified
$9,284,065.88 of payments deposited into bank accounts other than the Earnings Accounts,
$4,134,659.88 of which was improperly purportedly used for "New Buildings."[5]  The Senior
Facilities Agent, by a letter dated February 18, 2011, notified Omega that the $4.1 million of
diversions were a breach of the Senior Facilities Agreement and were required to be paid to the
Senior Facilities Agent within 14 days from the date of the letter.  In that letter, the Senior
Facilities Agent stated that "[b]ased on your concessions during our recent telephone

---

[5] The approximately $5 million remaining, although not properly deposited into the Earnings Accounts as required, appears to have been used for purposes permitted under the Senior Facilities Documents.  The Senior Facilities Lenders reserve all rights with respect to the Debtors' breach of their obligations concerning these funds as well.

conversation, and the contents of your letter, we understand that you admit to conducting the Earnings Accounts in a manner which amounts to an Event of Default." Omega responded to the Senior Facilities Agent in a letter dated March 9, 2011, stating that the "erroneous payment" of Earnings to accounts other than the Earnings Accounts was due to an "administrative error," and promised to deposit Earnings properly in the future. The Senior Facilities Agent, in a letter to Omega dated March 17, 2011, stated that Omega's explanation for diversion of funds was not accepted as sufficient and demanded that $4,134,659.88 of the diverted funds be deposited into the Earnings Accounts.   To this day, those funds have not been returned to the Earnings Accounts.

24.     Prepetition Transfer to Kassiotis.   The Debtors have claimed that they have an interest in non-Debtor Omnicrom Holdings Ltd. ("Omnicrom").  See Hr'g Tr., July 11, 2011, 74:4-74:15; Response of the Debtors to Statement of HSH Nordbank AG in Respect of Cash Collateral Order (the "Debtors' Cash Collateral Response") [Dkt. No. 97], ¶ 9.   However, the Debtors have also asserted that their interest in Omnicrom is "already pledged to secure the [$5,250,000 secured demand convertible] promissory note of ONE Investments, Inc.," of which Mr. Kassiotis is president.  Debtors' Cash Collateral Response at ¶ 9; see also Declaration of Gregory McGrath in Support of Debtors' Voluntary Petitions Under Chapter 11 of Title 11 of the United States Code and First Day Motions [Dkt. No. 16], ¶ 24.  This apparent insider transaction should be examined.

25.     Corporate Reorganization Shortly Before the Debtors' Default on the Senior Loan.   In connection with the Debtors' obtaining an equity investment from Delos Megacore Ltd. ("Delos") relating to Omega's participation in a joint venture, Megacore Shipping Ltd. ("Megacore"), in or around January 2011, just months before the maturity of the Senior

11

Loan, the Debtors entered into a corporate reorganization that may have been intended to insulate Omega's assets from legitimate creditors. Specifically, Omega apparently created two companies: (i) Omega Investments Ltd. ("OmIn"), a direct subsidiary of Omega (and a non-Debtor), and (ii) OD Investment Ltd. ("OD"), a joint venture between OmIn and Delos created for the purposes of replacing Omega as shareholder and joint venture party of Megacore. OmIn holds an 80% interest in OD. The result of the transfer is that Omega no longer owns directly 50% of the assets of Megacore[6] — it now owns indirectly through a non-debtor subsidiary 80% of 50% of such assets. So, Omega's interest was diluted and any proceeds of the sale of such assets, as was proposed in these Cases (discussed below), no longer benefits Omega directly as it would have prior to the corporate reorganization.

### E.     The Debtors' Improper Proposal To Have a Subsidiary Provide Standby Debtor-in-Possession Financing

26.     On August 12, 2011, the Debtors filed an Emergency Motion for Order Authorizing Omega Navigation Enterprises, Inc. to Vote Equity Interests in the Non-Debtor Omega Investments Ltd. [Dkt. No. 125] (the "Sale Motion") and an Emergency Motion Pursuant to 11 U.S.C. §§ 105, 362, 363, and 364 and Bankruptcy Rules 2002, 4001, and 9014 (I) Authorizing the Debtors to Obtain Postpetition Secured Financing, and (II) Granting Security Interests and Superpriority Claims [Dkt. No. 126] (the "DIP Motion"). Pursuant to the Sale Motion and the DIP Motion, the Debtors are seeking this Court's approval to have Omega's wholly-owned non-debtor subsidiary OmIn use some of the approximately $31.7 million it is seeking to obtain from selling its 80% interest in OD presumably to provide a $10 million standby debtor-in-possession financing on a secured basis (junior to the liens of the Debtors'

---

[6] The Megacore joint venture dissolved, with the assets of the venture being divided between the joint venture parties.

prepetition lenders) but senior to all unsecured claims.[7]  Given the ownership relationship between Omega and OmIn, however, this money could simply be dividended to Omega and used by the Debtors' estates.   Omega's proposal disadvantages unsecured creditors (including any deficiency claim that the Senior Facilities Lenders may have) who could find their claims subordinated to intercompany claims for funds advanced to Omega under the proposed debtor-in-possession financing, including interest thereon, when the funds could simply have been dividended to Omega.

## ARGUMENT

### THE COURT SHOULD DISMISS OR CONVERT THE DEBTORS' CASES TO CHAPTER 7 FOR "CAUSE"

27.     Section 1112(b) of the Bankruptcy Code provides that:

> on request of a party in interest, and after notice and a hearing, absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate, the court shall convert a case under [Chapter 11] to a case under chapter 7 or dismiss a case under [Chapter 11], whichever is in the best interests of creditors and the estate, if the movants establishes cause.

11 U.S.C. § 1112(b). Section 1112(b) lists a number of matters constituting cause for dismissal or conversion, but such list is not exhaustive. In re Yukos Oil Co., 321 B.R. 396, 410 (Bankr. S.D. Tex. 2005). Instead, courts may also grant dismissal or conversion after considering the totality of the circumstances. Id.; see also In re LJH Enters., No. 10-34355-H3-11, 2011 WL 597034, at *3 (Bankr. S.D. Tex. Feb. 11, 2011) ("Courts consider the totality of the circumstances in determining whether there is cause for dismissal.") (citation omitted).

---

[7] In the original proposed order approving the Sale Motion, the Debtors were also looking to obtain estate releases of claims, even though such relief was not requested in the Sale Motion.

A.  **Cause Exists to Dismiss or Convert the Cases Because
the Debtors Have Not Filed Their Cases in Good Faith**

28.  As the Fifth Circuit has recognized,

> Lack of good faith in the filing of a Chapter 11 bankruptcy petition
> constitutes cause for dismissal under 11 U.S.C. § 1112(b).  The
> good faith standard protects the integrity of the bankruptcy courts
> and prohibits a debtor's misuse of the process where the overriding
> motive is to delay creditors without any possible benefit, or to
> achieve a reprehensible purpose through manipulation of the
> bankruptcy laws.

Elmwood Dev. Co. v. Gen. Elec. Pension Trust (In re Elmwood Dev. Co.), 964 F.2d 508, 510

(5th Cir. 1992) (footnotes omitted); see also In re Briggs-Cockerham, L.L.C., No. 10-34222-

BJH-11, 2010 WL 4866874, at *3 (Bankr. N.D. Tex. Nov. 23, 2010) ("It is well-established in

this and other circuits that a debtor's bad faith in filing a chapter 11 petition constitutes 'cause'

for dismissal under § 1112.") (citation omitted); In re AdBrite Corp., 290 B.R. 209, 218 (Bankr.

S.D.N.Y. 2003) ("The most common equitable ground for conversion or dismissal is a lack of

good faith on the part of the debtor.").  As such, "[c]ourts are required to consider the debtor's

good faith."  In re Yukos Oil Co., 321 B.R. 396, 410 (Bankr. S.D. Tex. 2005) (citing Elmwood

Dev. Co., 964 F.2d 508).

29.  Courts consider a wide range of factors in determining whether there has

been a lack of good faith, including whether:  "[t]he prepetition conduct of the debtor has been

improper; [t]he foreclosed property is the sole or major asset of the debtor; . . . [t]here is no

possibility of reorganization; [t]he debtor's income is not sufficient to operate; and [t]he debtor

filed solely to create the automatic stay."  In re AdBrite Corp., 290 B.R. at 218 (citation omitted).

In considering a debtor's good faith or lack thereof, courts evaluate "the debtor's financial

condition, motives, and the local financial realities."  In re Yukos, 321 B.R. at 410 (citing

14

Elmwood Dev. Co., 964 F.2d 508).  As set forth herein, the Debtors did not file these Cases in good faith.

    30. <u>First</u>, as Debtors' counsel has already indicated, the Debtors' reorganization strategy is nothing more than a play for time: "the oil industry understands, the maritime industry understands the cyclicality of the business, and the fact that you're at a low does not mean, therefore, you're at a low forever."  Hr'g Tr., July 11, 2011, 17:9-13.  The Debtors have not proposed typical restructuring steps that they could take under Chapter 11 to unlock value, such as rejecting executory contracts or settling unsecured claims.  Chapter 11 may not legitimately be used by companies to wait out the "cyclicality" of the market at the expense of and sole risk to their secured creditors.  <u>See</u> <u>Humble Place Joint Venture</u> v. <u>Fory (In re Humble Place Joint Venture)</u>, 936 F.2d 814 (5th Cir. 1991) (affirming dismissal of Chapter 11 case, holding that that there was an absence of good faith when the debtor's business was "mowing the grass and waiting for market conditions to turn"); <u>In re LJH Enters.</u>, No. 10-34355-H3-11, 2011 WL 597034, at *3 (Bankr. S.D. Tex. Feb. 11, 2011) (dismissing a Chapter 11 case where the debtor's "reorganization depends entirely on a change in market conditions").  Moreover, the speculative and uncertain nature of any market rebound is demonstrated by the Debtors' own financial advisor, which recently acknowledged the deteriorating state of the market:  "With weaker than expected economic conditions, we believe the required crude oil inventory destocking required to stimulate crude oil tanker demand is unlikely to materialize before YE <u>reducing the probability of a significant recovery in charter rates before YE</u>."[8] Maritime Group, Jefferies Shipping Weekly, dated August 8, 2011, a copy of which is annexed hereto as Exhibit A (emphasis added).  Secured lenders simply are not required to bear the risk of

---

[8] Although the Ships here are product tankers, not crude tankers, there is a strong correlation between the charter rate markets for both kinds of tankers.

a market rebound that may never materialize. See In re Moore Constr., Inc., 206 B.R. 436, 438 (Bankr. N.D. Tex. 1997) (converting case to Chapter 7 where there was "no reason to allow [the Debtor's] debt to increase and further harm the creditors while the Debtor continues its exercise in tire kicking").

31.     Second, as discussed infra pages 22-24, each of the eight Ship-owning Debtors is effectively a single-asset debtor, and the Debtors' income is not sufficient to operate and to service, let alone repay, the Senior Facilities Obligations.   There is real risk of administrative insolvency here. See In re Briggs-Cockerham, 2010 WL 4866874, at *5 (noting that "[w]ith respect to 'bad faith' as 'cause' to dismiss a chapter 11 case, courts typically consider several factors [including] whether the debtor has only a single asset . . . [and] whether the debtor has any . . . cash flow and source of income to fund a plan") (citation omitted).

32.     Third, the Debtors' filing for Chapter 11 relief despite their lack of meaningful contacts to the United States further supports dismissal or conversion.[9]  The Debtors have no meaningful United States contacts relative to the overwhelmingly international nature of the Debtors' assets and operations.  Here, the Ships are registered in either the Marshall Islands or Liberia.  The Debtors are registered in the Marshall Islands, and their principal place of business is Greece.  The Debtors' employees and their officers (other than their CFO) are all located outside of the United States.  Their principal loan documents were all negotiated outside

---

[9] For example, in In re Yukos Oil Company, the Court found that the fact that "[t]he funds which created jurisdiction in this court were transferred to banks in the United States less than one week prior to the filing of the petition, and were transferred for the primary purpose of attempting to create jurisdiction in the United States Bankruptcy Court" contributed to a finding of cause for dismissing the case, particularly in light of the fact that the vast majority of the company's business and financial activities took place in Russia, and because of the interests of the Russian government. 312 B.R. 396, 411 (Bankr. S.D. Tex. 2005). The Court also expressed concern that a goal of the debtor was to usurp foreign law and to use "judicial structures within the United States in an attempt to alter the creditor priorities that would be applicable in the law of other jurisdictions" because the debtor was trying to subordinate its largest claim. Id. Here, the Debtors are trying to eliminate their largest claim, arising under an English law contract, by using pending claims under Greek law. The primacy of foreign law to those disputes demonstrates cause for dismissal or conversion.

16

the United States, are governed by English law and provide that the courts of England are the exclusive forum to adjudicate disputes. In attempting to explain to the Court why the Debtors filed for Chapter 11 relief in the United States, Debtors' counsel could only point to a NASDAQ listing for Omega, an office in New Jersey, the residence of one of the Debtors' officers in New Jersey, a de minimis bank account in New Jersey and the incorporation of Omega (USA) (a holding company with minimal assets) in Delaware. See Hr'g Tr., July 11, 2011, 14:7-15:3. When the Court pressed, asking why the Debtors had filed in the Southern District of Texas, counsel stated only that Debtor Baytown Navigation has several receivables owed by Houston companies, certain of the Debtors' Ships pull into the Houston port and Debtors' counsel holds a $19,000 retainer from the Debtors in a Houston bank account. Id. at 20:20-21:15.[10] It is improper for these non U.S.-Debtors to have embroiled this U.S. Court in their non-U.S. disputes and their non-U.S. assets and operations.

      33.    Fourth, these cases appear to be filed improperly to gain time so that the Debtors can pursue their slow-tracked claims in the Greece Litigation (the first hearing is presently schedules for 2013) while staving off litigations commenced in England by the Senior Facilities Lenders against the Debtors. The United States Bankruptcy Court for the Southern District of Texas "has generally found cause to dismiss cases [under § 1112(b)] in which it appeared that the debtor was attempting to use the provisions of the Bankruptcy Code to gain an unfair advantage in a two party dispute." In re LJH Enters., 2011 WL 597034, at *3 (citation omitted); see In re Starmark Clinics, LP, 388 B.R. 729, 736 (Bankr. S.D. Tex. 2008) ("It remains the case [after the 2005 amendments to the Bankruptcy Code] that a debtor's attempt to use the provisions of the Bankruptcy Code to gain an unfair advantage in a two party dispute strongly

---

[10] The Senior Facilities Agent does not concede that jurisdiction and venue is proper here and has repeatedly reserved its rights with respect to such issues and requested information.

supports a finding of cause for dismissal."); In re Sherwood Enters., Inc., 112 B.R. 165, 170-72
(Bankr. S.D. Tex. 1989) (dismissing Chapter 11 cases where the court found that the bankruptcy
process had been used as a litigation tactic in what was essentially a two-party dispute, stating
that "[u]se of the bankruptcy process as a litigation tactic is abuse of the reorganization process
constituting a lack of good faith in filing which warrants dismissal"). Here, the Debtors
improperly filed the Cases only to take advantage of the automatic stay so that they could avoid
foreclosure of the Ships by the Senior Facilities Agent and buy time for the frivolous Greece
Litigation. See Canpartners Realty Holding Co. IV, L.L.C. v. Vallambrosa Holdings, L.L.C. (In
re Vallambrosa Holdings, L.L.C.), 419 B.R. 81, 86 (Bankr. S.D. Ga. 2009) (determining that the
debtor filed its petition with a lack of good faith where the court found, among other things, that
"since the ongoing litigation between Debtor and Canpartners relates to this single asset and
since Debtor faces no imminent threat from any of its other creditors, there is compelling
evidence that this Chapter 11 filing is a mere two-party dispute relating to real property with
Canpartners, as the secured lender, trying to foreclose, and Debtor seeking to avoid
foreclosure").

34.    Fifth, the Debtors' prepetition conduct also warrants a finding of lack of
good faith. See In re Briggs-Cockerham, 2010 WL 4866874, at *4 n.7 (dismissing a Chapter 11
case, noting that "[t]he Debtor's Pre-petition conduct can be considered . . . in the context of
whether there is 'cause' to dismiss the case on the uncodified ground of bad faith"); In re
AdBrite Corp., 290 B.R. at 218 (noting that one oft-cited indicia of bad faith is whether "[t]he
prepetition conduct of the debtor has been improper"). As discussed supra pages 6-8, the Senior
Facilities Security Documents provide detailed and carefully constructed protections of the
Earnings generated by the Ships, which are pledged and assigned to the Senior Finance Parties.

18

Nonetheless, the Debtors, by their own admission, diverted millions of dollars of Earnings in breach of such contractual protections. Additionally, the Debtors engaged in questionable insider transfers and undertook a corporate reorganization mere months before the Senior Loan matured and they filed these Cases, requiring further inquiry by a disinterested fiduciary.

35. Sixth, the Debtors' postpetition conduct also demonstrates the Debtors' lack of good faith. See, e.g., Official Comm. of Unsecured Creditors v. Nucor Corp. (In re SGL Carbon Corp.), 200 F.3d 154, 159 n.8 (3d Cir. 1999) (noting that bad faith can involve either pre or postpetition misconduct). Specifically, the Debtors recently filed the Sale Motion in connection with which Omega's wholly-owned non-debtor subsidiary, OmIn, is seeking to monetize its interest in OD for approximately $31.7 million. Omega may be in a position to require OmIn to contribute up to it, as a dividend, the proceeds of such sale. Such a contribution would benefit all of Omega's stakeholders consistent with Omega's fiduciary duties as a debtor-in-possession. Omega, however, in apparent violation of its fiduciary duties, seeks in its DIP Motion to have OmIn provide on a secured basis (junior to the liens of the Debtors' prepetition lenders but senior to all unsecured claims) standby debtor-in-possession financing to the Debtors. In substance, Omega is rejecting an unfettered capital contribution from its subsidiary (which it could require) so that Omega needlessly can incur secured administrative obligations (including for interest) to its subsidiary. Furthermore, under the terms of the proposed financing, proceeds of the credit could be used only when cash collateral is unavailable. Meanwhile, the Debtors are using the Senior Facilities Lenders' cash collateral to fund the entirety of these Cases, including non-operational administrative expenses, while at the same time not paying as adequate protection any interest, amortization or other periodic cash payments, to the Senior Facilities Lenders and not reimbursing them for any fees incurred in connection with the Cases. The

19

Debtors' effort to pursue rehabilitation on the backs of the Senior Facilities Lenders and their apparent disregard for their fiduciary duties demonstrates a lack of good faith.[11]   See In re Canion, 129 B.R. 465, 470 (Bankr. S.D. Tex. 1989) (converting Chapter 11 case to Chapter 7 where, among other things, the debtor "failed in his attempt to balance his personal interests with his fiduciary obligation to the creditors and the estate"); In re Landmark Atl. Hess Farm, LLC, 448 B.R. 707, 716 (Bankr. D. Md. 2011) (holding that debtor's breach of fiduciary duty to its creditors constituted cause to dismiss its Chapter 11 case); see also In re Citi-Toledo Partners, 170 B.R. 602, 609 (Bankr. N.D. Ohio 1994) (finding that breaches of fiduciary duties were relevant to the determination of whether conversion or dismissal was warranted); In re Sal Caruso Cheese, Inc., 107 B.R. 808, 820 (Bankr. N.D.N.Y. 1989) (converting to Chapter 7 in light of pre and postpetition unauthorized or potentially avoidable transfers).

36.      Seventh, as discussed infra pages 25-30, there is no possibility of rehabilitation.   See In re Action Roofing & Supply Co., 137 B.R. 217, 219 (Bankr. S.D. Tex. 1991) ("In determining whether a Chapter 11 petition has been filed in good faith, the court should consider[, among other things] . . . whether there is a reasonable probability of a plan's being proposed and confirmed.") (citations omitted); In re AdBrite Corp., 290 B.R. at 218 (noting that one indicia of bad faith is whether "[t]here is no possibility of reorganization").

37.      In light of the foregoing, relief should be granted now and the Cases should be dismissed or converted to Chapter 7.   See, e.g., Stage I Land Co. v. U.S. Dep't of Hous. & Urban Dev., 71 B.R. 225, 231 (D. Minn. 1986) (affirming bankruptcy court's dismissal of Chapter 11 cases approximately three months after petitions were filed as petitions were not filed in good faith); In re Citi-Toledo Partners, 170 B.R. at 606 (granting motion to convert,

---

[11] It appears the Debtors are seeking to avoid risk to their own capital by keeping the sale proceeds outside of this Court's jurisdiction until the last possible moment.

rejecting the debtor's argument that a court may not convert or dismiss during a debtor's exclusivity period).

**B.     The Estates Are Suffering Substantial and Continuing Loss and Diminution and the Debtors Have No Reasonable Likelihood of Rehabilitation**

38.     Cause to dismiss or convert a Chapter 11 case also exists if there is both (i) "substantial or continuing loss or diminution of the estate" and (ii) "the absence of a reasonable likelihood of rehabilitation."  11 U.S.C. § 1112(b)(4)(A).  As set forth below, the elements are met for each Debtor.

**1.     There Is a Substantial and Continuing Loss to and Diminution of the Debtors' Estates**

39.     Courts have held that "[i]n determining whether there is a continuing loss to or diminution of the estate, courts must look beyond a debtor's financial statements and make a full evaluation of the present condition of the estate." In re Moore Constr., Inc., 206 B.R. 436, 437-38 (Bankr. N.D. Tex. 1997); In re Briggs-Cockerham, 2010 WL 4866874, at *5 (same) (citation omitted).  Here, by any measure, there is both loss to and diminution of the Debtors' estates, which is both substantial and continuing. See In re AdBrite Corp., 290 B.R. at 215 (stating that even a "positive cash flow will not guard against conversion when it masks a static enterprise whose financial statements do not account for costs necessary to doing business") (citation omitted).

**a.     The Estates Are Diminishing and Suffering Loss**

40.     Numerous courts confirm that depreciation of asset value is an indication of diminution of or loss to the estate that may warrant dismissal or conversion. See Fort Knox Mini Warehouse Inc., No. 01-03493, 2002 WL 1842452, at *3 (Bankr. N.D. Iowa July 31, 2002) (finding that, among other things, depreciation of estate assets warranted dismissal of Chapter 11 case); In re Becker, 38 B.R. 913, 915 (Bankr. D. Minn. 1984) (dismissing Chapter 11 case

21

where, among other things, equipment and machinery serving as collateral continued to depreciate through continued use); In re Tolco Props., Inc., 6 B.R. 482, 488 (Bankr. E.D. Va. 1980) (converting case to Chapter 7, finding that the depreciation in value of property of the estate constituted "continuing loss to or diminution of the estate").

41. Moreover, even if there were a limited equity cushion in the Ships (which there is not), the deterioration of that equity cushion by depreciation or by the accrual of postpetition interest and fees and the resulting harm to junior and unsecured creditors constitutes diminution of or loss to the estate for dismissal or conversion purposes. See In re Briggs-Cockerham, 2010 WL 4866874, at \*5 (dismissing a Chapter 11 case, finding continuing diminution of the estate where, among other things, the value of a mineral lease to the estate, if any, was decreasing due to the accrual of ongoing administrative expenses); In re Vallambrosa Holdings, 419 B.R. at 88-89 (dismissing a Chapter 11 case, finding continuing loss to or diminution of the estate where, due to accumulating interest accruals on a loan as well as administrative expenses, the equity cushion was shrinking, reducing potential distributions to unsecured creditors); see also Humble Place Joint Venture v. Fory (In re Humble Place Joint Venture), 936 F.2d 814, 818 (5th Cir. 1991) ("[T]he preservation of the investors' equity must be evaluated in the harsh light of the ongoing costs of bankruptcy administration and taxes, which deplete such equity at a steady pace.").

42. The Debtors' estates are also clearly suffering substantial and irremediable diminution and loss. The amount of the Senior Facilities Lenders' claims ($242.72 million, exclusive of prepetition interest, fees, expenses and other amounts) already exceeds the total value of the Ships ($239 million), which are the sole assets of eight of the Debtors and the primary assets of Omega. The Debtors' operations produce minimal net revenue. The Ships are

22

marine vessels, which are depreciating assets by their nature and which have a limited useful life. The Debtors' own public filings (albeit on an accounting basis) list depreciation in the range of approximately $1.6 million per month and, for sale purposes, at any one point in time the values of two ships of the same specification but differing in age can be expected to vary by between 5% and 7% per year of age (Willcox Decl. ¶ 22).[12]

43.     Thus, even while substantial cash collateral is being used to maintain, operate and preserve the Ships, the Ships themselves (and therefore the estates and the corresponding interests therein of the Senior Facilities Lenders) are diminishing in value. Further, so long as these Cases are outstanding, the Senior Facilities Lenders are placed at risk that market conditions could further deteriorate and quickly erode their collateral. Finally, even if the Senior Facilities Lenders were presently oversecured, which they are not, any limited equity cushion would be tenuous because postpetition interest, fees and expenses would then accrue along with continued asset depreciation. These facts demonstrate the very essence of "substantial" and "continuing" diminution.

### b.     The Estates Are Suffering Net Cash Losses and Are Likely Administratively Insolvent

44.     Actual cash losses also constitute diminution of or loss to the estate, even when resulting from accumulation of administrative expenses, including attorneys' fees. See, e.g., In re Moore Constr., Inc., 206 B.R. 436, 438 (Bankr. N.D. Tex. 1997) (converting case to Chapter 7, where, among other things, the Debtor would not have been able to pay administrative expenses in full on confirmation); In re AdBrite Corp., 290 B.R. at 215 ("Courts have held that a negative cash flow postpetition and an inability to pay current expenses satisfy the elements of §1112(b)(1).") (citations omitted); Loop Corp. v. U.S. Trustee, 379 F.3d 511, 516 (8th Cir. 2004)

---

[12] While the Debtors' depreciation calculation may not reflect the amount of actual economic diminution, it cannot be disputed that the Debtors' figures reflect a significant level of economic diminution.

("[A]ny negative cash flow-including that resulting only from administrative expenses-effectively comes straight from the pockets of creditors. This is enough to satisfy the first element of § 1112(b)(1)."); In re Vallambrosa Holdings, 419 B.R. at 89 ("'[A]ny negative cash flow-including that resulting only from administrative expenses-effectively comes straight from the pockets of the creditors.' That alone is enough to satisfy the first element of § 1112(b)(4)(A).") (citation omitted).

45.      Here, the Debtors' own budget and cash flow projections extend only through October 16, 2011, but they reveal at best a tenuous positive cash position ranging from a high of $3.2 million to a low of $200,000, before any payment to the Senior Facilities Lenders, whether in the form of current interest, fees and expenses or as adequate protection for the depreciating value of the Ships. The budget projects negative cash flow of $1.0 million over the 13-week period of the Debtors' cash projections, and there is nothing to indicate that this negative cash flow trend will not continue. Once periodic cash payments as adequate protection to the Senior Facilities Lenders are factored in, in an amount equal to the diminution or current interest, fees and expenses, the Debtors are suffering increased net losses. Moreover, the Debtors' cash flow projections overstate their projected financial health because they do not include expenses to be incurred outside of the projection horizon, like dry-docking expenses, or otherwise account for potential unanticipated expenses or reflect the uncertainty over shipping rates and the economic climate.

46.      The Senior Facilities Agent requested adequate protection at the outset of these Cases, and the Senior Facilities Lenders were granted, among other things, superpriority administrative claims for diminution in value in both orders approving the use of cash collateral. This is an actual administrative liability not included in the Debtors' cash flow projections but

24

which will ultimately have to be paid. It is only because the Senior Facilities Agent postponed certain of its adequate protection disputes, including the right to periodic cash payments, until they could be considered in the overall context of these Cases, that the Debtors manage to maintain a positive cash position at all through the budget period. Now is the time to address this fundamental flaw in these Cases. The Debtors have insufficient operating revenue to satisfy their operational and administrative obligations and pay the Senior Facilities Lenders. On this basis alone, the first element of § 1112(b)(4)(A) is met. See In re Vallambrosa Holdings, 419 B.R. at 89-91 (holding that negative cash flow is enough to satisfy the first element of § 1112(b)(4)(A)).[13]

### 2. These Cases Have No Reasonable Likelihood of Rehabilitation

47.     "Rehabilitation" in the context of Section 1112(b)(4)(A) does not mean the same thing as "reorganization," as that term is used in Chapter 11. "Courts have consistently understood 'rehabilitation' to refer to the debtor's ability to restore the viability of its business." Loop Corp. v. U.S. Trustee, 379 F.3d 511, 516 (8th Cir. 2004) (citations omitted). "When visionary schemes for rehabilitation entail significant risk to creditors without any reasonable probability that the debtor can successfully rehabilitate, conversion or dismissal is generally in order." In re Great Am. Pyramid Joint Venture, 144 B.R. 780, 791 (Bankr. W.D. Tenn. 1992) (citing Tenn. Publ'g Co. v. Am. Nat'l Bank, 299 U.S. 18 (1936)); see also In re Vallambrosa Holdings, 419 B.R. at 90 ("Projections of the income necessary to finance a plan of reorganization must be based on concrete evidence of financial progress and must not be speculative, conjectural or unrealistic.") (citation omitted).

---

[13] And, on this basis alone, relief from the stay may be granted under Bankruptcy Code Section 362(d)(1).

25

HOU:3146357.3

Case 11-35926   Document 190   Filed in TXSB on 08/25/11   Page 31 of 38

### a.     Waiting for a Market Rebound Is Insufficient To Constitute a Reasonable Likelihood of Rehabilitation

48.     The Debtors have not proposed any plans to reorganize and restructure their business.  The Ship-owning Debtors are single-asset entities (as is effectively their parent) with secured claims exceeding their asset values.  Even if the Debtors could confirm a plan (which they cannot as set forth below), each of the eight Ship-owning Debtors would have exactly the same business and same capital structure after any proposed emergence that they have now.  The Debtors are in effect gambling on a market turn-around, i.e., the "cyclicality" of the business, with the Senior Facilities Lenders' money in contravention to the Bankruptcy Code.  See, e.g., Loop Corp. v. U.S. Trustee, 379 F.3d 511, 515 (8th Cir. 2004) ("The purpose of § 1112(b)(1) is to 'preserve estate assets by preventing the debtor in possession from gambling on the enterprise at the creditors' expense when there is no hope of rehabilitation.'") (citation omitted); In re Moore Constr., Inc., 206 B.R. 436, 437 (Bankr. N.D. Tex. 1997) ("[T]he lack of bad faith does not permit a debtor in possession [to] gambl[e] on the enterprise at the creditors' expense when there is no hope of rehabilitation.").  That is exactly what it means to be "mowing the grass."  In re LJH Enters., No. 10-34355-H3-11, 2011 WL 597034, at *3 (Bankr. S.D. Tex. Feb. 11, 2011); Humble Place Joint Venture v. Fory (In re Humble Place Joint Venture), 936 F.2d 814 (5th Cir. 1991).

### b.     The Debtors Cannot Cram Down the Senior Facilities Lenders

49.     "[C]onfirmation of a plan . . . is an essential element of 'rehabilitation.'" In re Vallambrosa Holdings, 419 B.R. at 92; see also In re Great Am. Pyramid Joint Venture, 144 B.R. 780, 793 (Bankr. W.D. Tenn. 1992) ("A reorganization plan under chapter 11 must be more than a nebulous speculative venture and must have a realistic chance of success which would lead to rehabilitation, and if outside financing is needed, it must be clearly in sight.") (emphasis

26

added) (citation omitted).  Confirmation of any reorganization plan absent the Senior Facilities Lenders' acceptance will, at a minimum, require satisfaction of the cram down requirements of Section 1129(b)(2) of the Bankruptcy Code.  Stated simply, under that standard, the Senior Facilities Lenders would retain their liens and the Debtors would need to pay the Senior Facilities Lenders the full value of their collateral over time at essentially market commercial terms for a non-distressed ship financing transaction. 11 U.S.C. § 1129(b)(2)(A); see In re Kellogg Square P'ship, 160 B.R 343, 367-69 (Bankr. D. Minn. 1993) (rejecting debtor's "cramdown proposal" in light of secured creditor's objection, finding that the secured creditor "is entitled to insist on the execution of new security instruments, with content equivalent to what the parties would reasonably negotiate on a loan origination at the present time," and "entitled to demand market-standard terms as to all of the other points for which the Debtor's proposed security deviates from current norms").

50.    Courts thus have found an absence of likelihood of rehabilitation where rehabilitation is predicated on a cram down and the debtor lacks sufficient resources to effect the cram down.

> [T]he Creditor . . . has expressed no desire to work with the Debtor.  As a result, the Debtor, to effectuate a plan of reorganization, would be required to cram down the Creditor's interest, thereby entailing that the Creditor receive payments totaling the full value of its secured claim. 11 U.S.C. § 1129(b)(2)(A).  Considering that over the course of its three bankruptcy cases, the Debtor has not made any significant remuneration to the Creditor, complying with the requirements of cram down would appear to be an impossibility.

In re Westgate Props., Ltd., 432 B.R. 720, 723 (Bankr. N.D. Ohio 2010); see also In re Quail Farm, LLC, No. 09-bk-298, 2010 WL 1849867, at *5 (Bankr. N.D. W. Va. May 5, 2010) (dismissing a Chapter 11 case prior to the filing of any plan of reorganization, finding that it was

27

highly unlikely that the debtor could successfully rehabilitate its business where the debtor provided no solid or convincing evidence concerning its financial wherewithal to support its proposed business plan, which included cram down of a secured claim); In re Vallambrosa Holdings, 419 B.R. at 89-91 (holding that there was no likelihood of rehabilitation where, among other things, the debtor made a cram down proposal to subordinate a secured lender's debt to a prospective loan but the debtor lacked sufficient equity to provide adequate protection for such subordination).

51.     Here, it will be impossible for the Debtors to propose a "cram-up" that is also feasible and otherwise confirmable. Among other things, a market cram-up treatment would require a massive repayment to bring the Debtors' ratios of loan-to-collateral value and other financial covenant ratios in line with what the market would require. It would also require a market interest rate, amortization schedule and tenor. Had the Debtors been able to achieve this, they surely would have restructured or refinanced the Senior Loan prepetition and avoided filing for Chapter 11. They could not and, for the same reasons, they will not be able to accomplish the same result through the reorganization process. See also In re WN Truck Stop, LLC, No. 10-33156-HDH-11, 2011 WL 65928, at *4 (Bankr. N.D. Tex. Jan. 10, 2011) (finding plan not to be feasible where it incorporated an artificially low cram down rate, noting that experts had conceded that the debtor could not obtain any third-party arms'-length financing in the market place). As the Court noted in In re Vallambrosa Holdings:

> [T]he case was not simply filed after default and acceleration of the note and on the eve of a non-judicial foreclosure. Rather, the case was filed after the contractual maturity date of the note, and Debtor, clearly on notice of that deadline, failed to or was unable to refinance the note or exercise his contractual rights to an extension. The maturity date of the loan expired after Debtor repeatedly failed to timely perform contractual duties and meet development deadlines agreed to at the inception of the loan, as

28

> discussed in my earlier Order. These facts tip the scale in
> evaluating the entire context of the filing of this case.

419 B.R. at 87. Here, too, the Debtors tried to refinance their obligations and obtain an out-of-court restructuring before and after the Senior Loan matured, but simply could not satisfy the market. There is no reason to believe that they could do so now.

### c. The Debtors' Pursuit of the "Greece Litigation" Is Not a Plan To Rehabilitate

52. The mere existence of the Greece Litigation cannot justify maintaining these Cases in Chapter 11. Ancillary litigation in a foreign jurisdiction which may not be resolved for years — the first scheduled hearing in the Greece Litigation is in late 2013 — cannot allow a debtor with no other reorganization prospects to wallow in Chapter 11 without paying its secured creditors.

53. Most courts have refused to consider the merits of a debtor's pending litigation claims in deciding whether to dismiss or convert a Chapter 11 case. In re FRGR Managing Member LLC, 419 B.R. 576, 582 (Bankr. S.D.N.Y. 2009) ("[M]ost cases reject the need to evaluate the merits of a debtor's litigation claims in deciding whether to dismiss or convert a chapter 11 case."); see also In re BHS&B Holdings, LLC, 439 B.R. 342, 350 (Bankr. S.D.N.Y. 2010) ("[T]he mere hope of prevailing on potential litigation claims is not a sufficient basis to defeat a showing of cause to convert."); In re FRGR, 419 B.R. at 576, 584 (converting to Chapter 7, finding that the debtor could not "confirm a plan of reorganization in a timely fashion based solely upon its litigation claims against Citigroup, whatever the ultimate merits of its claims").

54. The Greece Litigation is nothing more than an attempt by the Debtors to avoid or delay paying their lawful contractual obligations under the Senior Facilities Documents. Nevertheless, the Court need not consider the merits of the Greece Litigation, which does not

29

challenge the validity of the Senior Facilities Lenders' claims or liens but, rather, seeks (i) a judicial extension of the Senior Facilities Obligations to 2014 and (ii) monetary damages. Any non-contractual judicial extension of the Senior Loan, however, would not help the Debtors as they would still need to cram-up the Senior Facilities Lenders or reinstate the Senior Facilities Documents through a plan. And, as the Debtors acknowledge, what remains of the Greece Litigation beyond that is essentially a counterclaim against the Senior Facilities Lenders for damages. See Hr'g Tr., July 11, 2011, 30:12-30:15 (stating the damages they seek in the Greece Litigation of $570 million "clearly exceeds the amount of the banks' debt."). There is no reason why the Court needs to resolve that claim now, and it would be improper to hold up dismissal or conversion until at least 2013 while the Debtors pursue their claims. Those claims, if they have any validity, can be analyzed and pursued by a Chapter 7 trustee. Moreover, the Debtors' attempts to use foreign litigation as a means to prolong these Cases in the United States is particularly improper given that the Debtors' connections to the United States are negligible, relative to the entirely non-U.S. nature of their business, assets and operations. See supra page 16.

## d. Creditor Resistance Is Immutable

55.      Finally, given that the Debtors cannot cram down or reinstate the Senior Facilities Lenders, the Debtors' only remaining hope is to receive the Senior Facilities Lenders' acceptance of a plan of reorganization. The Debtors have refused to honor their contractual obligations, filed a frivolous lawsuit in Greece, and filed these Cases in the United States without meaningful U.S. contacts as a tactic to avoid repayment. Millions of dollars were diverted from the Senior Facilities Lenders prepetition. Creditor acquiescence will surely not be forthcoming, and courts have held that plans that were unlikely to receive the votes necessary for confirmation because of creditor resistance established cause under Section 1112(b). See In re Fall, 405 B.R.

863, 871 (Bankr. N.D. Ohio 2009) (dismissing a Chapter 11 case where proposed plan was "likely to be met" with resistance from certain secured creditors and stood "a reasonable chance of meeting resistance" from unsecured creditors); In re Woodbrook Assocs., 19 F.3d 312, 316-17 (7th Cir. 1994) (affirming dismissal of Chapter 11 case, in part, because a major creditor voiced its refusal to vote for any plan that did not pay it in full); In re Ledges Apartments, 58 B.R. 84, 87-88 (Bankr. D. Vt. 1986) (dismissing a Chapter 11 case where, among other things, the two largest secured creditors indicated that they would reject the debtor's proposed plan and, therefore, "rehabilitation is an impossible dream").

## CONCLUSION

WHEREFORE, the Senior Facilities Agent respectfully requests that the Court enter an Order pursuant to 11 U.S.C. § 1112(b), dismissing with prejudice to refile or converting Debtors' Chapter 11 Cases into a Chapter 7 liquidation.

Dated: August 25, 2011                 Respectfully submitted,

                                        By: /s/ Timothy A. Davidson II
                                           Robin Russell
                                           State Bar No. 17424001
                                           Timothy A. Davidson II
                                           State Bar No. 24012503
                                           Joseph P. Rovira
                                           State Bar No. 24066008
                                           ANDREWS KURTH LLP
                                           600 Travis, Suite 4200
                                           Houston, Texas 77002
                                           (713) 220-4200 (Telephone)
                                           (713) 220-4285 (Facsimile)

                                        -and-

                                           Thomas E. Lauria
                                           Texas State Bar. No. 11998025
                                           Scott Greissman (admitted *pro hac vice*)
                                           David Hille (admitted *pro hac vice*)
                                           Douglas P. Baumstein (admitted *pro hac vice*)

31

WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036
(212) 819-8200 (telephone)
(212) 354-8113 (facsimile)

Attorneys for HSH Nordbank AG, as Senior Facilities
Agent

32

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the forgoing Motion was served this 25th day of August, 2011 via ECF notice on those parties set up for ECF notice and via United States First Class Mail on the parties on the attached list.

*/s/  Timothy A. Davidson II*
Timothy A. Davidson II

33